**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.  1:24-cv-00233-NYW-MEH

**AVODAH FARMS**, a Colorado nonprofit corporation, and
**KEENAN FITZPATRICK**, an individual

        Plaintiffs,

v.

**DEBORAH O'HARA-RUSCKOWSKI**,
Individually, and in a representative capacity
for **ORDER OF MALTA, AMERICAN
ASSOCIATION, U.S.A.**, a Delaware
limited liability company, **ORDER OF
MALTA, WESTERN ASSOCIATION,
U.S.A.**, a California nonprofit corporation,
and **ORDER OF MALTA WORLDWIDE
RELIEF MALTESER INTERNATIONAL
AMERICAS, INC.**, a Delaware foreign
nonprofit corporation.

        Defendants.

_____

**DEFENDANT DEBORAH O'HARA-RUSCKOWSKI'S
MOTION TO DISMISS PLAINTIFFS' COMPLAINT**
_____

Respectfully submitted,

COZEN O'CONNOR
Sarah Krissoff
Arianna K. McLaughlin
Joseph E. Okon
Cozen O'Connor
3 WTC
175 Greenwich St. 55th Floor
New York, New York 10007
Phone: (212) 908-1388
skrissoff@cozen.com
amclaughlin@cozen.com

*Attorneys for Deborah O'Hara-Rusckowski*

## CONFERRAL WITH OPPOSING COUNSEL

Counsel for Ms. O'Hara-Rusckowski has conferred with counsel for Plaintiffs, Avodah Farms ("Avodah") and Keenan Fitzpatrick ("Fitzpatrick") (collectively, "Plaintiffs"), on multiple occasions regarding this Motion to Dismiss pursuant to this Court's policies and D.C. Colo. L. Civ. R. 7.1(a), including on or about April 9, May 24, May 27, and June 5, 2024.  On the May 24, 2024 call, Ms. O'Hara-Ruskowski's counsel informed Plaintiffs' counsel of a variety of deficiencies with the Complaint, including deficiencies that Plaintiffs may want to address through amendment.  As set forth below, certain deficiencies are not correctable by amendment.  Plaintiffs have repeatedly informed counsel that they intend to file a motion for leave to amend their Complaint, but have yet to do so.

## INTRODUCTION

Plaintiffs filed their Complaint on January 25th, 2024, against Ms. O'Hara-Rusckowski and Order of Malta, American Association, U.S.A., Order of Malta, Western Association, U.S.A., Order of Malta Worldwide Relief Malteser International Americas, Inc. (collectively with O'Hara-Rusckowski, "Defendants").  Ms. O'Hara-Rusckowski is a leader in the Catholic and anti-trafficking communities that supported Plaintiffs' purported mission of supporting survivors of sex trafficking.  Plaintiffs assert claims for defamation, negligence, tortious interference with contract and prospective business relations, and extreme and outrageous conduct.

Unfortunately, Plaintiffs have an established history of using litigation to silence those who have criticized their activities.  Ms. O'Hara-Ruskowski—who has not just spoken out against Plaintiffs for labor trafficking, but has cooperated with the federal government in its investigation into Plaintiffs' criminal activities—is just Plaintiffs' latest

victim.  The claims against her rest on nothing beyond bald legal conclusions, speculation, and Plaintiffs' distorted and self-serving perception of reality masquerading as "fact."  But even Plaintiffs' revisionist history fails to plausibly state a single claim for relief.

All of Plaintiffs' claims against Ms. O'Hara-Rusckowski stem from constitutionally protected speech concerning Plaintiffs' misappropriation of charitable funds and human trafficking.  Under applicable Colorado law, these statements address matters of public concern and limited purpose public figures, which entitles Ms. O'Hara-Rusckowski to heightened protection under well-established defamation principles.  Thus, to state a viable claim for relief, Plaintiffs were required to aver facts demonstrating that Ms. O'Hara-Rusckowski's alleged statements were made with actual malice, *i.e.*, they were materially false *and* were made with knowledge of their falsity or with reckless disregard of the falsity of the statements.  Plaintiffs' own Complaint, however, establishes the opposite.  According to Plaintiffs, they worked with groups of religious sisters (the "Sisters") to provide care and service for victims of sex trafficking, received charitable donations to achieve certain objectives, spent that money, did not achieve those objectives, and then shipped off religious sisters, who had been contracted to advance those objectives in Massachusetts (the "Passionist Sisters"), to work for third parties elsewhere.

Plaintiffs also fail to allege that Ms. O'Hara-Rusckowski had any reason to suspect that her alleged statements were false.  According to Plaintiffs, when Defendants confronted Plaintiffs with their concerns, Plaintiffs conceded culpability by transferring all remaining funds back to Defendants and handing over management of the Passionist Sisters to Defendants.  In a separate chain of events arising from Plaintiffs' misconduct, the Archdiocese of Denver ("Archdiocese") disavowed Avodah as a Catholic ministry, in

August 2022, based on an extensive investigation of Plaintiffs' conduct following complaints by others, including Sisters employed by Plaintiffs. The labor trafficking allegations were also substantial enough to provide law enforcement with probable cause not only to enter Plaintiffs' Denver, Colorado property but to physically remove Sisters from that location.

Plaintiffs also do not connect Ms. O'Hara-Rusckowski's alleged statements to any of their stated harm. Plaintiffs allege that Sisters terminated their employment agreements with Plaintiffs, that religious organizations shunned Plaintiffs from attending their conferences, and that Plaintiffs lost the potential to partner with other Catholic organizations and potential donations. But Plaintiffs do not connect those harms to Ms. O'Hara-Rusckowski at all—they do not even allege that Ms. O'Hara-Rusckowski spoke to those third parties, directed others to disseminate her concerns thereto, or that the parties that discontinued their relationships were even aware of her accusations.

To that end, even if Plaintiffs could state a claim—which they cannot—they would not be entitled to any presumption of causation or damages. As the Complaint and matters this Court may consider demonstrate: (1) individuals involved with Plaintiffs vocalized that Avodah was a cult and Mr. Fitzpatrick had a personality disorder; (2) Plaintiffs' reputation was marred by systematic complaints made by the Sisters they employed; (3) the Archdiocese and two other religious organizations disavowed Avodah as a Catholic ministry and/or disclaimed their involvement therewith; (4) Plaintiffs engaged in a pattern of stifling criticism with legal threats; and (5) Plaintiffs publicized their disagreement with the Archdiocese online and accused the Archdiocese—a respected institution—of lies and deceit; and (6) local law enforcement raided Plaintiffs'

property and removed Sisters therefrom.  So, while Ms. O'Hara-Rusckowski admits that Plaintiffs became social pariahs, she expressly denies that it was because of any of her statements, which were a mere drop in the ocean of suspicion and criticism of Avodah's operations and Mr. Fitzpatrick's management thereof.

This case is thus a textbook example of failure to state a claim.  The Complaint does not plausibly allege any wrongdoing on the part of Ms. O'Hara-Rusckowski, as the allegations themselves reflect that her statements were neither materially nor knowingly false.  This is fatal to every one of Plaintiffs' claims, as is the fact that Plaintiffs fail to advance a single fact that would demonstrate causation and harm—requisite elements of all Plaintiffs' causes of action.  Finally, Plaintiffs' tort claims, which fail with the defamation claims, are also independently infirm and fail to state a claim for relief.

## FACTUAL BACKGROUND[1]

### I.    The Parties

All parties are entities or figures connected to the United States Catholic community.  *See* ECF 13 ("Compl."), at ¶¶ 4, 9, 15-16, 18-19.  Avodah allegedly provides care to sex-trafficking survivors through the Sisters.  *Id.* at ¶ 15.  Mr. Fitzpatrick is its Executive Director.  *Id.* at ¶ 4.  Ms. O'Hara-Rusckowski possessed an "influential position within the Catholic community," and served as a member of the Malta Board of Councillors, a Delegate, Permanent Observer for Malta at the United Nations, and a Board Member of Malteser.  *Id.* at ¶¶ 9, 18-19, 42.  Ms. O'Hara-Rusckowski also engages in significant and public-facing work relating to the Catholic church and human trafficking. *Id.*

---

[1] The following facts are summarized according to Plaintiffs' Complaint and accepted as true solely for purposes of this Motion to Dismiss.

II.      **Plaintiffs' History of Controversy Within the Catholic-American Community**

Plaintiffs are controversial figures within the Catholic-American and anti-trafficking communities, as they themselves recognize they were disavowed from the Archdiocese as a Catholic ministry.  *See* Compl., at ¶ 46.  Much of this controversy is detailed on Plaintiffs' own public website.  *See* Update: March 20, 2023, https://www.avodahcollective.org/march-20-update, attached hereto as **Exhibit A**; March 20, 2023, Support Materials, Original Accusations, https://www.avodahcollective.org/march20support1, attached hereto as **Exhibit B;** March 20, 2023, Support Materials, Promise of a Collaborative Review Process, https://www.avodahcollective.org/march20support2, attached hereto as **Exhibit C**; March 20 Support Materials, https://www.avodahcollective.org/march20support3, attached hereto as **Exhibit D**; Feb. 13, 2023, https://www.avodahcollective.org/media, attached hereto as **Exhibit E**.[2]

Avodah is a relatively new organization—as of March 20, 2023, it claims that it was operational for roughly "one year."  *See* Ex. A.  *But see* Compl., at ¶ 15 (alleging Avodah was formed in February of 2020).  Yet within that short span, it has, by its own account, "time and time again" faced accusations of wrongdoing.  *See id.*  In 2020, two

---

[2] This Court may take judicial notice of these exhibits.  Judicial notice is appropriate where the material is a matter "of public record" *or* where the document is "central to the plaintiff's claims, referred to in the complaint, and the parties do not dispute [its] authenticity."  *See Bandimere Auto-Performance Ctr., Inc. v. Johnson*, No. 22-CV-01644-NYW-SKC, 2023 WL 4421402, at *4 (D. Colo. July 10, 2023) (internal quotations omitted).  Materials from Plaintiffs' website are matters of public record.  The documents are also central to Plaintiffs' claims as Plaintiffs attempt to prove damages and harm based on the Archdiocese's disavowal of Avodah, which the attached webpages address, and Plaintiffs cannot dispute the authenticity of their own website.

individuals—a licensed counselor and a former volunteer—expressed concern that Mr. Fitzpatrick had a personality disorder, which they brought to the attention of Avodah's Board of Directors. *See* Exs. A-B. Plaintiffs responded with the threat of litigation. *See* Ex. B. Then, in November of 2021, another former volunteer began informing others that, based on his experience with Plaintiffs, he believed that Avodah was a cult. *See id.* Plaintiffs, again, responded by threatening legal action. *See id.*

Those speakers accordingly brought their concerns directly to the Archdiocese, which held several meetings with Plaintiffs, the last of which was in August of 2022. *See* Ex. A. Rather than assert their wholesale innocence, Plaintiffs sought "guidance" on the Archdiocese's concerns, which were so numerous, Plaintiffs submitted a 96-page document to address them in full. *See* Exs. A, C. But although Plaintiffs purported to participate in this evaluation process, the independent reviewer brought in to evaluate the accusations against Plaintiffs felt that he lacked "access to" "interviews with people on [Plaintiffs'] side." *See id.*

***Ultimately, in timing that is fatal to many of the allegations in the Complaint, the Archdiocese disavowed Avodah as a Catholic ministry on August 23, 2022, because of "systematic" complaints against Avodah by the Sisters that Avodah oversaw***. *See* Archdiocese of Denver, Feb. 3, 2023, Ltr., *see* https://archden.org/wp-content/uploads/2023/02/Avodah-Review-Conclusion-letter-to-the-faithful.pdf, attached hereto as **Exhibit F**.[3] In so deciding, it explained that "when Avodah was confronted with

---

[3] This press release reflects material that Plaintiffs referred to in their Complaint and, for the reasons above, is central to Plaintiffs' claims. It is also subject to judicial notice because it is available online on the Archdiocese's official website, and is thus "a matter of public record not subject to reasonable dispute." *See Hastey on behalf of YRC*

these issues, [the Archdiocese] was met with deception and excuses." *Id.* The Archdiocese accordingly followed the actions of "two prominent Catholic ministries dedicated to helping sex-trafficking victims," that "cut ties with Avodah" due to "similar problems." *Id.* The Archdiocese reaffirmed its decision to disavow Avodah on February 3, 2023. *Id.*

In response, Plaintiffs released several public articles addressing the Archdiocese's decision, as well as a video recorded by Mr. Fitzpatrick as Avodah's putative spokesperson. *See id.* at Ex. A-E. They assert, among other things, that the Archdiocese engaged in "lies and deceit" in connection with its review of Avodah. *See id.* at Ex. A. Plaintiffs, apparently, also published two additional webpages relating to "the facts of [Plaintiffs'] positions" and the evidence of lies and deceit, which they have since replaced with a message requesting that viewers "for now . . . meet with us privately to review information and evidence related to these statements[.]" *See* Ex. D.

Ultimately, law enforcement agents raided Plaintiffs' property in Denver, Colorado. *See* Compl. at ¶ 45. They also removed Sisters from that location. *See id.* Plaintiffs do not allege that the police lacked probable cause for entering Plaintiffs' property or that they did not have a legal basis to do so—or that they lacked the Sisters' consent in removing the Sisters from the property.

### III.    Plaintiffs Fail to Fulfil their Obligations With Respect to the Lowell Home in Massachusetts

Ms. O'Hara-Rusckowski became involved with Plaintiffs before the accusations in Colorado became public. *Id.* at ¶¶ 8, 21, 25. According to the Complaint, Ms. O'Hara-

---

*Worldwide, Inc. v. Welch,* 449 F. Supp. 3d 1053, 1060 (D. Kan. 2020) (judicial notice of press release on website).

Rusckowski began working with Avodah in 2021 to assist with her significant work in the human trafficking space, specifically with the intention of creating a safe house in Massachusetts. Ms. O'Hara Rusckowski connected Plaintiffs to a religious order selling the property known as the "Lowell Home" in Massachusetts. *Id.* at ¶¶ 8, 20, 21, 25. The plan was to renovate the Lowell Home and utilize it for safe housing for survivors of sex trafficking and Sisters who were hired to care for them. *Id.* at ¶ 26. From November of 2021 through March of 2022, Defendants donated and/or arranged for the donation of $750,000 for those purposes, including the training of the Passonist Sisters and the renovation of the Lowell Home. *Id.* at ¶¶ 27-30, 37.

In February 2022, Avodah entered into a purchase and sale agreement for the Lowell Home. *Id.* at ¶ 28. By Plaintiffs' own account, Defendants were essential to the project and donated hundreds of thousands of dollars to establish the safe house, although "Defendants possessed no legal right or property interests which would permit them to exert control or decision-making authority over the development of the Lowell Home. *Id.* at ¶ 37. The project, however, did not go as planned. *See*, e.g., *id.* at ¶ 21. More than a year passed after Defendants' initial donation, and Plaintiffs had still failed to accomplish their goals and left significant obligations unfulfilled. *Id.* at ¶¶ 31-34, 39, 41. Plaintiffs had spent $500,000, but had little to show for it: the renovations were incomplete, the Lowell Home was unoccupied, and Plaintiffs shipped the Passionist Sisters who were supposed to be trained and employed at the Lowell Home in Massachusetts to other locations managed by other third-party organizations. *Id.* at ¶¶ 31-34, 39, 41.

As a result, on November 7, 2022, Defendants requested that Plaintiffs transfer the property to Defendants, return unused funds donated to Avodah in connection with the Lowell Home, and enter into an agreement with respect to the management of the Passionist Sisters at the Lowell Home to ensure that the Sisters could fulfill their mission of caring for survivors sheltered in the Lowell Home.  *Id.* at ¶¶ 39-41.  Plaintiffs agreed to all of these requests.  *Id.*

Plaintiffs allege that Ms. O'Hara-Rusckowski subsequently made statements concerning Plaintiffs' mismanagement of the Lowell Home, including that Plaintiffs misappropriated funds, engaged in labor trafficking, and that Fitzpatrick was "NO friend—more demon than friend!!"  *Id.* at ¶¶ 43-51.

## IV.    Plaintiffs Assert Alleged Harms Untethered to Ms. O'Hara-Rusckowski's Alleged Statements

Plaintiffs claim that Ms. O'Hara-Rusckowski's statements caused the Archdiocese to "disavow[] Avodah as a Catholic organization, causing Plaintiffs to incur significant and severe injuries, damages and losses."  *Id.* at ¶ 46.  But the Archdiocese made its decision on August 23, 2022, which was well before *any* of the allegedly defamatory statements were made.  Indeed, the Archdiocese made its decision based on "systematic complaints" raised by the Sisters themselves.  *See* Ex. F. By the time the Archdiocese reaffirmed this opinion in a scathing rebuke of Avodah in 2023, *two other* prominent catholic ministries had also disavowed their relationships with Avodah for reasons lacking any connection to Plaintiffs' misconduct in connection with the Lowell Home.  *See id.*

Plaintiffs also suggest that Ms. O'Hara-Rusckowski's statements caused law enforcement to enter Plaintiffs' Colorado property and remove Sisters from that location.  *Id.* at ¶ 45.  They do not allege, however, that the Sisters' removal was based on any

false statements, or even that the police were wrong in suspecting that Plaintiffs were, in fact, violating the law by trafficking the Sisters.  Indeed, nothing in the Complaint connects this removal in any way to Ms. O'Hara-Rusckowski's statements.  *See id.* at ¶ 34.

Plaintiffs also allege a slew of other harms that followed the Archdiocese's initial disavowal of Avodah as a Catholic ministry.  Specifically, they claim that the Sisters terminated their employment agreements with Plaintiffs because they believed their work visas were in jeopardy and that donors and potential partners ceased their contributions and involvement with Plaintiffs.  *Id.* at ¶¶ 52-53, 56.  Plaintiffs were also uninvited and disallowed from attending religious-industry events, first in July of 2023 and again in January of 2024.  *Id.* at ¶¶ 45-46.  Plaintiffs, however, do not allege that Ms. O'Hara-Rusckowski communicated or caused another to communicate the allegedly defamatory statements to any of the Sisters, donors, or potential partners that reduced their involvement with Avodah.  Nor do they state that the third parties were even aware of Ms. O'Hara-Rusckowski's statements.

At bottom, it defies reality to conclude that these results stemmed from anything that Ms. O'Hara-Rusckowski did or said.  Materials this Court may properly consider on a motion brought under Federal Rule of Civil Procedure 12(b)(6) reflect that these reactions arose from the fact that—in just a year or so of operations—Plaintiffs attracted the ire of former volunteers, a licensed professional counselor, Sisters employed by Plaintiffs, the Archdiocese, two other Catholic organizations, and Colorado law enforcement.  Plaintiffs, moreover, brought much of this attention to themselves, choosing to publicly discuss the accusations online in an attempt to disregard the valid complaints raised by the Sisters

10

by claiming that the Archdiocese—for no reason at all—engaged in "lies and deceit" as a pretext for punishing Plaintiffs.

## ARGUMENT

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must include sufficient facts to state a claim for relief that is plausible on its face and raises a right to relief above the speculative level. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 548, 570 (2007). These standards require "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Where the pleaded facts are consistent with both lawful and unlawful behavior, and the lawful behavior is the more likely explanation, the claim is not plausible. *See id.* at 680-82. In assessing plausibility, the reviewing court should "draw on its experience and common sense." *See id.* at 663-64.

The Complaint falls far short of plausibly alleging Plaintiffs' claims, offering nothing more than "formulaic recitations of the elements," and conclusory assertions that are insufficient to state a claim. *See Twombly*, 550 U.S. at 555. This Court should accordingly dismiss Plaintiffs' claims as to Ms. O'Hara-Rusckowski with prejudice.

## I.    Plaintiffs' Defamation Claims (Counts I and II) Should be Dismissed

Plaintiffs assert that Defendants collectively defamed Avodah (Count I) and Fitzpatrick (Count II). "Because the threat of protracted litigation could have a chilling effect on the constitutionally protected right of free speech, prompt resolution of defamation actions . . . by motion to dismiss . . . is appropriate*." Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 138 F. Supp. 3d 1191, 1199 (D. Colo. 2015), *aff'd*, 861 F.3d 1081 (10th Cir. 2017) (cleaned up). Indeed, "courts have tended to construe [a] complaint [asserting defamation] by a somewhat stricter standard and have been more inclined to

grant a Rule 12(b)(6) motion to dismiss."  5B Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE 3D § 1357.

Plaintiffs' defamation claims are governed by Colorado law.  *See Brokers' Choice of Am., Inc.,* 138 F. Supp. 3d at 1197 ("Because this claim arises under diversity jurisdiction, the Court applies Colorado substantive law in determining whether Plaintiffs have stated a defamation claim.").  "In ruling on a motion to dismiss a defamation claim, whether a statement is defamatory, as well as whether allegedly defamatory language is constitutionally protected opinion is a matter of law to be determined by the Court." *Nguyen v. Mai Vu,* No. 18-CV-01132-CMA-NRN, 2018 WL 5622634, at *4 (D. Colo. Oct. 30, 2018), *report and recommendation adopted,* No. 18-CV-01132-CMA-NRN, 2018 WL 6603955 (D. Colo. Nov. 15, 2018) (cleaned up).  Dismissal is proper where, *inter alia,* the statements are "substantially true," "too vague to state a claim," or "are not defamatory as a matter of law."  *Id.*

All of these reasons necessitate the dismissal of Plaintiffs' defamation claims in Counts I and II of the Complaint as to Ms. O'Hara-Rusckowski.  As a threshold matter, Plaintiffs filed their Complaint on January 25, 2024, such that only claims made on or after January 25, 2023, are actionable.  *See, e.g., Burke v. Green*, 963 P.2d 1119, 1121 (Colo. App. Ct. 1998) (observing one-year statute of limitations for defamation clams).  The only statements made by Ms. O'Hara-Ruskowski that are not presumptively time-barred are those contained in paragraphs 48-51 of the Complaint, and any allegations falling outside that time frame should accordingly be dismissed on that basis.[4]

---

[4] Specifically, the allegations in paragraphs 42-43 are time-barred.  Paragraphs 42 and 43 also violate Federal Rule of Civil Procedure 8(b) as an impermissible group pleading in that it fails to identify how, specifically, O'Hara-Rusckowski was involved in this alleged

Even those allegations do not establish an actionable defamation claim. Without specificity, Plaintiffs allege that Ms. O'Hara-Rusckowski defamed Plaintiffs by making "oral and/or written statements to representatives of the Archdiocese of Denver that Avodah had 'misappropriated' donor and investor funds and was 'labor trafficking' Sisters." Compl. at ¶ 43. The only specific language that Plaintiffs attribute to Ms. O'Hara-Rusckowski is a text message in which she stated "[Fitzpatrick] is NO friend – more demon than friend." *Id.* at ¶ 48. In any event, none of these allegations can plausibly give rise to a defamation claim, and this Court should therefore dismiss Counts I and II as against Ms. O'Hara-Rusckowski.

## A. Plaintiffs Cannot Assert a Defamation Claim Based on Non-Literal Hyperbole

Plaintiffs assert that Ms. O'Hara-Rusckowski defamed Fitzpatrick by claiming "Fitzpatrick is NO friend – more demon than friend!!" *Id.* at ¶ 48. Plaintiffs also allege that "the statement that Fitzpatrick is a demon was false, and made with reckless disregard for its falsity." *Id.* Because we must accept Plaintiffs' allegations as true on a motion to dismiss, we must accept that Ms. O'Hara-Rusckowski made the statement that Fitzpatrick is "more demon than friend" and that Fitzpatric is, in fact, not a demon. But in any case, "imaginative expression" and "rhetorical hyperbole" are "worthy of constitutional protection." *See Zueger v. Goss*, 343 P.3d 1028, 1034 (Colo. App. Ct. 2014) (cleaned up). Dismissal is thus proper where the language is not intended in a literal sense and,

---

defamation. *See, e.g., L5L Indus., Inc. v. Kiss Indus., LLC*, No. 1:20-CV-03742-RM-SKC, 2022 WL 704705, at *2 (D. Colo. Jan. 21, 2022) (dismissing claim predicated on group pleading allegations). In any event, all allegations fail to state a plausible claim for relief regardless of the applicable statute of limitations for the reasons described in full below.

consistently, cannot be "proved true or false." *See Timmins v. Henderson*, No. 122CV00754CNSSBP, 2024 WL 1215617, at *4 (D. Colo. Mar. 21, 2024).

The statement that Mr. Fitzpatrick is "more demon than friend!!" is an obvious case of imaginative language that "should not be taken literally or as a reasoned accusation[.]" *Goss*, 343 P.3d at 1034 (Colo. App. Ct. 2014) (statement that reflected speaker's "unfavorable opinion" of recipient was not defamatory); *see also Keohane v. Stewart*, 882 P.2d 1293, 1301 (Colo. 1994) (statement using "colorful and exaggerated terms" and "multiple exclamation points" was not actionable). And, of course, Mr. Fitzpatrick cannot prove or disprove in this secular Court whether he is a demon. *See, e.g.*, *Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 284 (1974) ("traitor to god" is not defamatory"); *Cummings v. City of N.Y.*, No. 19-CV-7723 (CM)(OTW), 2020 WL 882335, at *22 (S.D.N.Y. Feb. 24, 2020) (accusation that individual was "white devil" was not actionable).

### B. Ms. O'Hara-Ruckowski's Statements Are Privileged and Plaintiffs Fail to Plausibly Allege Defamation Under Colorado's Heightened Requirements

Plaintiffs also assert defamation claims based on alleged, non-specific statements regarding Plaintiffs' misappropriation of funds donated towards the Lowell Home and labor trafficking of the Sisters. Statements that involve a public figure *or* matters of public concern are "subject to heightened standards." *L.S.S. v. S.A.P.*, 523 P.3d 1280, 1287 (Colo. App. Ct. July 17, 2023). Ms. O'Hara-Ruckowski's statements are entitled to protection for both reasons. As such, Plaintiffs must "prove the statement's falsity by clear and convincing evidence, rather than by a mere preponderance," and "prove by clear and convincing evidence that the speaker published the statements with actual malice[.]" *Id.*

Plaintiffs fail to even plausibly allege their entitlement to relief under this standard, necessitating dismissal in Ms. O'Hara-Rusckowski's favor.

1.    The Statements Are Privileged as Matters of Public Concern

Colorado law affords heightened protections to statements that involve matters of public concern. *See Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1034-35 (10th Cir. 2013) (applying Colorado law). "Public concern is interpreted broadly." *Id.* (cleaned up). Generally, a statement addresses a matter of public concern where it "can be fairly considered as relating to any matter of political, social, or other concern to the community[.]" *Id.* at 1035 (internal quotations omitted). Whether a statement involves a matter of public concern is a question of law for the Court. *See id.* at 1041.

Plaintiffs' own allegations demonstrate that the alleged statements address matters of public concern. Whether Plaintiffs mistreat employees or engage in the labor trafficking of nuns has the "potential to impact many members of the public." *See Bensinger*, 713 F.3d at 1034-37 (claim business engaged in the mistreatment of employees and "human trafficking" related to matters of public concern). To be sure, no shortage of courts have found matters of public concern where the statements relate to such "illegal or questionable business practices with ramifications for the general public." *See* Robert E. Drechsel, *Defining "Public Concern" in Defamation Cases Since Dun & Bradstreet v. Greenmoss Builders*, 43 FED. COMM. L.J. 1, 12 (1990); *see also, e.g., Shoen v. Shoen*, 292 P.3d 1224, 1229 (Colo. 2012) ("The commission of a crime" is "without question [an] event[] of legitimate concern to the public.") (internal quotations omitted).

The government also has an interest in the statements. *See Bensinger*, 713 F.3d at 1034-37 (statements would interest "government officials."). As the Complaint asserts, as a result of the allegations, law enforcement received cause to enter Plaintiffs' property

15

and "remove several religious Sisters who were living on Avodah property in Denver, Colorado." *See* Compl. at ¶ 45. Courts have found that a statement implicates public concern where, as here, the government *"*considered the complaints serious enough to pursue an investigation of the business." *See Smiley's Too, Inc. v. Denver Post Corp.*, 935 P.2d 39, 42 (Colo. App. Ct. 1996).

Colorado jurisprudence also firmly supports the application of the public concern privilege here. Plaintiffs aver that Avodah "network[s] with individuals, organizations, and non-profits performing similar work," depends on "donors, partner organizations, and other like-minded charitable organizations to further [its] mission," and participates in "seminars, conferences and other prominent activities" with "high-powered, prominent organization[s]." *Id.* at ¶¶ 17, 21, 46, 57-59. Those are all activities that, by necessity, require public involvement, and the public has an interest in knowing whether their finite time, money, and efforts are used to support a business engaged in acts of such "impropriety." *See Zimmerman v. Bd. Of Publications of Christian Reformed Church, Inc.*, 598 F. Supp. 1002, 1011-12 (D. Colo. 1984) (public concern where statement related to church's business practices); *Diversified Mgmt., Inc. v. Denver Post, Inc.*, 653 P.2d 1103, 1108 (Colo. 1982) (public concern where statement addressed financial development scheme and "potential buyers" in the public "had an abiding interest in the matter.").

2.    <u>The Statements are Privileged As They Relate to Limited Purpose Public Figures</u>

Ms. O'Hara-Rusckowski's statements are also privileged because Plaintiffs are limited purpose public figures. A plaintiff is a limited purpose public figure where "the defamatory statement involves a matter of public concern," and "the level of plaintiff's participation in the controversy invites scrutiny." *Lewis v. McGraw-Hill Broad. Co.*, 832

P.2d 1118, 1122 (Colo. App. Ct. 1992).  The Supreme Court of Colorado has explained this category of public figure includes "those who have thrust themselves to the forefront of a particular public controversy to affect its resolution," and "would generally be capable of effectively countering criticism and exposing the falsity of defamatory statements concerning them."  *DiLeo v. Koltnow*, 613 P.2d 318, 321-22 (Colo. 1980).

Here, Avodah claims to be a prominent figure within the sex trafficking and Catholic-American communities and Fitzpatrick is its Executive Director.  *See* Compl. at ¶¶ 4, 17, 21, 46, 57-59.  The alleged defamation does not concern Mr. Fitzpatrick's personal life, but rather, Plaintiffs' carrying out of Avodah's mission through questionable means.  That provides a basis for this Court to impose the standard attached to limited public figures.  *See Planet Aid, Inc. v. Reveal*, 44 F.4th 918, 922, 927-28 (9th Cir. 2022) (director of charitable organization where organization was accused of misappropriating funds); *Banks v. Jackson*, No. 20-cv-02074, 2022 WL 1451904, at *1, 5-7 (D. Colo. May 9, 2022) (church pastor and member of church and executive direction of nearby non-profit with respect to alleged defamation of church).

Plaintiffs have also publicly addressed criticisms of Avodah's operations. Following the Archdiocese's disavowal of Avodah—which, under Plaintiffs' version of events, was inextricably intertwined with the purported defamation—Plaintiffs voluntarily posted a number of press releases critiquing the Archdiocese's decision, justifying their operations, highlighting critiques as to both Avodah and Fitzpatrick personally, advancing the salacious accusation that the Archdiocese disavowed Avodah upon lies and deception, and encouraging interested members of the public to "meet" with Avodah for further discussion.  *See* Compl. ¶¶ 43-45; Exs. A-C. E-F.  Mr. Fitzpatrick also recorded a

video addressing these topics as Plaintiffs' putative spokesperson.  *See* Ex. A.  Thus, "even if initially a private matter, [the] dispute became a public controversy through [Plaintiffs'] efforts," as Plaintiffs have invited "public attention and comment in regard to the [] controversy."  *DiLeo*, 613 P.2d at 321-222.

### 3.    Plaintiffs Fail to Plausibly Allege Falsity and the Materiality Thereof

Ms. O'Hara-Rusckowski's statements are entitled to a conditional privilege as either matters involving public concern or relating to limited purpose public figures.  As such, Plaintiffs must ultimately prove the falsity of the statements with clear and convincing evidence.  *See L.S.S.*, 523 P.3d at 1287.  They fail to allege any facts suggesting that they can meet that burden for four reasons.

***First,*** "a defamation complaint cannot couch allegations of falsity in vague, conclusory terms."  *Brokers' Choice of Am., Inc.*, 861 F.3d at 1105.  Where, as here, "falsity is an element of a state defamation claim, federal courts have required plaintiffs to plead facts that, if proven, would allow a reasonable person to consider the statement false."  *Tannerite Sports, LLC v. NBCUniversal News Grp., a division of NBCUniversal Media, LLC*, 864 F.3d 236, 247 (2d Cir. 2017) (aggregating authority).  Courts will dismiss defamation claims under this standard where a plaintiff "fail[s] to provide any facts supporting [a] conclusory allegation" of falsity.  *Woods v. Ross*, No. 21-2011-DDC-TJJ, 2021 WL 3077236, at *15 (D. Kan. July 21, 2021), *aff'd,* No. 22-3046, 2023 WL 1794170 (10th Cir. Feb. 7, 2023).

Thus, where a defamation claim requires a showing of falsity, "[i]t is not enough for plaintiffs to list a number of statements and generally declare them to be false without alleging facts which, if proven, would show them to be false."  *See NuStar Farms, LLC v. Lizza*, 613 F. Supp. 3d 1124, 1132 (N.D. Iowa 2020) (granting motion to dismiss).  But

that is all that Plaintiffs have done here.  While Plaintiffs baldly claim that the statements were false, they fail to explain what, precisely, was false, or proffer factual averments that tend to demonstrate that falsity.  That alone necessitates dismissal.

*Second,* even factual denials are not enough to survive a motion to dismiss where they do not address the falsity of the entire allegedly defamatory statement.  *See CoreCivic, Inc. v. Candide Grp., LLC*, 46 F.4th 1136, 1144 (9th Cir. 2022).  Dismissal is appropriate where a plaintiff's "specific denial" is more narrow than the "broader" accusation levied against it, as the specific denial fails to demonstrate the falsity of the statement as a whole.  *See id.; see also, e.g., Cabello-Rondon v. Dow Jones & Co., Inc.*, No. 16-CV-3346 (KBF), 2017 WL 3531551, at *5 (S.D.N.Y. Aug. 16, 2017), *aff'd*, 720 F. App'x 87 (2d Cir. 2018) (dismissing defamation claim where plaintiff failed to plausibly allege that "gist or substance" of statement was false).

 Plaintiffs' denials fail by way of that same mismatch.  With respect to the labor trafficking statement, Plaintiffs only state that they moved the Passionist Sisters to different organizations pursuant to their employment agreements. *See* Compl. ¶ 34.  But, even if so, that does not disprove that Plaintiffs engaged in labor trafficking, which encompasses a host of activity unbound by the contractual legitimacy thereof.  Similarly, Plaintiffs do contradict the claim that they misappropriated donor funds or spent money with nothing to show for their doing so.  *See id.* at ¶¶ 41-42, 47.  Plaintiffs do not affirmatively aver that they did not steal or misuse donations or that they otherwise engaged in perfectly acceptable business practices with respect to their use thereof. They solely claim that they received authorization to use *some* funds in a manner contrary to their stated purpose. *See id.* at ¶ 33.  However, that specific assertion does not address

the broader alleged accusations, which are not limited to—and may not even address—Plaintiffs' purportedly authorized activity.

**Third,** Plaintiffs' factual allegations—accepted as true—belie a finding of falsity. *See, e.g., Tannerite Sports, LLC*, 864 F.3d at 247 (aggregating cases dismissing claims for lack of apparent falsity). The gist of the alleged defamatory statements is that Plaintiffs received funds to train the Passionist Sisters and house survivors at the Lowell Home, spent $500,000 of funds dedicated towards those purposes, and yet, the Lowell Home was incomplete, no survivors were cared for there, and the Passionist Sisters were sent out to third parties they did not contemplate working with. Plaintiffs do not deny those facts—they affirmatively allege them. *See* Compl., ¶¶ 25-31, 34, 30-41. They also *admit* that when they were confronted with these accusations in November of 2022, Plaintiffs conceded their wrongdoing by transferring the home, unused funds, and management of the Passionist Sisters to Defendants. *See id.* at ¶¶ 40-41. Under the Plaintiffs theory, these accusations were substantial enough, moreover, that Plaintiffs assert that law enforcement relied on them in entering Plaintiffs' property and removing religious Sisters therefrom. *See id.* at ¶ 45. Given Plaintiffs' own proffered facts, the "Complaint does not plausibly demonstrate the falsity" of the allegedly defamatory statements. *See Soojung Jang v. Trustees of St. Johnsbury Acad.*, 331 F. Supp. 3d 312, 348 (D. Vt. 2018).

**Fourth**, Plaintiffs do not plausibly allege that any falsity was material. Colorado law requires a showing that the statement was not just false, but *materially* so. *See Bustos v. A & E Television Networks*, 646 F.3d 762, 764 (10th Cir. 2011) (applying Colorado law). "[A] misstatement is not actionable if the comparative harm to the plaintiff's reputation is real but only modest" when compared to the actual truth. *See id.* For

instance, courts have rejected defamation claims for lack of material falsity where a prisoner was not a member of the Aryan Brotherhood, as claimed, but nonetheless socialized and affiliated with them, or where an individual was falsely labeled as a participant in a "heinous bombing," when, in reality, he was involved in a separate crime and was merely a material witness to the bombing, as, in both instances, the public would still have had a substantially negative reaction to the truth. *See id.* at 764-769.

Even if the alleged assertions of misappropriation and trafficking are *not* true, there is still no material falsity. Plaintiffs do not plead—or explain—why the allegations were *materially* false. Nor could they, as: (1) Plaintiffs turned over unused funds, title to the property, and management of the Passionist Sisters to Defendants; (2) the Archdiocese disavowed Avodah as a Catholic ministry because of systemic complaints from individuals working with Plaintiffs; (3) two other institutions ceased their relationships with Avodah for similar concerns; and (4) Denver law enforcement raided Plaintiffs' property and removed Sisters therefrom. Those facts are more than enough to allow the public to significantly change their estimation of Plaintiffs, such that any falsity is immaterial. *See Bustos*, 646 F.3d at 764; *Brokers' Choice of Am., Inc.,* 861 F.3d at 1111 (affirming dismissal of complaint under Colorado law based on absence of material falsity).

4.    Plaintiffs Have Not Plausibly Alleged Malice or Reckless Disregard

In addition to material falsity, Plaintiffs were required to plausibly allege facts that would show actual malice or reckless disregard of the truth. *See Lawson v. Stow*, 327 P.3d 340, 346 (Colo. App. Ct. 2014). "Reckless disregard exists when the defendant, in fact, entertained serious doubts about the truth of his publication." *Seible v. Denver Post Corp.*, 782 P.2d 805, 808 (Colo. App. Ct. 1989). Ill will against the allegedly defamed

individual and a failure to investigate the truth of one's statements are not sufficient to prove reckless disregard. *See Nguyen*, 2018 WL 5622634, at *10.

Plaintiffs must allege the requisite scienter with more than boilerplate assertions of malice, and courts should "disregard" such legal conclusions where the plaintiff makes "no factual allegations to support [such a] conclusion of law." *Fry v. Lee*, 408 P.3d 843, 855 (Colo. App. Ct. 2013) (dismissing defamation claim); *see also, e.g., Nguyen,* 2018 WL 5622634, at *10 (dismissing defamation claim where "Plaintiffs' only allegations of malice in this case are conclusory and devoid of factual enhancement."); *Resolute Forest Prods., Inc. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1019 (N.D. Cal. 2017) (citing actual malice pleading standard as "demanding," and dismissing complaint where plaintiff did not "provide any specific allegations that would support a finding that [defendants] harbored serious subjective doubts as to the validity" of statements).

The Complaint is devoid of a single fact that would demonstrate that Ms. O'Hara-Rusckowski had any reason to know that the alleged statements concerning Plaintiffs were false. And Plaintiffs' own allegations belie such scienter, as Plaintiffs did not contest their wrongdoing or plead their innocence when confronted by Defendants. That, along with independent actions on the part of the Archdiocese and law enforcement, among others, refutes any finding of actual malice and is fatal to the defamation claims.

## II.    This Court Should Dismiss All of Plaintiffs' Derivative Tort Claims For Lack of Wrongdoing and Causation

Plaintiffs assert claims for negligence, tortious interference, and extreme and outrageous conduct based on the alleged defamation discussed above. Those claims must fail to the extent the defamation claims fail. *See Fry,* 408 P.3d at 856 (aggregating

authority).  All claims also fail for lack of causation and corresponding damages—requisite elements of negligence and the intentional torts Plaintiffs assert.

"In Colorado, as elsewhere, a party seeking recovery in tort must demonstrate that the defendant's conduct caused the alleged injury."  *See June v. Union Carbide Corp.*, 577 F.3d 1234, 1238 (10th Cir. 2009).  "The general rule for causation is that the plaintiff must prove that the alleged injury would not have occurred but for the defendant's negligent conduct."  *Id.*  (internal quotations omitted).  Causation  is  not  established where "an event other than the defendant's alleged conduct appears predominant."  *A.B. by Ybarra v. City of Woodland Park*, No. 14-CV-00151-RM-KMT, 2016 WL 1237195, at *5 (D. Colo. Mar. 29, 2016) (applying Colorado law).

Plaintiffs cannot plausibly allege causation with  rote legal conclusions.  *See, e.g., VDARE Found. V. City of Colorado Springs*, 11 F.4th 1151, 1173 (10th Cir. 2021).  Rather, consistent  with  the  plausibility  standard,  plaintiffs  must  provide  a  factual  basis  that substantiates a finding of sufficient causation.  *See, e.g., A.G. ex rel. Maddox v. v. Elsevier, Inc.,*  732  F.3d  77,  82  (1st  Cir.  2013)  ("The  superficiality  of  the  causation allegation . . . makes manifest that the plaintiffs have failed to plead a plausible cause of action").  Failure to do so warrants dismissal.  *See id.*

Each of Plaintiffs' claims assert a different form of harm, but it appears the crux of Plaintiffs'  theories  stem  from  the  Archdiocese's  disavowal of Avodah as a Catholic ministry.  *See* Compl., at ¶¶ 43-45.  That makes sense given the significance of such a finding by a preeminent institution in Plaintiffs' home state.  The issue, though, is that the Archdiocese disavowed Plaintiffs *before* the alleged defamation and *before* Defendants uncovered Plaintiffs' misconduct with respect to the Lowell Home.  *Compare* Ex. F; *with*

Compl., at ¶¶ 39, 43.  While Plaintiffs allege otherwise, the "exhibit controls" over the contradictory allegations in the Complaint and negates any finding of causation.  *See Brokers' Choice of Am.,* 861 F.3d at 1101.

The Complaint also fails to establish any connection between Ms. O'Hara-Rusckowski's statements and the conduct of third parties.  Plaintiffs contend that Sisters terminated their employment because of a statement concerning the "status of [the Sisters'] international work visas."  *See* Compl. at ¶ 90.  However, there are no allegations that Ms. O'Hara-Rusckowski has said anything about international visas.  And even if she did, Plaintiffs do not allege that Ms. O'Hara-Rusckowski communicated her concern to the Sisters that terminated their employment or that those Sisters were even aware of such statements when they did so.  Plaintiffs similarly fail to allege any such connection between Ms. O'Hara-Rusckowski, on one part, and the donors and organizations that opted not to partner with or donate to Plaintiffs, on the other.  Such allegations are necessary links between the alleged misconduct and stated harm, absent which, there is no plausible allegation of causation and harm.

In evaluating whether Plaintiffs have alleged causation, this Court is not required to eschew common sense.  Nor is it required to ignore Plaintiffs' own allegations and matters properly before the Court by way of judicial notice.  Those sources all reflect that, to the extent Plaintiffs sustained any harm, it was a result of their own conduct.  In less than two years of operation, Plaintiffs' actions led to systematic complaints by Sisters concerning their working conditions, rumors that Avodah was a cult and Mr. Fitzpatrick had a personality disorder, *findings* by the Archdiocese and local law enforcement of Plaintiffs' wrongdoing, the independent decisions of two other organizations to cease

24

relationships with Avodah, and so forth.  And Plaintiffs fail to plausibly allege any facts that would suggest that it was Ms. O'Hara-Rusckowski's statements that substantially caused Plaintiffs' reputational harm.

III.    **This Court Should Dismiss Plaintiffs' Negligence Claim for Lack of Duty and Causation**

Plaintiffs assert that Ms. O'Hara-Rusckowski was negligent in communicating about Plaintiffs to others.  To prove a negligence claim, Plaintiffs must demonstrate that Ms. O'Hara-Rusckowski "owed a duty to" Plaintiffs.  *See Stenson v. Edmonds*, 86 F.4th 870, 880–81 (10th Cir. 2023) (applying Colorado law).  This requires that they "allege what state statutes or common law give rise to Defendant's legal duty."  *Gordon v. Chipotle Mexican Grill, Inc.*, 344 F. Supp. 3d 1231, 1256 n. 5 (D. Colo. 2018).  As "[t]he existence and scope of a legal duty is a question of law for the Court to decide,"  dismissal is proper where the Court finds that the defendant did not owe the plaintiff a legal duty. *See Fine v. Tumpkin*, 330 F. Supp. 3d 1246, 1253 (D. Colo. 2018).

It is unclear what legal duty Ms. O'Hara-Rusckowski could have owed to Plaintiffs. While Plaintiffs cursorily note some type of joint venture with Defendants, that assertion is rebutted by Plaintiffs' allegation that "Defendants possessed no legal right or property interest which would permit them to exert control . . . over the development of the Lowell Home."  *See* Compl. ¶¶ 20, 37.  Even if there were such a relationship, Ms. O'Hara-Rusckowski's purported wrongdoing occurred *after* Defendants severed their cooperation with Plaintiffs due to concern over Plaintiffs' use of donations and management of the Passionist Sisters.  Colorado law would not support a finding of legal duty in such a situation, as it would create endless liability following any type of cooperation between

entities or individuals and would functionally place a gag order on any critical communications following the termination of that arrangement.

IV.    This Court Should Dismiss Plaintiffs' Tortious Interference Claims

Plaintiffs also fail to state claims for tortious interference with contract and prospective business relations. The prior cause of action is predicated on the Sisters' termination of their employment agreements with Plaintiffs, while the latter rests on Plaintiffs' failure to secure third-party donations and partnerships. Both claims require Plaintiffs to allege facts reflecting that Ms. O'Hara-Rusckowski "intentionally induced" the third parties to breach their contracts or cease their involvement with Plaintiffs. *Shell v. Am. Fam. Rts. Ass'n*, 899 F. Supp. 2d 1035, 1059–60 (D. Colo. 2012) (dismissing claim on motion to dismiss); *DTC Energy Grp., Inc. v. Hirschfeld*, 420 F. Supp. 3d 1163, 1178 (D. Colo. 2019) (dismissing tortious interference claim for lack of plausible allegations explaining how defendant induced third party to breach contract).

The Complaint does not allege that Ms. O'Hara-Rusckowski directed her communications to the Sisters that terminated their employment with Plaintiffs or the third parties that ceased donating or partnering with Plaintiffs. Nor does it allege facts reflecting that Ms. O'Hara-Rusckowski was *aware* that she was "interfering with [the Sisters'] performance of the contract" or imminent business relationships. Restatement (Second) of Torts § 766 (1979), cmnt. i. As a result, Plaintiffs have not alleged that Ms. O'Hara-Rusckowski "intentionally induced" the requisite harm. *See Shell,* 899 F. Supp. 2d at 1059–60; *Hirschfeld*, 420 F. Supp. 3d at 1178.

The prospective business relations claim fails for another reason as well. Colorado law is exceedingly clear that tortious interference claims premised on prospective relations require factual allegations demonstrating the "reasonable likelihood of

contracting with a particular third party." *See Crocs, Inc. v. Effervescent, Inc.*, 248 F. Supp. 3d 1040, 1060 (D. Colo. 2017). This requires *facts* "related to the likelihood of a contractual relationship arising." *Id.* at 1060 n.17. A plaintiff must also *specifically* identify the purportedly lost relationships by name. *See IIT, Inc. v. Commc'ns Distributors, LLC*, No. 20-CV-01580-RM-STV, 2021 WL 5240243, at *6 (D. Colo. Jan. 27, 2021), *report and recommendation adopted sub nom. IIT, Inc. v. IDT Corp.,* No. 20-CV-01580-RM-STV, 2021 WL 5240237 (D. Colo. Mar. 1, 2021) (aggregating authority).

This is yet another easy determination for this Court, as Plaintiffs fulfill neither requirement. They do not "include specific factual allegations regarding particular contracts, third parties, or prospective business relationships, stating only generally that such relationships existed and that [Defendants] took actions to interfere with them." *Compare id; with* Compl. ¶ 97. And, as a matter of common sense, Plaintiffs could not demonstrate the reasonable likelihood of entering into such relationships given the circumstances that defeat any finding of causation, discussed above. This renders dismissal necessary and amendment futile.

**V.      This Court Should Dismiss Plaintiffs' Claim for Extreme and Outrageous Conduct**

The Plaintiffs' final claim is for extreme and outrageous conduct as to Fitzpatrick, which is essentially a claim for intentional infliction of emotional distress ("IIED"). *See English v. Griffith*, 99 P.3d 90, 93 (Colo. App. Ct. 2004). To establish a viable claim, Plaintiffs must allege that: "(1) the defendant engaged in extreme and outrageous conduct; (2) the defendant engaged in such conduct recklessly or with the intent of causing the plaintiff severe emotional distress; and (3) the defendant's conduct caused

plaintiff to suffer severe emotional distress." *McCarty v. Kaiser-Hill Co.*, 15 P.3d 1122, 1126 (Colo. App. Ct. 2000).

This claim fails for many of the reasons the defamation claim fails. Mr. Fitzpatrick cannot state a claim as a matter of law because the criticism is related to his "public persona" as Avodah's Executive Director, and Mr. Fitzpatrick is a limited-purpose public figure. *See Brooks v. Paige*, 773 P.2d 1098, 1101-03 (Colo. App. Ct. 1988). Plaintiffs also cannot establish the second element of an IIED claim for the same reasons they fail to prove actual malice—namely, that Ms. O'Hara-Rusckowski would have no reason to have known of the falsity of her statements and no motivation to randomly attack a fellow Catholic working to serve sex trafficking victims without a justifiable basis for doing so. *See, e.g., Tatten v. Bank of Am. Corp.,* 912 F. Supp. 2d 1032, 1044 (D. Colo. 2012) (dismissing claim for lack of intentional or reckless conduct).

The complained-of conduct is also not sufficiently extreme and outrageous. The tort of IIED "was designed to create liability for a very narrow type of conduct." *Maiteki v. Marten Transportation Ltd.,* 4 F. Supp. 3d 1249, 1256 (D. Colo. 2013) (applying Colorado law). ***"[T]he level of outrageousness required to create liability is extremely high."*** *Id.* (cleaned up) (emphasis added). As courts have repeatedly acknowledged:

> Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities are insufficient. Only conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized community, will suffice.

*Id.* (internal quotations omitted). "[V]ery few fact situations give rise to a cognizable claim for intentional infliction of emotional distress." *Rawson v. Sears Roebuck & Co.*, 530 F. Supp. 776, 780 (D. Colo. 1982). As a result, courts may dismiss claims upon a determination that reasonable people could not conclude that the defendant's conduct

was outrageous.  *See, e.g.,  Maiteki,* 4 F. Supp. 3d at 1256; *see also Morales v. L. Firm of Michael W. McDivitt, P.C.,* 641 F. Supp. 3d 1035, 1040 (D. Colo. 2022) (dismissing IIED claim as "allegations fail to meet the exacting and very high bar to successfully pleading an IIED claim under Colorado common law.").

Defamation is not enough to demonstrate extreme and outrageous harm.  *See e.g.*, *Gordon v. Boyles*, 99 P.3d 75, 82 (Colo. App. Ct. 2004) (dismissing claim upon finding that false allegation of abuse was not outrageous).  Similarly, plaintiffs have been unable to prove outrageous conduct even upon false allegations that the "plaintiff stole money and used drugs," or was a "misappropriating church funds," or, in the context of a police officer, guilty of "a criminal offense . . . and of serious sexual misconduct."  *Han Ye Lee v. Colorado Times, Inc.,* 222 P.3d 957, 969 (Colo. App. Ct. 2009) (Dailey, J., concurrence in part) (aggregating authority).

Plaintiffs allege no worse than that here, as accusations of financial impropriety and questionable employment practices are less extreme than accusing a police officer of crime and sexual misconduct, for instance.  Additionally, and as alleged by Plaintiffs, Ms. O'Hara-Ruskowski criticized Plaintiffs based on her perception of their business operations.  Such complaints as to a plaintiff's work performance are not considered sufficiently extreme enough to give rise to liability for IIED.  *See Steinberg v. Thomas*, 659 F. Supp. 789, 795 (D. Colo. 1987); *Goodwin v. Student Movers, Inc.*, No. 11-CV-02486-WYD-KLM, 2012 WL 1090427, at *3 (D. Colo. Apr. 2, 2012).

## CONCLUSION

For the foregoing reasons, Ms. O'Hara-Ruskowski respectfully requests that the Court dismiss Plaintiffs' Complaint with prejudice.

DATED this 20th day of June, 2024.

Respectfully submitted,

COZEN O'CONNOR

By:  *s/ Arianna K. McLaughlin*
      Sarah Krissoff
      Arianna K. McLaughlin
      Cozen O'Connor
      3 WTC
      175 Greenwich St. 55th Floor
      New York, New York 10007
      Phone: (212) 908-1388
      skrissoff@cozen.com
      amclaughlin@cozen.com
      *Attorneys for Deborah O'Hara-Rusckowski*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was filed electronically through the CM/ECF

system on June 20, 2024, which will provide notice to all counsel of record.


*/s/ Arianna K. McLaughlin*
Arianna McLaughlin