IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-233

**AVODAH FARMS**, a Colorado nonprofit corporation, and
**KEENAN FITZPATRICK**, an individual
Plaintiffs,

v.

**DEBORAH O'HARA-RUSCKOWSKI**, an individual
Defendant.

---

### FIRST AMENDED COMPLAINT AND JURY DEMAND

---

COME NOW Plaintiffs, Avodah Farms, a Colorado nonprofit corporation, and Keenan

Fitzpatrick, individually, by and through counsel, Messner Reeves, LLP, and submit this First

Amended Complaint and Jury Demand pursuant to Federal Rule of Civil Procedure 15(a)(1)(B).

Plaintiffs state and allege as follows:

### <u>INTRODUCTION</u>

This lawsuit is the result of an improper and unlawful attempt by Defendant Deborah

O'Hara-Rusckowski, with personal and business incentive, to tarnish the public standing of

Plaintiffs Avodah Farms and Keenan Fitzpatrick through knowingly false and defamatory

statements.

Plaintiffs Avodah Farms, a Colorado nonprofit organization, and its Executive Director

1

Fitzpatrick work to provide restorative long-term care to survivors of sex trafficking at survivor safe homes across the U.S. They are among the first to develop and implement an innovative "Sister Care" program model, through which groups of religious sisters from across the world live in residence and provide long-term care to trafficking survivors and their children at survivor safe homes throughout the U.S.

Defendant Rusckowski represents and markets herself as an expert and thought leader in the care of human trafficking victims. She has prominent standing and connections in the faith-based and charitable communities and is involved in both nonprofit and for-profit work in caring for human trafficking victims. Prior to her work with Plaintiffs, however, Defendant Rusckowski lacked experience or expertise in survivor safe homes or the Sister Care model.

The parties attempted a partnership to develop the Lowell Home, a survivor safe home in Lowell, Massachusetts, with planned implementation of the Sister Care model. But after helping to secure donations for the Lowell Home, Defendant Rusckowski recognized the value and business potential of the Sister Care model for her own career and her own entities. She seized control of the Lowell Home by coercing Plaintiffs out of their contractual rights and then converted the Lowell Home into what is now The O'Connell House. She then publicly named herself the founder, took credit for the Sister Care model, and initiated a campaign to tarnish Plaintiffs' public standing and reputation with influential partners and donors in the faith-based and charitable communities by making knowingly false and defamatory statements. For sound reason, Colorado law protects against and provides legal recourse to remedy such a wrong.

## **PARTIES**

1.      Plaintiff Avodah Farms ("Avodah") is a Colorado nonprofit corporation with its

principal place of business at 1130 E. Kenyon Ave., Englewood, Colorado. At all times relevant

hereto, Avodah was authorized to do business throughout the United States, including but not

limited to the states of Colorado and Massachusetts.

2.      Avodah is governed by a six (6) member board of directors.

3.      Plaintiff, Keenan Fitzpatrick ("Fitzpatrick"), is an individual residing at 3737 S.

Ogden Street, Englewood, Colorado 80113.

4.      Fitzpatrick is the Executive Director of Avodah.

5.      Defendant Deborah O'Hara-Rusckowski ("Rusckowski") is an individual who

resides in Andover, Massachusetts.

6.      During the relevant times giving rise to this action, Rusckowski was a member

of the Board of Councillors of the Order of Malta, American Association, U.S.A., ("Malta"), a

Delegate and Special Advisor on Human Trafficking to the Ambassador for the Order of Malta

at the United Nations, and a Board Member of Malteser International, a worldwide relief agency

of the Order of Malta.

7.      Rusckowski is also the Founder of Global Strategic Operatives ("GSO"), an entity

which provides training programs and services to healthcare systems, among other institutional

and corporate clients, in the identification of potential trafficking victims. Rusckowski has led

GSO since founding the entity in 2018.

## JURISDICTION AND VENUE

8.      Jurisdiction is appropriate in this Court pursuant to 28 U.S.C. § 1332(a) and 28

U.S.C. § 1391.

9.      Specifically, the amount in controversy exceeds $75,000 and there is complete

diversity of citizenship between parties.

10.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2). A substantial part of the events giving rise to the claims herein occurred in Colorado and Rusckowski tortiously interfered with contracts which were to be performed in the state of Colorado. Those damages claimed herein pertaining to lost donors and partner organizations, and/or Plaintiffs' lost relationship with the Catholic Church, and specifically, with the Archdiocese of Denver, were sustained and suffered in the state of Colorado.

## GENERAL ALLEGATIONS

**A.    Avodah and Fitzpatrick work to develop and implement a "Sister Care" program model at safe houses across the U.S. for sex trafficking survivors.**

11.    In 2021 alone, approximately 27.6 million people globally were victims of forced labor, of which 6.3 million were forced into commercial sexual exploitation. [1]

12.    Avodah was formed in February 2020. It works to restore and reintegrate women survivors of sex trafficking ("survivors") through comprehensive, Christ-centered care provided by Catholic religious sisters and the faith-based community. Avodah conducts its nonprofit missionary work across the U.S.

13.    Avodah, and Fitzpatrick as Executive Director, have worked to develop a "Sister Care" program model through which religious sisters live in residence and provide long-term care to survivors and their children at survivor safe homes throughout the U.S.

14.    Upon information and belief, the Sister Care model was initially developed in the U.S. by Father Jeffery Bayhi, an acquaintance and friend of Fitzpatrick, and implemented at

---

[1] https://www.state.gov/humantrafficking-about-human-trafficking/ (last accessed July 10, 2024).

Metanoia Manor in Baton Rouge, Louisiana. Avodah and Fitzpatrick were then among the first
to attempt to further develop and implement the Sister Care model across the U.S.

15.    As Avodah worked to implement the Sister Care model across the U.S, it
contracted with several groups of religious Sisters to provide long-term care and pastoral service
for survivors, in accordance with Avodah's mission. The groups included the following Sister
orders:

a)    Sisters of St. Louis;

b)    Passionist Sisters of St. Paul of the Cross;

c)    The Sisters of the Nativity;

d)    The Sisters of St. Michael the Archangel; and

e)    The Sisters of the Eucharistic Heart of Jesus.

16.    Avodah's employment agreements with these groups of religious Sisters
provided for internships with Avodah partner organizations throughout the U.S., subject to the
approval of the religious Sisters. The religious Sisters with whom Avodah contracted voluntarily
approved and accepted these internships, which afforded the religious Sisters additional
experience and training in caring for survivors, and supported Avodah's mission of providing
long-term restorative care to survivors across the U.S.

17.    Alongside development of the Sister Care model, Avodah and Fitzpatrick have
also developed an initiative to convert under-utilized or vacant church buildings and other
religious facilities into survivor safe homes, at which the Sister Care model is then implemented.

18.    Avodah and Fitzpatrick network and partner with individuals and organizations
performing similar work to establish survivor safe homes that help break longstanding cycles of

abuse, shield survivors from past abusers, and reintegrate survivors into safe, stable, and fulfilling lives.

19.      Avodah and Fitzpatrick conduct fundraising activities and recruit both individual and institutional donors to contribute financially to Avodah's mission. Avodah's work is funded primarily by donations. Without these donations, Avodah is unable to establish survivor safe homes or provide restorative long-term care to survivors and their children across the U.S.

**B.      Avodah and Fitzpatrick partner with Rusckowski to develop the Lowell Home, including planned implementation of the Sister Care model.**

20.      Avodah and Fitzpatrick met and began to partner with Rusckowski in 2021.

21.      Together, Avodah, Fitzpatrick, and Rusckowski began a joint venture and/or partnership to develop a survivor safe home and implement the Sister Care model at a survivor safe home in Massachusetts.

22.      The parties contributed complementary experience and expertise in establishing the partnership. Avodah and Fitzpatrick contributed experience and expertise in survivor safe homes and the Sister Care model which they had developed, while Rusckowski contributed a network of connections with donors and charitable organizations in the Catholic religious community, both in Massachusetts and Colorado, along with her experience in training professionals to identify trafficking victims through her entity GSO.

23.      As Rusckowski described the partnership in a joint public podcast interview with Fitzpatrick: "So for GSO, it was a natural progression, and I thank God that we, you know, God, put Keenan Fitzpatrick in my path and we were able to really complement each other, mine with the education and his forte with the safe homes." (https://endinghumantrafficking.org/265/) (last accessed July 10, 2024).

24.     In November 2021, Rusckowski helped Avodah secure a $100,000 donation from Malta to support the development of the Sister Care model and to train religious Sisters in caring for survivors. Rusckowski then helped administer the expenditure and management of these funds. Plaintiffs properly administered these funds and did not steal or otherwise misappropriate any of these funds.

25.     To obtain a location for a survivor safe home, Rusckowski connected Avodah and Fitzpatrick to the Oblates, a religious order that had an under-utilized residential facility in Lowell, Massachusetts.

26.     In February 2022, Avodah and/or an entity which it fully controlled, entered into a Purchase and Sale Agreement ("PSA") with the Oblate Real Estate Trust and acquired all property rights to the Lowell Home in accordance with the PSA.

27.     In March 2022, Rusckowski helped Avodah secure an additional donation of $400,000.00 from Malta to fund four religious Sisters from the Passionist Sisters of St. Paul of the Cross ("the Passionist Sisters") to serve at the Lowell Home, to hire and train staff for the Lowell Home, and to fund general operations for housing survivors at the Lowell Home. Rusckowski then helped administer the expenditure and management of these funds. Plaintiffs properly administered these funds and did not steal or otherwise misappropriate any of these funds.

28.     Additionally, Rusckowski and/or Malta arranged for The Flatley Foundation, an entity affiliated with Malta, to donate $250,000.00 for renovations and construction of the Lowell Home. However, Avodah was never given access to The Flatley Foundation funds for the Lowell Home renovations and construction. All control of The Flatley Foundation funds was maintained

by Rusckowski and/or Malta. Plaintiffs did not steal or otherwise misappropriate any of these funds.

29.    Subsequent to the announcement of the donation from The Flatley Foundation, but prior to the availability of The Flatley Foundation funds for Lowell Home renovations and construction, payments were due to contractors for construction work on the Lowell Home. Rusckowski, who was helping to administer Avodah's grant funds from Malta, instructed Avodah both orally and in written correspondence to use Malta grant funds to pay for the construction work and, once received, to use funds from The Flatley Foundation to reimburse the funds donated by Malta. Additional members of Malta's leadership further explicitly instructed Avodah to use Malta funds for construction work and then subsequently reconcile balances with funds donated by The Flatley Foundation.

30.    While Rusckowski had helped Avodah secure significant donations to support the development of the Lowell Home and helped administer these donated funds, Rusckowski possessed no legal right or property interest which would permit her to exert control or decision-making authority over the development of the Lowell Home.

**C.    Rusckowski recognizes the value and business potential of the Sister Care model for her own career, coerces Avodah and Fitzpatrick out of their contractual rights in the Lowell Home, and seizes control of the Lowell Home.**

31.    Supply chain issues and labor shortages caused construction delays that slowed the renovation and development of the Lowell Home.

32.    Because of the construction delays and ongoing renovations, Avodah could not immediately house survivors at the Lowell Home. In the interim, Avodah arranged internships for the Passionist Sisters at similar faith-based and charitable partner organizations across the

U.S., in accordance with both the Passionist Sisters' employment agreement and Avodah's mission. These internships afforded the Passionist Sisters additional experience and training in caring for survivors pending construction and renovation of the Lowell Home. The Passionist Sisters' employment agreement expressly provided for these internships with Avodah partner organizations, the Passionist Sisters voluntarily approved and accepted these internships, and these internships were in no way coerced.

33.     Despite the delays at the Lowell Home, Rusckowski recognized the value and business potential of the Sister Care model. As Rusckowski stated during a joint public podcast interview with Fitzpatrick, regarding the Sister Care model: "[I]s it replicable? Absolutely. . . We're excited about this phase one and really perfecting it. So we will be able to replicate it and move on and improve many, many more lives." (https://endinghumantrafficking.org/265/) (last accessed July 10, 2024).

34.     Rusckowski represents and markets herself as an expert and thought leader in the care of human trafficking victims.

35.     Rusckowski's reputation and public standing as an expert and thought leader in the care of human trafficking victims is critical to her career, to the viability of her nonprofit work, and to the commercial success of her entity GSO.

36.     GSO generates revenue by providing training services and programs to healthcare systems, among other institutional and corporate clients, in the identification of trafficking victims. On its website, GSO claims to have trained over 800,000 healthcare providers. (https://www.globalstrategicoperatives.org/home) (last accessed July 10, 2024).

37.     Upon information and belief, Rusckowski derives personal financial benefit from

the revenue generated by GSO.

38.    Rusckowski is married to Steve Rusckowski, the former CEO of Quest Diagnostics. Upon information and belief, Steve Rusckowski has a personal, business, and financial interest in Rusckowski's reputation and public standing as an expert and thought leader in the care of human trafficking victims along with her nonprofit work and the commercial success of GSO.

39.    Accreditation with and attribution of the development of the Sister Care model and its implementation at survivor safe homes would bolster Rusckowski's reputation and public standing as an expert and thought leader in the care of human trafficking victims.

40.    In turn, accreditation with and attribution of the development of the Sister Care model and its implementation at survivor safe homes would bolster Rusckowksi's career, her nonprofit work, and the commercial success of her entity GSO.

41.    On or about November 7, 2022, Rusckowski invited Fitzpatrick and Avodah members to Lowell, Massachusetts for a meeting to purportedly discuss renovation progress of the Lowell Home. The meeting was scheduled to take place at the Lowell Home between Fitzpatrick, Avodah's Director of Operations Alexandra Tilton, Rusckowski, and Rusckowski's husband Steve Rusckowski.

42.    However, when Fitzpatrick and Ms. Tilton arrived at the Lowell Home, they encountered a group which Rusckowski had gathered comprised of Rusckowski, Rusckowski's husband Steve Rusckowski, unannounced members of Malta, and other unidentified third-parties who, upon information and belief, are influential in the faith-based and charitable communities. Defendant Rusckowski then threatened Fitzpatrick and Tilton that they could not leave the

meeting unless and until they agreed to transfer all PSA contractual rights to the Lowell Home to Rusckowski, return allegedly unused restricted funds for the Lowell Home to Malta, and agree that the Passionist Sisters would be managed by Rusckowski at the Lowell Home.

43.    Under coercion and duress, Avodah and Fitzpatrick agreed to transfer all PSA contractual rights to the Lowell Home to Rusckowski. Avodah and Fitzpatrick were also required to agree to transfer training and supervision of the Passionist Sisters to the new management entity of the Lowell Home as established by Rusckowski. As the meeting's attendees, Fitzpatrick and Tilton were further required to agree to the "strict confidentiality" of what occurred at this November 7, 2022 meeting.

44.    Subsequent to this November 7, 20022 meeting, Avodah and Fitzpatrick transferred all PSA contractual rights to the Lowell Home to Rusckowski.

45.    Subsequent to this November 7, 2022 meeting, Avodah and Fitzpatrick returned to Malta all unused funds which Malta had donated. The Controller for Malta confirmed in written correspondence to Avodah that all funds had been accounted for and were reconciled.

**D.    Rusckowski converts the Lowell Home into The O'Connell House and names herself the Founder, takes credit for the Sister Care model, and tarnishes the reputation and public standing of Avodah and Fitzpatrick with influential partners and donors.**

**1.    Rusckowski converts the Lowell Home into The O'Connell House, names herself the Founder, and takes credit for the Sister Care model.**

46.    Subsequent to acquiring control of the Lowell Home, Rusckowski converted the Lowell Home into The O'Connell House, which is now a survivor safe home in Lowell, Massachusetts that operates under the Sister Care model.

47.    Rusckowski named herself the Founder of The O'Connell House.

48.    The inauguration of the O'Connell House in 2023 was attended by members of

Malta and numerous other influential guests in the faith-based and charitable communities, featured a special blessing and ceremonial ribbon cutting from the Cardinal Archbishop of Boston, and attracted media coverage.

49.    The official website for The O'Connell House states: "GSO has trained & hired Religious Sisters as 'care providers,' to provide a loving, nurturing presence in the home for the victims' rehabilitation. We call this the '***Sister Care Model.***'" (italics and bold in original) (https://theoconnellhouse.org/about/) (last accessed July 10, 2024).

50.    The official website for The O'Connell House claims that its "Sister Care Model" is "unique[.]" (https://theoconnellhouse.org/) (last accessed July 10, 2024).

51.    The official website for The O'Connell House states: "Longer term, we hope to identify more properties to re-purpose them into safe houses for victims of trafficking, replicated by the O'Connell House Model." (https://theoconnellhouse.org/about/) (last accessed July 10, 2024).

52.    In a National Catholic Register article on approaches for caring for trafficking victims and featuring GSO and the development of The O'Connell House, Rusckowski is quoted as stating: "The sister-care model is the secret sauce to success[.]" (https://www.ncregister.com/features/sound-of-freedom-offers-opportunity-to-highlight-a-catholic-approach-to-helping-victims-of-sex-trafficking-heal-from-trauma) (last accessed July 10, 2024).

53.    The same National Catholic Register article further reports that Rusckowski "is coordinating with [Malta] on an important meeting in Rome to propose creating treatment homes from Church properties no longer needed and to adopt a unique Catholic approach to recovery"

through the "sister-care model[.]" (https://www.ncregister.com/features/sound-of-freedom-offers-opportunity-to-highlight-a-catholic-approach-to-helping-victims-of-sex-trafficking-heal-from-trauma) (last accessed July 10, 2024).

54.    The official website for GSO states: "Now that we have had major success in training *almost 800,000 healthcare providers* and ancillary staff, we are moving forward with an additional mission: **providing safe homes for survivors**. We realize the more the healthcare systems identify victims, the greater the need for accurate placement for healing to help them on their journey to becoming survivors. GSO has established a good relationship with law enforcement and Homeland Security to assist in placement of victims. We have hired Religious Sisters as caregivers to provide a loving, nurturing presence in the home for the victims' rehabilitation. All staff will be trained by GSO and we will teach Trauma Informed Care, with a Victim-centered approach." (https://www.globalstrategicoperatives.org/post/providing-safe-homes-for-survivors) (italics and bold in original) (last accessed July 10, 2024).

> **2.**    **Ruschowski tarnishes the reputation and public standing of Avodah and Fitzpatrick with influential partners and donors in the faith-based and charitable communities.**

55.    Subsequent to the November 7, 2022 meeting, and alongside Rusckowki's conversion of the Lowell Home into The O'Connell House, Rusckowski initiated a campaign to tarnish the reputation and public standing of Avodah and Fitzpatrick with influential partners and donors in the faith-based and charitable communities through knowingly false and defamatory statements.

56.    Leveraging her prominent position and connections in the faith-based and charitable communities, Rusckowski published statements to influential partners and donors in

these communities that Plaintiffs were "labor trafficking" religious Sisters, had stolen and misappropriated grant funds, and had perpetrated crimes and been federally charged with labor trafficking religious Sisters. Rusckowski published these statements to both existing partners and donors of Avodah, along with prospective partners and donors for Avodah. Upon information and belief, Rusckowksi also published these statements to both existing partners and donors of The O'Connell House, along with prospective partners and donors for The O'Connell House.

57.    In winter 2023, Rusckowski published written and/or verbal statements to representatives of the Archdiocese of Denver ("Archdiocese") that Avodah had caused grant money to go "missing," was "not following grant restrictions," had "misused" grant funding, and had "failed to account for grant money in the amount of $130,000." Thereafter, the Archdiocese relayed to Plaintiffs that Rusckowski had told the Archdiocese that Plaintiffs "stole $130,000."

58.    Additionally, in winter 2023, and after Rusckowski had published knowingly false and defamatory statements regarding Plaintiffs to influential partners and donors in the faith-based and charitable communities, at least one of these partners and donors to whom Rusckowski had published these statements then further conveyed to the Archdiocese that Plaintiffs had "misappropriated" grant funds and were "labor trafficking" religious Sisters.

59.    The Archdiocese relied upon these false and defamatory statements about Plaintiffs and further published these false statements to numerous other third parties, including additional influential donors and partners in the faith-based and charitable communities. This included both existing partners and donors of Avodah, along with prospective partners and donors for Avodah.

60.    On February 3, 2023, as a direct result of Ruscowksi's knowingly false and

defamatory statements, the Archdiocese confirmed its decision to disavow Avodah as a Catholic organization and issued public statements to the Catholic community about its decision to disavow Avodah. This disrupted Plaintiffs' nonprofit work, harmed Plaintiffs' reputation and public standing, and caused Plaintiffs to lose valuable relationships and business opportunities with both existing and prospective partners and donors.

61.    Also in February 2023, and again as a direct result of Rusckowksi's knowingly false and defamatory statements to the Archdiocese regarding Plaintiffs, representatives of the Archdiocese utilized local law enforcement to induce the removal of several Eucharistic Heart of Jesus Sisters who were living and caring for survivors on Avodah's campus in Denver, Colorado. This directly interfered with Avodah's business contract with the Eucharistic Heart of Jesus Sisters and disrupted Avodah's programming, services, and mission for survivors on its Denver campus.

62.    Also in February 2023, and again as a direct result of Rusckowksi's knowingly false and defamatory statements to the Archdiocese regarding Plaintiffs, the Archdiocese issued communications to several organizations of religious Sisters, including active partner organizations of Avodah. These communications from the Archdiocese spread false concern regarding the visa status of several religious Sisters who were working with Avodah along with the propriety of Avodah's sponsorship and management of the religious Sisters with whom it had contracted. These communications from the Archdiocese further spread concern for Avodah's continued viability as an organization following the prejudice to its public standing resulting from Rusckowski's knowingly false and defamatory statements. These communications from the Archdiocese, which directly resulted from Rusckowski's knowingly false and defamatory

statements regarding Plaintiffs, induced several religious Sister organizations to breach and/or terminate their employment agreements with Avodah.

63.    In February 2023, Rusckowski also published knowingly false and defamatory statements regarding Plaintiffs to Kristen Meyer, an influential Catholic leader. Ms. Meyer then sent written correspondence to a network of prospective Avodah partners and donors in the faith-based and charitable communities stating: "If Keenan [Fitzpatrick] approached you or stewards for money or if he is an interloper in any way it's best to keep him far away. He scammed our good friends out of 500k and is ironically and sadly trafficking religious sisters.  Happy to discuss further."  Upon information and belief, the parties to whom Ms. Meyer sent this correspondence include existing partners and donors of both Avodah and The O'Connell House, along with prospective partners and donors for both Avodah and The O'Connell House.

64.    On or about February 19, 2023, Rusckowski sent a group text message to a network of prospective Avodah partners and donors in the faith-based and charitable communities, and inadvertently to Fitzpatrick, stating that Rusckowski had terminated her partnership with Avodah and that in her dealings with Avodah, "it is certainly a spiritual battle and evil we are up against!" Upon Rusckowski's recognition that she had inadvertently sent this message to Fitzpatrick, Rusckowski sent another group text message stating: "Unfortunately, the culprit is still on our 'Friends of Deb' List--[Fitzpatrick] is NO friend--more demon than friend!! I will create another list for just TRUE Friends of Deb!" Rusckowski then sent a third group text message stating, in regard to Fitzpatrick: "Everyone please delete this list---he'll probably try to go after you!"  Upon information and belief, the parties to whom Rusckowski sent these text messages include existing partners and donors of both Avodah and The O'Connell House, along

with prospective partners and donors for both Avodah and The O'Connell House.

65.    In the spring of 2023, Rusckowski called an Avodah partner and prominent figure in both the Catholic community and national anti-trafficking field and stated: "Avodah and Fitzpatrick misappropriated funds and were labor trafficking religious sisters who Avodah employed to care for victims of sex trafficking." Rusckowski urged this individual to disassociate himself from Plaintiffs and made clear that the purpose of her call was to induce this individual and others to avoid any prospective personal or business involvement with Plaintiffs. Rusckowski later sent correspondence to this individual reaffirming the previous phone conversation in an attempt to dissuade him and his network from donating to or otherwise prospectively involving themselves with Plaintiffs.

66.    Rusckowksi's statements interfered with Avodah's partnerships with both existing and prospective donors, by spreading false information about Avodah and its employees with the intent that existing donors would not fulfill their financial commitments to Avodah and prospective donors would refrain from donating to Avodah.

67.    As a direct result of Rusckowski's knowingly false and defamatory statements and improper conduct, donors and partner organizations who had pledged, or planned to pledge, financial commitments to Avodah, withdrew their donations and/or commitments, thereby causing Plaintiffs to incur substantial injuries, damages, and losses.

68.    Throughout the foregoing, Plaintiffs had entered into discussions with prospective donors regarding millions of dollars in donations that were intended for Avodah and its mission of caring for survivors. As a direct result of Rusckowski's knowingly false and defamatory statements, at least one donor ceased raising funds worth hundreds of thousands of

dollars that were intended to be donated to Avodah for the benefit of survivors served by Avodah. As a further direct result of Rusckowski's knowingly false and defamatory statements, Plaintiffs suffered injuries, damages, and losses, in the form of millions of dollars in withdrawn donations and fundraising for projects intending to benefit Avodah.

69.    As a direct result of Rusckowski's knowingly false and defamatory statements and improper conduct, various community organizations have shunned Avodah and disallowed Avodah's attendance and participation at seminars, conferences, and other prominent activities pertinent to Avodah's operations and development.

70.    In July 2023, the Napa Institute, a high-powered, prominent organization dedicated to the formation and preparation of Catholic leadership, disinvited Avodah from its 13th annual summer conference due to a "pending shadow" caused by the defamatory statements made by or on behalf of Rusckowski within the community.

71.    In January 2024, FOCUS, a prominent Catholic outreach organization, sponsored its annual SEEK Conference in St. Louis, Missouri. As a direct result of Rusckowski's knowingly false and defamatory statements, Fitzpatrick was publicly removed from the presence of friends, donors, and priests at the partner track of the conference.

72.    Upon information and belief, Rusckowski's knowingly false and defamatory statements caused or otherwise contributed to the U.S. Attorney's Office for the District of Massachusetts convening a federal criminal investigation against Plaintiffs regarding allegations that Avodah had labor trafficked religious sisters.

73.    No federal charges have been filed against Plaintiffs.

74.    Nonetheless, Rusckowski has published knowingly false and defamatory

statements to influential partners and donors in the faith-based and charitable communities that Plaintiffs have perpetrated crimes and have been federally charged with labor trafficking religious Sisters. Rusckowski published these statements to both existing partners and donors of Avodah, along with prospective partners and donors for Avodah.  Upon information and belief, the parties to whom Rusckowski published these statements further include both existing partners and donors of The O'Connell House, along with prospective partners and donors for The O'Connell House.

75.    As a direct result of Rusckowski's knowingly false and defamatory statements and improper conduct set forth herein, Plaintiffs continue to suffer injuries and damages today, including economic and non-economic damages and reputational harm.

## <u>FIRST CAUSE OF ACTION</u>
### (Defamation of Avodah)

76.    Plaintiffs allege and incorporate herein each and all of the allegations of paragraphs 1 through 76, inclusive.

77.    Rusckowski published written and/or verbal statements to third parties that Avodah was "labor trafficking" religious Sisters.

78.    The statement that Avodah was "labor trafficking" religious Sisters exposes Avodah to contempt and ridicule, with prejudice to Avodah's public standing, by improperly and inaccurately representing that Avodah committed a criminal offense, deceived donors and partners, and both defied and inhibited its own purpose and mission through harmful and immoral misconduct against a vulnerable population that it functions to serve. The statement is thus defamatory.

79.    The statement that Avodah was "labor trafficking" religious Sisters imputes to

Avodah the criminal offense of labor trafficking under C.R.S. § 18-3-503 and is thus defamatory per se.

80.     In publishing statements to third parties that Avodah was "labor trafficking" religious Sisters, Rusckowski represented these statements as factual.

81.     The statement that Avodah was "labor trafficking" religious Sisters is materially false.

82.     Through Rusckowski's affiliation and partnership with Avodah, her knowledge of and participation in Avodah's programs and operations generally, and her knowledge of and participation in Avodah's work with religious Sisters specifically, including Rusckowski's knowledge of Avodah's employment agreements with religious Sisters and the religious Sisters' voluntary approval and acceptance of internships with Avodah partner organizations in accordance with those employment agreements, Rusckowski had actual knowledge that the statement that Avodah was "labor trafficking" religious Sisters is false when she published this statement to third parties.

83.     Because Rusckowski had actual knowledge that the statement that Avodah was "labor trafficking" religious Sisters is false when she published this statement to third parties, or Rusckowski at minimum published this statement to third parties with reckless disregard for whether the statement was true, Rusckowski published this statement to third parties with actual malice.

84.     Rusckowski published written and/or verbal statements to third parties that Avodah had stolen and misappropriated grant funds.

85.     The statement that Avodah had stolen and misappropriated grant funds exposes

Avodah to contempt and ridicule, with prejudice to Avodah's public standing, by improperly and inaccurately representing that Avodah committed a criminal offense, deceived donors and partners, and both defied and inhibited its own purpose and mission through harmful and immoral misconduct. The statement is thus defamatory.

86.    The statement that Avodah had stolen and misappropriated grant funds imputes to Avodah the criminal offense of theft under C.R.S. § 18-4-401 and is thus defamatory per se.

87.    In publishing statements to third parties that Avodah had stolen and misappropriated grant funds, Rusckowski represented these statements as factual.

88.    The statement that Avodah had stolen and misappropriated grant funds is materially false.

89.    Through Rusckowski's affiliation and partnership with Avodah, her knowledge of and participation in Avodah's programs and operations generally, and her knowledge of and participation in Avodah's administration and expenditure of grant funds specifically, including Rusckowski's personal administration and oversight of grant funds donated to Avodah along with her personal and specific instructions to Avodah to use Malta grant funds to pay for construction work at the Lowell Home and, once received, to reimburse these funds with funds donated by The Flatley Foundation, Rusckowski had actual knowledge that the statement that Avodah had stolen and misappropriated grant funds is false when Rusckowski published this statement to third parties.

90.    Because Rusckowski had actual knowledge that the statement that Avodah had stolen and misappropriated grant funds is false when Rusckowski published this statement to third parties, or Rusckowski at minimum published this statement to third parties with reckless disregard

for whether the statement was true, Rusckowski published this statement to third parties with actual malice.

91.    Rusckowski published written and/or verbal statements to third parties that Avodah had perpetrated crimes and had been federally charged with labor trafficking religious Sisters.

92.    The statement that Avodah had perpetrated crimes and had been federally charged with "labor trafficking" religious Sisters exposes Avodah to contempt and ridicule, with prejudice to Avodah's public standing, by improperly and inaccurately representing that Avodah committed a criminal offense, deceived donors and partners, and both defied and inhibited its own purpose and mission through harmful and immoral misconduct against a vulnerable population that it functions to serve. The statement is thus defamatory.

93.    The statement that Avodah had perpetrated crimes and had been federally charged with labor trafficking imputes a criminal offense and is thus defamatory per se.

94.    In publishing statements to third parties that Avodah had perpetrated crimes and had been federally charged with labor trafficking, Rusckowski represented these statements as factual.

95.    The statement that Avodah had perpetrated crimes and had been federally charged with labor trafficking is materially false.

96.    Through Rusckowski's affiliation and partnership with Avodah, her knowledge of and participation in Avodah's programs and operations, and her knowledge of the status of the federal criminal investigation convened by U.S. Attorney's Office for the District of Massachusetts against Plaintiffs, Rusckowski had actual knowledge that the statement that Avodah had perpetrated crimes and had been federally charged with labor trafficking is false when Rusckowski

published this statement to third parties.

97.    Because Rusckowski had actual knowledge that the statement that Avodah had perpetrated crimes and had been federally charged with labor trafficking is false when Rusckowski published this statement to third parties, or Rusckowski at minimum published this statement to third parties with reckless disregard for whether the statement was true, Rusckowski published this statement to third parties with actual malice.

98.    As a direct, proximate, and foreseeable result of Rusckowski's defamatory statements, both individually and collectively, and the repetition thereof by third parties, Avodah has incurred and will continue to suffer injuries, damages and losses including but not limited to economic and non-economic harm, special damages, reputational harm in the community, cost and expense as described herein in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### (Defamation of Fitzpatrick)

99.    Plaintiffs allege and incorporate herein each and all of the allegations of paragraphs 1 through 98, inclusive.

100.    Rusckowski published written and/or verbal statements to third parties that Fitzpatrick, as Executive Director of Avodah, was "labor trafficking" religious Sisters.

101.    The statement that Fitzpatrick was "labor trafficking" religious Sisters exposes Fitzpatrick to contempt and ridicule, with prejudice to Fitzpatrick's public standing, by improperly and inaccurately representing that Fitzpatrick committed a criminal offense, deceived donors and partners of Avodah as its Executive Director, and both defied and inhibited the purpose and mission of Avodah as its Executive Director through harmful and immoral misconduct against a vulnerable population that Fitzpatrick works to serve. The statement is thus defamatory.

102.    The statement that Fitzpatrick was "labor trafficking" religious Sisters imputes to Fitzpatrick the criminal offense of labor trafficking under C.R.S. § 18-3-503 and is thus defamatory per se.

103.    In publishing statements to third parties that Avodah was "labor trafficking" religious Sisters, Rusckowski represented these statements as factual.

104.    The statement that Fitzpatrick was "labor trafficking" religious Sisters is materially false.

105.    Through Rusckowski's affiliation and partnership with Fitzpatrick, her knowledge of Fitzpatrick's work in Avodah's programs and operations generally, and her knowledge of and participation in Fitzpatrick's work with religious Sisters specifically, including Rusckowski's knowledge of Avodah's employment agreements with religious Sisters and the religious Sisters' voluntary approval and acceptance of internships with Avodah partner organizations in accordance with those employment agreements, Rusckowski had actual knowledge that the statement that Fitzpatrick was "labor trafficking" religious Sisters is false when Rusckowski published this statement to third parties.

106.    Because Rusckowski had actual knowledge that the statement that Fitzpatrick was "labor trafficking" religious Sisters is false when Rusckowski published this statement to third parties, or Rusckowski at minimum published this statement to third parties with reckless disregard for whether the statement was true, Rusckowski published this statement to third parties with actual malice.

107.    Rusckowski published written and/or verbal statements to third parties that Fitzpatrick, as Executive Director of Avodah, had stolen and misappropriated grant funds donated

to Avodah.

108.    The statement that Fitzpatrick had stolen and misappropriated grant funds exposes Fitzpatrick to contempt and ridicule, with prejudice to Fitzpatrick's public standing, by improperly and inaccurately representing that Fitzpatrick committed a criminal offense, deceived donors and partners of Avodah as its Executive Director, and both defied and inhibited the purpose and mission of Avodah as its Executive Director through harmful and immoral misconduct. The statement is thus defamatory.

109.    The statement that Fitzpatrick had stolen and misappropriated grant funds imputes to Fitzpatrick the criminal offense of theft under C.R.S. § 18-4-401 and is thus defamatory per se.

110.    In publishing statements to third parties that Fitzpatrick had stolen and misappropriated grant funds, Rusckowski represented these statements as factual.

111.    The statement that Fitzpatrick had stolen and misappropriated grant funds is materially false.

112.    Through Rusckowski's affiliation and partnership with Fitzpatrick, her knowledge of Fitzpatrick's work in Avodah's programs and operations generally, and her knowledge of Fitzpatrick's administration and expenditure of Avodah grant funds specifically, including Rusckowski's personal administration and oversight of grant funds donated to Avodah along with her personal and specific instructions to Fitzpatrick to use Malta grant funds to pay for construction work at the Lowell Home and, once received, to reimburse these funds with funds donated by The Flatley Foundation, Rusckowski had actual knowledge that the statement that Fitzpatrick had stolen and misappropriated grant funds is false when Rusckowski published this statement to third parties.

113.    Because Rusckowski had actual knowledge that the statement that Fitzpatrick had stolen and misappropriated grant funds is false when Rusckowski published this statement to third parties, or Rusckowski at minimum published this statement to third parties with reckless disregard for whether the statement was true, Rusckowski published this statement to third parties with actual malice.

114.    Rusckowski published written and/or verbal statements to third parties that Fitzpatrick, as Executive Director of Avodah, had perpetrated crimes.

115.    The statement that Fitzpatrick had perpetrated crimes exposes Fitzpatrick to contempt and ridicule, with prejudice to Fitzpatrick's public standing, by improperly and inaccurately representing that Fitzpatrick committed a criminal offense, deceived donors and partners of Avodah as its Executive Director, and both defied and inhibited the purpose and mission of Avodah as its Executive Director through harmful and immoral misconduct. The statement is thus defamatory.

116.    The statement that Fitzpatrick had perpetrated crimes imputes a criminal offense to Fitzpatrick and is thus defamatory per se.

117.    In publishing statements to third parties that Fitzpatrick had perpetrated crimes, Rusckowski represented these statements as factual.

118.    The statement that Fitzpatrick had perpetrated crimes is materially false.

119.    Through Rusckowski's affiliation and partnership with Fitzpatrick and her knowledge of Fitzpatrick's work in Avodah's programs and operations, Rusckowski had actual knowledge that the statement that Fitzpatrick had perpetrated crimes is false.

120.    Because Rusckowski had actual knowledge that the statement that Fitzpatrick had

perpetrated crimes is false when Rusckowski published this statement to third parties, or Rusckowski at minimum published this statement to third parties with reckless disregard for whether the statement was true, Rusckowski published this statement to third parties with actual malice.

121.    Rusckowski published written and/or verbal statements to third parties specifically in faith-based communities that Fitzpatrick is a "demon".

122.    The statement that Fitzpatrick is a "demon" exposes Fitzpatrick to contempt and ridicule, with prejudice to Fitzpatrick's public standing, by improperly and inaccurately representing that Fitzpatrick has immoral, harmful, dangerous, and sacrilegious propensities. The statement is thus defamatory.

123.    In publishing statements to third parties specifically in faith-based communities that Fitzpatrick is a "demon", Rusckowski represented these statements as factual.

124.    The statement that Fitzpatrick is a "demon" is materially false.

125.    Through Rusckowski's affiliation and partnership with Fitzpatrick and her knowledge of Fitzpatrick's commitment to and work in faith-based service programs and charitable initiatives, Rusckowski had actual knowledge that the statement that Fitzpatrick is a "demon" is false when Rusckowski published this statement to third parties.

126.    Because Rusckowski had actual knowledge that the statement that Fitzpatrick is a "demon" is false when Rusckowski published this statement to third parties, or Rusckowski at minimum published this statement to third parties with reckless disregard for whether the statement was true, Rusckowski published this statement to third parties with actual malice.

127.    The published defamatory statements by Rusckowski referenced above regarding

Fitzpatrick were made to third parties and entities working directly with Fitzpatrick individually, as well as both existing and prospective donors and partner organizations of Avodah.

128.    As a direct, proximate, and foreseeable result of Rusckowski's defamatory statements, both individually and collectively, and the repetition thereof by third parties, Fitzpatrick has incurred and will continue to suffer injuries, damages and losses including but not limited to economic and non-economic harm, special damages, reputational harm in the community, cost and expense described herein in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### (Intentional Interference with Contract)

129.    Plaintiffs allege and incorporate herein each and all of the allegations of paragraphs 1 through 128, inclusive.

130.    Avodah maintained employment contracts with religions Sisters for their work with Avodah.

131.    Specifically, Avodah contracted with the Sisters of the Eucharistic Heart of Jesus on August 24, 2022, and the contract term was a two-year period.

132.    Avodah contracted with the Sisters of the Nativity on August 16, 2022, for a two-year period.

133.    Avodah contracted with the Passionist Sisters of St. Paul of the Cross on July 28, 2022, for a two-year period.

134.    Avodah contracted with the Sisters of St. Louis on July 20, 2022, for a two-year period.

135.    Avodah contracted with Dominican Sisters of the Most Holy Rosary on September 7, 2022, for a two-year period.

136.    The contracts with all of the religious Sisters are collectively referred to as the "Contracts".

137.    Rusckowski knew about the Contracts between Avodah and the religious Sisters.

138.    Rusckowski had an improper motive to intentionally interfere with the Contracts between Avodah and the religious Sisters. Specifically, upon information and belief, Rusckowski had both a personal and business motive to disrupt Avodah's development and implementation of the Sister Care model across the U.S., to disrupt Avodah's partnerships with the religious Sisters and prevent further partnerships between Avodah and the religious sisters, to instead competitively position both The O'Connell House and Rusckowski's entity GSO for partnerships and contractual agreements with the religious Sisters that had formerly contracted with Avodah, to develop new revenue-generating business lines for her entity GSO, and to eliminate Avodah as a competitor for grants, partnerships, and business opportunities pertaining to the Sister Care model and survivor safe homes.

139.    Rusckowski intentionally interfered with the Contracts between Avodah and the religious Sisters through improper conduct. Specifically, Rusckowski intentionally induced the religious Sisters to breach and/or terminate their employment Contracts through knowingly false and defamatory statements, which intentionally caused the religious Sisters false concern regarding their visa status and the propriety of Avodah's sponsorship and management, and also intentionally caused the religious Sisters concern for Avodah's continued viability as an organization following the prejudice to its public standing resulting from Rusckowski's knowingly false and defamatory statements. As a direct, proximate, and foreseeable result of Rusckowski's knowingly false and defamatory statements and the concerns these statements

caused to the religious Sisters, the religious Sisters then breached and/or terminated their employment Contracts with Avodah.

140.    Rusckowski thereby both intentionally and improperly interfered with the employment Contracts between Avodah and the religious Sisters, by intentionally inducing the religious Sisters to breach and/or terminate their employment Contracts with Avodah through improper conduct and with improper motive as set forth above.

141.    As a direct, proximate, and foreseeable result of Rusckowski's intentional and improper interference with the employment Contracts between Avodah and the religious Sisters, Avodah has incurred and will continue to incur damages, including but not limited to loss of past and future income, loss of contractual benefits with third parties, loss of business opportunity, reputational harm in the community, and cost and expense as described herein in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**(Intentional Interference with Prospective Business Relations)**

142.    Plaintiffs allege and incorporate herein each and all of the allegations of paragraphs 1 through 141, inclusive.

143.    Plaintiffs had developed advantageous prospective business relationships with third-party donors and partner organizations including, but not limited to, the following national organizations in the anti-trafficking field: Dominican Sisters of St. Catherine Siena, Tim Tebow Foundation, Opus AMDG, Wellspring, Generate Hope, and Her Campaign.

144.    Rusckowski knew about Plaintiffs' prospective business relationships with third-party donors and partner organizations, including but not limited to the organizations referenced above. These prospective business relationships with third-party donors and partner organizations

would have provided financial, organizational, and reputational benefit to Plaintiffs in performing their nonprofit mission, would have expanded Avodah's capabilities and programs, and would have competitively positioned Avodah for additional grants, donations, and partnerships with other donors and partner organizations.

145.     Rusckowski had an improper motive to intentionally interfere with Plaintiffs' prospective business relationships with third-party donors and partner organizations, including but not limited to the organizations referenced above. Specifically, upon information and belief, Rusckowski had both a personal and business motive to disrupt Plaintiffs' development and implementation of the Sister Care model across the U.S., to disrupt prospective business relations and contractual agreements between Plaintiffs and prospective donors and partner organizations that are critical to Plaintiffs' nonprofit work and the viability of Avodah as an organization, to instead competitively position both The O'Connell House and her entity GSO for partnerships and contractual agreements with third parties that were formerly prospective donors and partner organizations for Avodah, to develop new revenue-generating business lines for her entity GSO, and to eliminate Avodah as a competitor for grants, partnerships, and business opportunities pertaining to the Sister Care model and survivor safe homes.

146.     Rusckowski intentionally interfered with Plaintiffs' prospective business relationships with third-party donors and partner organizations, including but not limited to the organizations referenced above, through improper conduct. Specially, Rusckowski induced or otherwise caused third-party donors and partner organizations to discontinue and/or refrain from prospective business relations with Plaintiffs, prevented contractual arrangements between Plaintiffs and these organizations, and further prevented Plaintiffs from acquiring or continuing

prospective relationships with these organizations through knowingly false and defamatory statements which tarnished Plaintiffs' reputation and public standing in the faith-based and charitable communities. As a direct, proximate, and foreseeable result of Rusckowski's knowingly false and defamatory statements and the prejudice these statements caused to Plaintiffs' reputation and public standing in the faith-based and charitable communities, third-party donors and partner organizations discontinued and/or refrained from prospective business relations with Plaintiffs.

147.    Upon information and belief, the prospective donors and partners which Rusckowski intentionally and improperly induced or otherwise caused to discontinue and/or refrain from prospective business relations with Plaintiffs include both existing partners and donors of The O'Connell House, along with prospective partners and donors for The O'Connell House.

148.    Rusckowski thereby both intentionally and improperly interfered with Plaintiffs' prospective business relationships with third-party donors and partner organizations, including but not limited to the organizations referenced above, by intentionally inducing or otherwise causing third-party donors and partner organizations to discontinue and/or refrain from prospective business relations with Plaintiffs, intentionally preventing contractual arrangements between Plaintiffs and these organizations, and further intentionally preventing Plaintiffs from acquiring or continuing prospective relationships with these organizations through improper conduct and with improper motive as set forth above.

149.    As a direct, proximate, and foreseeable result of Rusckowski's intentional and improper interference with Plaintiffs' business relationships and prospective business

relationships, Plaintiffs and have incurred and will continue to incur injuries and damages including but not limited to loss of past and future income, loss of contractual benefits with third parties, loss of business opportunities, reputational harm in the community, and cost and expense as described herein.

## FIFTH CAUSE OF ACTION
### (Extreme and Outrageous Conduct – Fitzpatrick)

150.      Plaintiffs allege and incorporate herein each and every allegation set forth in paragraphs 1 through 149, inclusive.

151.      Rusckowski's actions and statements, individually, and collectively as a course of conduct, which Rusckowski initiated with improper personal and business incentive, and which ridiculed and publicly tarnished Fitzpatrick and his work, character, morality, and faith through false representations and accusations, were so outrageous in character and so extreme in degree that a reasonable member of the community would regard them as atrocious, going beyond all possible bounds of decency and utterly intolerable in a civilized community.

152.      Rusckowski's actions and statements, individually, and collectively as a course of conduct, which Rusckowski initiated with improper personal and business incentive, and which ridiculed and publicly tarnished Fitzpatrick and his work, character, morality, and faith through false representations and accusations, would arouse resentment against Rusckowski among reasonable members of the community and lead members of the community to conclude that the conduct and statements of Rusckowski were extreme and outrageous.

153.      Rusckowski's actions and statements were performed with the intent of causing Fitzpatrick severe emotional distress, or at minimum were reckless in causing Fitzpatrick severe

emotional distress.

154.    Rusckowski's public ridicule and disparagement of Fitzpatrick and his work, character, morality, and faith through false representations and accusations has caused and continues to cause Fitzpatrick severe emotional distress.

155.    As a direct, proximate, and foreseeable result of Rusckowski's extreme and outrageous conduct, Fitzpatrick has incurred and will continue to incur injuries and damages including but not limited to loss of past and future income, loss of contractual benefits with third parties, loss of business opportunity, reputational harm in the community, cost and expense.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment on all causes of action against Rusckowski and for all applicable damages according to proof, including but not limited to economic and non-economic damages, special damages, attorneys' fees, costs, expenses, and interest in accordance with law and such other and further relief as the Court may deem proper.

## **JURY DEMAND**

**Plaintiffs demand a jury for the trial of this action on all matters so triable.**

Respectfully submitted this 10th day of July, 2024.

By:  *s/ M. Caleb Meyer*
M. Caleb Meyer, Esq.
Adam M. Royval. Esq.
**MESSNER REEVES LLP**
1550 Wewatta Street, Suite 710
Denver, CO 80202
Telephone: (303) 623-1800
*Attorneys for Plaintiffs, Avodah Farms and Keenan Fitzpatrick*