**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**


Civil Action No.  1:24-cv-00233-NYW-MEH

**AVODAH FARMS**, a Colorado nonprofit corporation, and
**KEENAN FITZPATRICK**, an individual

       Plaintiffs,

v.

**DEBORAH O'HARA-RUSCKOWSKI**, an individual

       Defendant.

_____

**DEFENDANT DEBORAH O'HARA-RUSCKOWSKI'S
MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**
_____

## CONFERRAL WITH OPPOSING COUNSEL

Counsel for Ms. O'Hara-Rusckowski conferred with counsel for Plaintiffs, Avodah Farms ("Avodah") and Keenan Fitzpatrick ("Fitzpatrick") (collectively, "Plaintiffs"), regarding this Motion pursuant to Uniform Civil Practice Standard 7.1(B)(b) and D.C. Colo. L. Civ. R. 7.1(a), including on or about April 9, May 24, May 27, June 5, and August 5, 2024.

## INTRODUCTION

Ms. O'Hara-Rusckowski is a leading expert on human trafficking, a prominent member of the Catholic faith, and has been the Delegate for the Order of Malta's Mission at the United Nations, where her work focuses on human trafficking and the global refugee crisis.  At one time she worked with Plaintiffs on a project that was supposed to further Plaintiffs' *purported* mission of assisting survivors of sex trafficking.  It did not end well.

According to the First Amended Complaint (the "FAC"), the parties intended to work with Catholic nuns (the "Passionist Sisters") to provide care for sex trafficking survivors in a Lowell, Massachusetts house that the Plaintiffs were supposed to turn into a safe home (the "Lowell Home").  Ms. O'Hara-Rusckowski introduced Plaintiffs to a religious order that was selling this underused residential facility.  She also provided funding directly and indirectly (by connecting Plaintiffs to a wellspring of Catholic donors) to purchase and renovate the home and to train and provide for the Passionist Sisters. While Plaintiffs quickly spent a small fortune, they did not achieve any of their objectives, and the Lowell Home remained uninhabited and uninhabitable.  Plaintiffs then shipped off the Passionist Sisters to work for third parties elsewhere throughout the United States. When Ms. O'Hara-Rusckowski confronted Plaintiffs with these serious concerns, Plaintiffs

conceded their wrongdoing by ending their involvement with the Lowell Home, returning unused funds, and ceding the relationship with the Passionist Sisters.

The FAC asserts claims for defamation, tortious interference with contract, tortious interference with prospective business relations, and extreme and outrageous conduct. But even with the benefit of seeing Ms. O'Hara-Rusckowski's motion to dismiss Plaintiffs' original complaint (ECF 61), the FAC fails to state any plausible claims for relief. That is unsurprising. The original complaint's deficiencies were not the product of poor pleading or ignorance as to the elements of the claims. Rather, the law does not support any cause of action against Ms. O'Hara-Rusckowski in these circumstances.

At the heart of this case is a quintessentially ecclesiastical matter. Plaintiffs claim that Ms. O'Hara-Ruskowski allegedly defamed them, and committed other torts, by telling the Archdiocese of Denver and unnamed others about her experience working with Plaintiffs, and, based on those alleged defamatory statements, the Archdiocese of Denver ("Archdiocese") "confirmed its decision to disavow Avodah as a Catholic organization and issued public statements to the Catholic community about its decision to disavow Avodah." FAC ¶ 60. Elsewhere, Plaintiff Fitzpatrick alleges that Ms. O'Hara-Rusckowski defamed him by referring to him as a "demon," *id.* at ¶ 64, and further alleges that "[t]he statement that Fitzpatrick is a 'demon' is materially false." *Id.* at ¶ 124. While there are many bases for dismissing these claims, this Court lacks subject matter jurisdiction over such matters that involve religious disputes and doctrines.

Plaintiffs also have an established and public history of trying to use litigation to silence their religious critics; Ms. O'Hara-Rusckowski is just Plaintiffs' latest victim. Based on materials referred to in Plaintiffs' pleadings, prior to the events surrounding the Lowell

Home, former Avodah members had expressed concern that Avodah was a "cult" and that Mr. Fitzpatrick had a "personality disorder." Plaintiffs retaliated by threatening legal action. According to these same documents, the Archdiocese of Denver became aware of systemic complaints from religious sisters concerning their experiences with Plaintiffs. In August of 2022, following an extensive investigation—that, according to the Archdiocese, Plaintiffs impeded with "deception and excuses"—the Archdiocese disavowed Avodah as a Catholic ministry. Two other prominent organizations also severed their relationships with Plaintiffs based on similar complaints. Rather than reforming what were clearly some (at least) unorthodox practices, Plaintiffs took to the internet to release videos—starring Mr. Fitzpatrick—blaming and besmirching third parties, claiming that Plaintiffs—rather than the Sisters—were victimized, and waging a war against the Archdiocese and the former Avodah members and volunteers who spoke out against Plaintiffs. This was all before Ms. O'Hara-Rusckowski purportedly made any of her allegedly defamatory statements.

As for Ms. O'Hara-Rusckowski, Plaintiffs have not pled her allegedly defamatory statements with any specificity. The only quoted language is about Mr. Fitzpatrick being "more demon than a friend." Other than the "demon" statement, the FAC does not include the "who," "what," "when," or "where" of any of the allegedly defamatory statements—facts that are necessary for a defendant to be able to defend a defamation claim. Plaintiffs only plead that the *gist* of the allegedly defamatory statements are that Plaintiffs had misappropriated or stolen grant funds, that Plaintiffs had engaged in labor trafficking, and that Plaintiffs were the subject of a federal investigation. Even with the lack of specific language and context, it is reasonable to infer from the pleadings that any of the allegedly

defamatory statements, to the extent that they were made at all, would have to have been based on the experiences that Ms. O'Hara-Rusckowski had with the Plaintiffs and her knowledge of the federal investigation. It is therefore more than reasonable to infer that Ms. O'Hara-Rusckowski explained the factual basis for her opinions about Plaintiffs, which would make the allegedly defamatory statements protected opinion.

But, in any event, Plaintiffs' wide-of-the-mark allegations fall far short of satisfying the actual malice standard that applies in a case like this. Plaintiffs' claims all stem from constitutionally-protected speech concerning human trafficking and Plaintiffs' misappropriation of charitable funds. The alleged defamatory statements are therefore subject to heightened protection under applicable law, and Plaintiffs must therefore allege facts plausibly demonstrating not only that Ms. O'Hara-Rusckowski *made* the allegedly defamatory statements, but also that she did so with *actual malice*, *i.e.*, they were materially false *and* were made with knowledge of their falsity or with reckless disregard as to their falsity. But other than offering talismanic incantations, Plaintiffs plead no facts to support actual malice, and, in fact, the FAC, along with matters referenced therein, establish the opposite.

Plaintiffs' misconduct, moreover, is not just gossip and scandal in the religious and charitable communities. Law enforcement in the state of Colorado had probable cause to enter Plaintiffs' property in Denver and thereafter removed Sisters from that location. Remarkably, Plaintiffs see this fact—which they affirmatively allege—not as evidence of their misconduct, but as evidence of some undescribed conspiracy against them. They similarly act as martyrs with respect to the ongoing federal criminal investigation led by the United States District Attorney's Office of the District of Massachusetts into Plaintiffs'

suspected illegal activities.  Given all of Plaintiffs' *entanglements*, it is wholly unsurprising that they cannot connect any of Ms. O'Hara-Rusckowski's allegedly defamatory statements to their alleged harm.

Ultimately, the FAC does not plausibly allege any wrongdoing on the part of Ms. O'Hara-Rusckowski.  Plaintiffs have failed to allege any specific actionable statements that are defamatory, materially false, not protected opinion, and that were made with actual malice.  This is fatal to all of Plaintiffs' claims.  For these reasons, this Court should dismiss Plaintiffs' First Amended Complaint in its entirety and, for the reasons discussed in the concurrently filed Special Motion to Dismiss under Colorado's Anti-SLAPP statute, award Ms. O'Hara-Rusckowski's fees and costs incurred in connection with this lawsuit.

## FACTUAL BACKGROUND[1]

### I.  Plaintiffs' History of Controversy Within the Catholic-American Community

Avodah purports to provide care to sex-trafficking survivors, in part, through the use of Catholic sisters.  *See* FAC at ¶ 12.[2]  Mr. Fitzpatrick is its Executive Director.  *Id.* at ¶ 13.  Plaintiffs tout their use of a "Sister Care" model, under which religious sisters live in residence and provide long-term care in safe homes to survivors of sex trafficking (and their children).  *Id.*  Plaintiffs did not invent the "Sister Care" model, nor were they the first to utilize it in the United States.  *See id.* at ¶ 14.

---

[1] The following facts are taken from the FAC and accepted as true solely for purposes of this Motion to Dismiss. Ms. O'Hara-Rusckowski also relies on documents that are the proper subject of judicial notice, as explained in footnotes 2 and 3, *infra*, that can be considered both for this motion to dismiss and the concurrently filed anti-SLAAP motion.

[2] While replete with lofty language regarding Avodah's purported work in this field, the FAC is notably devoid of any facts describing the particulars of this work.  For instance, there are no allegations suggesting that Avodah successfully established a safe house or directly provided care for any actual survivors of sex trafficking using the "Sister Care" model, or that its work has even gone beyond developing initiatives.  *See* FAC ¶¶ 16-18.

Plaintiffs are controversial figures within the Catholic-American and anti-trafficking communities. The Archdiocese disavowed Avodah in August of 2022, meaning, among other things, that Avodah was not allowed to call itself a "Catholic ministry," a decision that was thereafter confirmed in February 2023. *See id.* at ¶ 60. Much of this controversy is detailed on Plaintiffs' own public website. *See* Declaration of Arianna K. McLaughlin ("McLaughlin Decl."), at Exs. A-E.[3] It also comes despite Avodah's status as a relatively new organization. *See* Ex. A. Since its founding, Avodah has, by its own account, "time and time again" faced accusations of wrongdoing. *See* Ex A. In 2020, two individuals— a licensed counselor and a former volunteer—expressed concern that Mr. Fitzpatrick had a "personality disorder," which they brought to the attention of Avodah's Board of Directors. *See* Exs. A-B. Plaintiffs responded with the threat of litigation. *See* Ex. B. In November of 2021, another volunteer informed others that, based on his experience, Avodah was a cult. *Id.* Plaintiffs, again, responded by threatening legal action. *Id.*

---

[3] This Court may take judicial notice of these exhibits. Judicial notice is appropriate where the material is a matter "of public record" *or* where the document is "central to the plaintiff's claims, referred to in the complaint, and the parties do not dispute [its] authenticity." *See Bandimere Auto-Performance Ctr., Inc. v. Johnson*, No. 22-CV-01644-NYW-SKC, 2023 WL 4421402, at *4 (D. Colo. July 10, 2023) (internal quotations omitted). A party's own website meets these requirements. *See O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) (judicial notice of party's website was mandatory, and district court abused its discretion in not taking judicial notice thereof, where court was provided link to webpage and webpage "should not be subject to dispute . . . because [party] created it."); *see also Escobar, Inc. v. Barwest Grp., LLC*, No. 20-CV-02771-PAB-STV, 2021 WL 4319572, at *6 n.3 (D. Colo. Sept. 22, 2021) ("The Court may [] take judicial notice of a screenshot from a website."). Materials from Plaintiffs' website are matters of public record and are also central to Plaintiffs' attempt to prove damages and harm based on the Archdiocese's disavowal of Avodah, which the attached webpages address. As a result, this Court may take judicial notice of these exhibits and consider "factual information" contained therein. *See O'Toole,* 499 F.3d at 1257.

The Archdiocese became interested in the various accusations against Plaintiffs and held several meetings with Plaintiffs, the last of which was in August of 2022.  *See* Ex. A.  Ultimately, the Archdiocese disavowed Avodah as a Catholic ministry in August 2022 because of "systematic" complaints against Avodah by the Sisters that Avodah oversaw.  *See* McLaughlin Decl. at Ex. F.[4]  It also observed that "when Avodah was confronted with these issues, [the Archdiocese] was met with deception and excuses." *Id.*  The Archdiocese accordingly followed the actions of "two prominent Catholic ministries dedicated to helping sex-trafficking victims," that "cut ties with Avodah" due to "similar problems."  *Id.*

Plaintiffs responded by releasing several public articles and a video recorded by Mr. Fitzpatrick addressing the Archdiocese's decision.  *See id.* at Ex. A-E.  They assert that the Archdiocese engaged in "lies and deceit" in connection with its review of Avodah. *See id.* at Ex. A.  Plaintiffs published two additional webpages relating to "the facts of [Plaintiffs'] positions" and the evidence of lies and deceit, which they have since replaced with a message requesting that viewers "for now . . . meet with us privately to review information and evidence related to these statements[.]"  *See* Ex. D.

In February of 2023, law enforcement agents raided Plaintiffs' property in Denver and removed several Eucharistic Heart of Jesus Sisters whom Plaintiffs had kept on their campus.  *See* FAC at ¶ 61.  Plaintiffs do not allege that the police lacked probable cause for entering Plaintiffs' property, that they did not have a legal basis to do so, or that the

---

[4] This press release is subject to judicial notice because it reflects material that Plaintiffs referred to in their Complaint, is central to Plaintiffs' claims, and is available online on the Archdiocese's official website, such that it is "a matter of public record not subject to reasonable dispute."  *See Hastey on behalf of YRC Worldwide, Inc. v. Welch,* 449 F. Supp. 3d 1053, 1060 (D. Kan. 2020) (judicial notice of press release on website).

police lacked the Sisters' consent in removing the Sisters from the property. The United States Attorneys' Office for the District of Massachusetts is currently pursuing a federal criminal investigation against Plaintiffs. *See id.* at ¶ 96.

II.    **Plaintiffs Fail to Fulfil Their Obligations With Respect to the Lowell Home in Massachusetts**

Ms. O'Hara-Rusckowski is an expert and thought-leader in the care of human trafficking victims. *See* FAC at Intro. She was a member of the Board of Councilors of the Order of Malta, American Association, U.S.A., ("Malta"), a Delegate and Special Advisor on Human Trafficking to the Ambassador for the Order of Malta at the United Nations, and a Board Member of Malteser International, a worldwide relief agency of the Order of Malta. *Id.* at ¶ 6. Ms. O'Hara-Rusckowski began working with Avodah in 2021 to create a safe house for sex trafficking survivors in Massachusetts, and connected Plaintiffs to a religious order selling a property known as the "Lowell Home" in Massachusetts. *Id.* at ¶¶ 20-21. 25. The plan was for Plaintiffs to renovate the Lowell Home and utilize it for safe housing for survivors and the Sisters who were hired to care for them. *Id.* at ¶ 24, 27, 28. Ms. O'Hara-Rusckowski secured donations to aid Plaintiffs to these ends from November of 2021 through March of 2022. *Id.*

The project, however, did not go as planned. *See id.* at ¶¶ 31-32. More than a year passed after Defendants' initial donation, yet Plaintiffs failed to accomplish any of their primary goals and left significant obligations unfulfilled. *Id.* Plaintiffs spent money, but had little to show for it: the renovations were incomplete, the Lowell Home was unoccupied, and Plaintiffs shipped the Passionist Sisters who were supposed to be trained and employed at the Lowell Home in Massachusetts to other locations "[a]cross the U.S." managed by other third-party organizations. *Id.* Thus, on November 7, 2022,

Ms. O'Hara-Rusckowski and the Order of Malta met with Fitzpatrick. *See id.* at ¶ 42. Based on accusations of wrongdoing, Plaintiffs agreed to relinquish their rights with respect to the Lowell Home, return all unused funds, and transfer training and supervision of the Passionist Sisters, who Plaintiffs had farmed out to other organizations in different parts of the country, to Ms. O'Hara-Rusckowski. *See* FAC at ¶¶ 43-45.[5]

Plaintiffs' failures with respect to the Lowell Home did not deter Ms. O'Hara-Rusckowski from providing survivors a much needed place to stay and care from religious sisters. She was able to renovate the property and convert it into the O'Connell House, which still operates today as a survivor safe home. *See id.* at ¶ 46. Ms. O'Hara-Rusckowski continues to focus her philanthropic efforts on providing safe housing for survivors, which includes caretaking by religious sisters trained on Trauma Informed Care. *Id.* at ¶ 54.

III.    **Plaintiffs Assert Alleged Harms Untethered to Ms. O'Hara-Rusckowski's Alleged Statements**

Plaintiffs allege that Ms. O'Hara-Rusckowski defamed them by telling the Denver Archdiocese and other unidentified parties at unidentified times that Plaintiffs had misappropriated grant funds, engaged in labor trafficking, and were federally charged with labor trafficking. *See* FAC at ¶¶ 57, 58, 64, 65, 74. Plaintiffs also allege that Ms. O'Hara-Rusckowski improperly called him a "demon" and that "[t]he statement that Fitzpatrick is a 'demon' is materially false." FAC at ¶ 124. Plaintiffs allege that, as a result of this

---

[5] The allegations in Plaintiffs' original Complaint and First Amended Complaint on these points are inconsistent. In the former, Plaintiffs unambiguously assert that they relinquished their rights to the Lowell Home, unused funds, and training and supervision of the Passionist Sisters to the Order of Malta. *See* ECF 13 ¶¶ 40-41. In the latter, they allege that they transferred their contractual rights to the Lowell Home to Ms. O'Hara-Ruskowski personally, and agreed that the Passionist Sisters would be managed by Ms. O'Hara-Rusckowski at the Lowell Home. *See* FAC at ¶¶ 43-45.

defamation, the Archdiocese "confirmed" its decision to disavow Avodah, local law enforcement instituted successful action against Avodah, religious Sisters terminated their contracts with Avodah, Plaintiffs were unable to participate in third-party conferences and did not secure donations and partnerships for which Plaintiffs claim an expectancy, and the federal government instituted an ongoing investigation against Plaintiffs.  *See id.* at ¶¶ 60-61, 62, 67, 72.

But this narrative is belied by Plaintiffs' own allegations.  Even if Ms. O'Hara-Rusckowski informed the Archdiocese in "winter 2023"—whenever that was—that Plaintiffs misappropriated funds, the Archdiocese disavowed Avodah months prior, in August of 2022.  *Compare* FAC at ¶ 57; *with* McLaughlin Decl., at Ex. F.  It is also clear from statements in the Archdiocese's public letter concerning Avodah that the Archdiocese made its decision based on "systematic complaints" raised by the Sisters themselves.  *See id.*  By the time the Archdiocese reaffirmed this opinion in a scathing rebuke of Avodah in February of 2023, *two other* prominent catholic ministries had also disavowed their relationships with Avodah for reasons lacking any connection to Plaintiffs' misconduct regarding the Lowell Home.  *See id.*

Plaintiffs also appear to claim that Ms. O'Hara-Rusckowski's alleged statement to the Archdiocese somehow caused law enforcement to enter Plaintiffs' Colorado property and remove Sisters from that location.  *Id.* at ¶ 61.  But nothing in the FAC ties any of these ideas together:  the FAC does not allege facts reflecting that Ms. O'Hara-Rusckowski communicated to the Archdiocese *before* the raid.  Nor does it allege that Ms. O'Hara-Rusckowski said anything to the Archdiocese concerning the Sisters who were present at Avodah's Denver facility or anything about the Denver property at all.  *Id.*

at ¶ 57.  And Plaintiffs do not allege that the police acted upon false statements, that the police lacked probable cause, that those Sisters were *not* held at that campus against their will, or that the Sisters did not seek law enforcement's assistance in vacating Plaintiffs' premises.  *See generally* FAC.  The only reasonable inference is that local law enforcement had probable cause to suspect that Plaintiffs were engaged in labor trafficking, saw evidence of such an offense on the property, and accordingly acted to remove religious Sisters from that location.

Plaintiffs also allege that as a result of Ms. O'Hara-Rusckowski's alleged statements to the Archdiocese, "the Archdiocese issued communications to several organizations of religious Sisters . . . spread[ing] the false concern regarding the visa status of several religious Sisters who were working with Avodah[.]"  *Id.* at ¶ 62.  But the FAC never claims that what Ms. O'Hara-Rusckowski allegedly said to the Archdiocese related in any way to anyone's visa status.  *See id.* at ¶ 57.  Plaintiffs also do not allege facts demonstrating that the Sisters were *aware* of Ms. O'Hara-Rusckowski's alleged statements at the time they terminated their agreements with Plaintiffs.  *See generally id.*

Finally, without any factual support, Plaintiffs' Amended Complaint alleges that Ms. O'Hara-Rusckowski did not just cooperate with the federal investigation into Plaintiffs' criminal wrongdoing, but "*upon information and belief*" was the sole reason the United States Attorneys' Office for the District of Massachusetts, in conjunction with federal law enforcement agencies, convened this criminal investigation against Plaintiffs.  *Id.* at ¶ 72.

At bottom, it defies all credulity to conclude that these results stemmed from anything that Ms. O'Hara-Rusckowski did or said.  Materials this Court may properly consider on a motion brought under Federal Rule of Civil Procedure 12(b)(6) reflect that

these reactions arose from the fact that—in just a year or so of operations—Plaintiffs attracted the ire of former volunteers, a licensed professional counselor, Sisters employed by Plaintiffs, the Archdiocese, two other Catholic organizations, Colorado law enforcement, and multiple federal law enforcement agencies.

## ARGUMENT

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must include sufficient facts to state a claim for relief that is plausible on its face and raises a right to relief above the speculative level. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 548, 570 (2007). This standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing plausibility, the reviewing court should "draw on its experience and common sense." *See id.* at 663-64. Here, the FAC falls far short of plausibly alleging Plaintiffs' claims, offering nothing more than "formulaic recitations of the elements," and conclusory assertions that are insufficient to state a claim. *See Twombly*, 550 U.S. at 555. This Court should accordingly dismiss Plaintiffs' Complaint in its entirety.

**I.      This Court Lacks Subject Matter Jurisdiction to Consider at Least Some of the Claims Asserted in the FAC**

As noted, this case is a quintessentially ecclesiastical in nature. Plaintiffs claim that Ms. O'Hara-Ruskowski allegedly defamed them, and committed other torts, by telling the Archdiocese of Denver (and unnamed others in the religious community) about her experience of working with Plaintiffs. Based on those alleged defamatory statements, the Archdiocese of Denver then "confirmed its decision to disavow Avodah as a Catholic organization and issued public statements to the Catholic community about its decision to disavow Avodah." FAC ¶ 60. Elsewhere, Plaintiff Fitzpatrick alleges that Ms. O'Hara-

Rusckowski defamed him by referring to him as a "demon," *id.* at ¶ 64, and further alleges

that "[t]he statement that Fitzpatrick is a 'demon' is materially false." *Id.* at ¶ 124.

Where, as here, the underlying subject matter of a lawsuit relates to a religious

dispute, the Court must decide whether it has subject matter jurisdiction to hear the claim.

And because the central operative facts in the complaint—the allegations that Ms.

O'Hara-Rusckowski said things to the Denver Archdiocese which caused the Archdiocese

to confirm its earlier decision to disavow Plaintiffs, and the allegation that Ms. O'Hara-

Rusckowski falsely called Mr. Fitzpatrick a "demon"—are matters of religious

administration and belief, the Court has no subject matter jurisdiction over those claims.

Indeed, "[t]he threshold inquiry here is whether the underlying dispute is a secular one,

capable of review by a civil court, or an ecclesiastical one about 'discipline, faith, internal

organization, or ecclesiastical rule, custom or law.'" *Jones v. Crestview Southern Baptist

Church*, 192 P.3d 571, 573 (Colo. Ct. of App. 2008) (quoting *Bell v. Presbyterian Church*,

126 F.3d 328, 331 (4th Cir.1997) and citing *Serbian Eastern Orthodox Diocese v.

Milivojevich*, 426 U.S. 696, 713 (1976)).

In *Jones*, a former pastor sued his church, alleging multiple causes of action

including breach of contract, unjust enrichment, quantum merit, and indebtedness. He

claimed that the Church had not fully compensated him for his services as a pastor. The

court held that:

> The determination whether Jones has performed such duties adequately
> would necessarily entangle the court or a jury in matters that are purely
> ecclesiastical. Accordingly, the trial court properly ruled that the First
> Amendment precluded it from exercising subject matter jurisdiction. *See
> Nevius v. Africa Inland Mission Int'l*, 511 F. Supp. 2d 114 (D.D.C.2007)
> (dismissing missionary's claim against missionary organization for breach
> of contract as barred under the Free Exercise Clause); *see also McClure v.
> Salvation Army*, 460 F.2d 553, 558–59 (5th Cir.1972) (holding that matters

such as a minister's salary, place of assignment, and duties are matters of church administration and governance and are thus beyond the purview of civil authorities).

*Jones*, 192 P.3d at 573.

Here, at a minimum, the Court must dismiss those claims that relate in any way to the decision by the Denver Archdiocese to disavow Avodah and all claims relating to "demons." The court in *Jones*, *however*, went further and dismissed the case in its entirety: "[f]urther, resolution of Jones's equitable claims for unjust enrichment and quantum meruit would require determinations of the value of his services as a Baptist pastor, a matter that is largely ecclesiastical and thus not subject to court inquiry under the First Amendment." That is exactly what this Court would have to do here: determine whether it was proper for Ms. O'Hara-Rusckowski to explain her experiences with Plaintiffs to the Denver Archdiocese and religious donors, whether the Denver Archdiocese's decision to disavow Plaintiffs was properly within its discretion in church administration, and whether that decision was justified based on Plaintiffs' actions. Under First Amendment principles, those are not inquiries that a federal court should make. *See Our Lady of Guadalupe School v. Morrissey Berru*, 591 U.S. 732 (2020). But even if the Court proceeds to the merits of Plaintiffs' claims, it is clear that they are all deficient and should be dismissed.

## II.      Plaintiffs' Defamation Claims (Counts I and II) Should be Dismissed

Plaintiffs' claims that Ms. O'Hara-Rusckowski defamed Avodah (Count I) and Fitzpatrick (Count II) are not plausible and should be dismissed for multiple reasons, as dismissal is appropriate at the pleading stage. *See Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 138 F. Supp. 3d 1191, 1199 (D. Colo. 2015) ("[P]rompt resolution of defamation actions [] by motion to dismiss . . . is appropriate." (cleaned up)), *aff'd*, 861

F.3d 1081 (10th Cir. 2017).  "In ruling on a motion to dismiss a defamation claim, whether a statement is defamatory, as well as whether allegedly defamatory language is constitutionally protected opinion is a matter of law to be determined by the Court." *Nguyen v. Mai Vu*, No. 18-CV-01132-CMA-NRN, 2018 WL 5622634, at *4 (D. Colo. Oct. 30, 2018), *report and recommendation adopted,* No. 18-CV-01132-CMA-NRN, 2018 WL 6603955 (D. Colo. Nov. 15, 2018) (cleaned up).  Dismissal is proper where, *inter alia,* the statements are "substantially true," "too vague to state a claim," statements of opinion, or "not defamatory as a matter of law."  *Id.*  These reasons necessitate the dismissal of Plaintiffs' defamation claims in Counts I and II.

### A.    Plaintiffs Cannot Assert a Defamation Claim Based on Non-Literal Hyperbole

Plaintiffs assert a defamation claim based on the allegation that Ms. O'Hara-Rusckowski stated that "Fitzpatrick is NO friend – more demon than friend!!"  *Id.* at ¶ 64. But—at best—the statement is "[i]maginative expression" and "rhetorical hyperbole" that is "worthy of constitutional protection" and "should not be taken literally or as a reasoned accusation[.]"  *See Zueger v. Goss*, 343 P.3d 1028, 1034 (Colo. App. Ct. 2014) (cleaned up) (statement reflecting  "unfavorable opinion" was not defamatory); *see also Keohane v. Stewart*, 882 P.2d 1293, 1301 (Colo. 1994) (statement using "colorful and exaggerated terms" and "multiple exclamation points" was not actionable defamation).

Additionally, defamation requires a statement that is capable of being proven or disproven as true or false.  *See, e.g., id.*  But Mr. Fitzpatrick, of course, cannot prove or disprove in this secular Court whether he is a "demon."  *See, e.g.*, *Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 284 (1974) ("traitor to god" not defamatory); *Cummings v. City of N.Y.*, No. 19-CV-7723 (CM)(OTW),

2020 WL 882335, at *22 (S.D.N.Y. Feb. 24, 2020) ("white devil" not actionable as defamation); *Roth v. United Fed'n of Tchrs.*, 787 N.Y.S.2d 603, 611 (N.Y. Sup. Ct. 2004) ("A statement such as . . . 'Satan' is nothing more than exaggerated hyperbole."); *Blomberg v. Cox Enterprises, Inc.*, 491 S.E.2d 430, 433 (Ga. App. Ct. 1997) ("'[S]ilver-tongued devil' is an assertion that cannot be proved false" and therefore not defamatory). As a result, Plaintiffs cannot state a defamation claim based on this statement.

### B. Plaintiffs Did Not Allege the Details of Ms. O'Hara-Rusckowski's Alleged Statements With Sufficient Specificity

Plaintiffs vaguely allege that Ms. O'Hara-Rusckowski "published written and/or verbal statements to third parties that Avodah had perpetrated crimes and had been federally charged with labor trafficking religious Sisters." *See* FAC at ¶ 91. But the FAC nowhere alleges specific facts about these publications: the specific words, the date(s) of any communications, the place(s) where they were allegedly made, the recipient(s) of the communications, and the context of the allegedly defamatory statements are all left to the imagination. Nor is it clear whether Ms. O'Hara-Rusckowski affirmatively claimed that Avodah was charged with a federal offense, or whether that was just the mistaken understanding of an unidentified recipient of the communication set forth in paragraph 91 of the Complaint.

Courts have routinely dismissed defamation claims for such lack of specificity. *See, e.g., Carosella v. One World Translation & Assocs., Inc.,* No. 16-CV-0805-WJM-KMT, 2017 WL 11545380, at *3 (D. Colo. Mar. 1, 2017) (dismissing claim for failure "to identify precisely to whom the alleged 'disparaging remarks' were made, the time and place of the publication, and the alleged defamatory words themselves"); *see also, e.g., Banks v. Jackson,* No. 20-CV-02074-KMT, 2021 WL 4149618, at *9 (D. Colo. Sept. 13,

2021); *Grays v. Granicus, LLC*, No. 18-CV-02271-CMA-NRN, 2019 WL 8750267, at *13 (D. Colo. Oct. 25, 2019), *report and recommendation adopted in part, rejected in part*, No. 18-CV-02271-CMA-NRN, 2020 WL 1482620 (D. Colo. Mar. 26, 2020); *Ross v. Gallegos,* No. 13-CV-00831-REB-KLM, 2013 WL 6283910, at *5 (D. Colo. Dec. 3, 2013); *Partminer Worldwide Inc. v. Siliconexpert Techs. Inc.*, No. 09-CV-00586-MSK- MJW, 2010 WL 502718, at *5 (D. Colo. Feb. 10, 2010); *Walters v. Linhof*, 559 F. Supp. 1231, 1234 (D. Colo. 1983); *Royal Pac. Ltd. v. Faith Elec. Manufacture Co., Ltd*, 322 F. Supp. 3d 1178, 1184 (D.N.M. 2018); *Celli v. Shoell*, 995 F. Supp. 1337, 1346 (D. Utah 1998); *Bushnell Corp. v. ITT Corp.*, 973 F. Supp. 1276, 1287 (D. Kan. 1997).

This leads to another critical defect in the Complaint. "[A] simple expression of opinion based on disclosed or assumed non-defamatory facts is not itself sufficient for an action of defamation." *Simmons v. Prudential Ins. Co. of Am.*, 641 F. Supp. 675, 686 (D. Colo. 1986). That is all Plaintiffs have alleged here. Absent sufficient factual allegations otherwise, it is reasonable to infer that, in communicating with third parties concerning her experiences with Plaintiffs, Ms. O'Hara-Rusckowski disclosed the facts giving rise to her alleged opinions. That is not actionable defamation as a matter of law. *See id.*

### C.  Ms. O'Hara-Rusckowski's Statements Are Privileged and Plaintiffs Cannot Plausibly Allege Defamation Under the Actual Malice Standard

Plaintiffs also attempt to assert defamation claims based on alleged, non-specific statements regarding Plaintiffs' misappropriation of funds donated towards the Lowell Home and labor trafficking of the Sisters. *See* FAC ¶¶ 57-58, 64-65, 72. These are statements that involve a public figure or matters of public concern, which are "subject to heightened standards." *L.S.S. v. S.A.P.*, 523 P.3d 1280, 1287 (Colo. App. Ct. July 17,

2023).  Specifically, Plaintiffs must be able to allege facts sufficient to show actual malice.

*See, e.g., Brokers' Choice of Am., Inc.,* 757 F.3d at 1136.  Plaintiffs have not done so.

          1.    <u>The Challenged Statements Qualify for a Heightened Pleading Requirement</u>

              a)    <u>The Statements Are Privileged as Matters of Public Concern</u>

Colorado law affords heightened protections to statements that involve matters of public concern.  *See Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1034-35 (10th Cir. 2013) (applying Colorado law).  "Public concern is interpreted broadly." *Id.* (cleaned up).  Generally, a statement addresses a matter of public concern where it "can be fairly considered as relating to any matter of political, social, or other concern to the community[.]"  *Id.* at 1035 (internal quotations omitted).  Whether a statement involves a matter of public concern is a question of law for the Court.  *See id.* at 1041.

Human trafficking, including labor trafficking, is clearly an issue of public and social concern, because whether Plaintiffs engage in such practices in connection with their purported work has the obvious "potential to impact many members of the public."  *See Bensinger*, 713 F.3d at 1034-37 (alleged defamatory statement that business engaged in the mistreatment of employees and "human trafficking" related to matters of public concern); *Shoen v. Shoen*, 292 P.3d 1224, 1229 (Colo. 2012) ("The commission of a crime" is "without question [an] event[] of legitimate concern to the public [for purposes of pleading defamation].") (internal quotations omitted).  This is particularly so because Plaintiffs' purported work in trafficking "is funded primarily by donations," and Plaintiffs' operations depend on networking at events held by "high powered prominent organization[s]."  *See* FAC ¶¶ 18, 70-71.  These are all activities that, by necessity, require public involvement, and the public has an interest in knowing whether their finite time,

money, and efforts are used to support an entity engaged in acts of such "impropriety."

*See Zimmerman v. Bd. Of Publications of Christian Reformed Church, Inc.*, 598 F. Supp.

1002, 1011-12 (D. Colo. 1984) (public concern where statement related to church's

business practices); *Diversified Mgmt., Inc. v. Denver Post, Inc.*, 653 P.2d 1103, 1108

(Colo. 1982) (public concern where statement addressed financial development scheme

and "potential buyers" in the public "had an abiding interest in the matter").

These matters are also of great political importance. *See,* e.g., *Bensinger*, 713

F.3d at 1034-37 ( "government officials [] have an abiding interest in matters discussed in

the film, such as human trafficking" and therefore were subject to the actual malice

standard). Plaintiffs concede that this is a matter of governmental interest, alleging that

law enforcement removed several religious Sisters from Avodah's property in Denver,

and that the federal government is currently investigating Plaintiffs for illegal activities.

*See* FAC ¶ 61, 72. The actual malice standard applies under these circumstances.

b)    Plaintiffs are Limited Purpose Public Figures

Plaintiffs' defamation allegations are also subject to a heightened pleading

standard because Plaintiffs are limited purpose public figures. A plaintiff is a limited

purpose public figure where "the defamatory statement involves a matter of public

concern," and "the level of plaintiff's participation in the controversy invites scrutiny."

*Lewis v. McGraw-Hill Broad. Co.*, 832 P.2d 1118, 1122 (Colo. App. Ct. 1992). The

Supreme Court of Colorado has explained this category of public figure includes "those

who have thrust themselves to the forefront of a particular public controversy to affect its

resolution," and "would generally be capable of effectively countering criticism and

exposing the falsity of defamatory statements concerning them." *DiLeo v. Koltnow*, 613

P.2d 318, 321-22 (Colo. 1980).

Avodah alleges that it is a prominent figure within the sex trafficking and Catholic-American communities, and Fitzpatrick is its Executive Director. *See* FAC ¶¶ 4, 12-13, 15, 18. The alleged defamation does not concern Mr. Fitzpatrick's personal life, but rather, his carrying out of Avodah's mission through questionable means. That provides a basis for this Court to treat him as a limited public figures. *See Planet Aid, Inc. v. Reveal*, 44 F.4th 918, 922, 927-28 (9th Cir. 2022) (director of charitable organization was public figure where organization was accused of misappropriating funds); *Banks v. Jackson*, No. 20-cv-02074, 2022 WL 1451904, at *1, 5-7 (D. Colo. May 9, 2022) (pastor and church member who was also the executive director of nearby non-profit were public figures with respect to alleged defamation of church).

Plaintiffs also made these matters public through their own voluntary actions. Following the Archdiocese's disavowal of Avodah, which Plaintiffs claim was inextricably intertwined with the allegedly defamatory statements, Plaintiffs posted press releases critiquing the Archdiocese's decision, justifying their operations, encouraging interested members of the public to "meet" with Avodah for further discussion, and so forth. *See* Exs. A-C. E-F. Mr. Fitzpatrick also recorded a video addressing these topics as Plaintiffs' spokesperson. *See* Ex. A. Thus, "even if initially a private matter, [the] dispute became a public controversy through [Plaintiffs'] efforts," as Plaintiffs have invited "public attention and comment in regard to the [] controversy." *DiLeo*, 613 P.2d at 321-222.

2.     Plaintiffs Cannot Plausibly Allege Material Falsity

Because the challenged statements are matters of public concern and Plaintiffs are public figures, Ms. O'Hara-Rusckowski's statements are entitled to a conditional privilege. As such, Plaintiffs must "plead facts that, if proven, would allow a reasonable person to consider the statement false." *Tannerite Sports, LLC v. NBCUniversal News*

*Grp., a division of NBCUniversal Media, LLC*, 864 F.3d 236, 247 (2d Cir. 2017)
(aggregating cases dismissing claims for lack of falsity). Notably, Colorado law requires
not just falsity, but *material* falsity. *See Brokers' Choice of Am., Inc., 757 F.3d at 1136
(10th Cir. 2014)* (affirming motion to dismiss where challenged statements were not
materially false). "[A] misstatement is not actionable [as materially false] if the
comparative harm to the plaintiff's reputation is real but only modest" when compared to
the actual truth. *Bustos v. A & E Television Networks*, 646 F.3d 762, 765 (10th Cir. 2011)
(applying Colorado law). For instance, the Tenth Circuit affirmed the district court's
dismissal of a defamation claim for failure to plead material falsity where a prisoner was
not a member of the Aryan Brotherhood, as claimed in the allegedly defamatory
statement, but nonetheless socialized and affiliated with them, and where an individual
was falsely labeled as a participant in a "heinous bombing," when, in reality, he was
involved in a separate crime and was merely a material witness to the bombing. *Id.* at
768. As the Tenth Circuit held, in both instances, the public would still have had a
substantially negative reaction to the truth. *See id.* at 764-769.

The gist of the alleged defamatory statements is that Plaintiffs misused funds and
engaged in labor trafficking. But the FAC does not plead that these statements are
materially false. To the contrary, the FAC's allegations actually *substantiate* those
statements—Plaintiffs allege they received funds to train the Passionist Sisters and house
survivors at the Lowell Home, spent funds dedicated towards those purposes, yet, the
Lowell Home was incomplete, no survivors were cared for there, the Passionist Sisters
were sent off to third parties, and, when confronted on these matters, Plaintiffs conceded

their wrongdoing by returning unused funds and relinquishing control of the property and

the Passionist Sisters.  *See* FAC ¶¶ 27, 28, 31-32, 43-45.

Moreover, any allegation of falsity could not possibly be *material* falsity where,

based on the allegations in the FAC, it is undisputed that:

(1) the Archdiocese had already disavowed Avodah as a Catholic ministry
because of systemic complaints from individuals working with Plaintiffs—
before the allegedly defamatory statements were made;

(2) two other institutions ceased their relationships with Avodah based on
similar concerns;

(3) Denver law enforcement raided Plaintiffs' property and removed Sisters
therefrom;

(4) the federal government is currently investigating Plaintiffs for labor
trafficking and financial impropriety; and

(5) Plaintiffs turned over unused funds and management of the Passionist
Sisters to Defendants, and relinquishing control over the relevant physical
property;

*See* FAC ¶¶ 27, 28, 31-32, 43-45, 60-61, 70-72.  Those undisputed facts are more than

enough to rebut any claim of material falsity.  *See Brokers' Choice of Am., Inc.,* 861 F.3d

at 1111 (affirming dismissal of complaint for lack of material falsity).[6]

---

[6] Plaintiffs do not specify details regarding Ms. O'Hara-Ruskowski's alleged statements
concerning the federal investigation, so it is impossible to know whether Ms. O'Hara-
Rusckowski allegedly claimed that Plaintiffs were *under investigation* or *charged* by the
federal government.  In any event, an assertion as to the latter is not materially false
because the federal government was, in fact, investigating Plaintiffs for criminal activity.
*See id.; see also Rouch v. Enquirer & News of Battle Creek Michigan*, 487 N.W.2d 205,
207, 216-20 (Mich. 1992) (defendant's statement that plaintiff was "charged" with criminal
sexual conduct, absent any formal arraignment, was not materially false where plaintiff
was arrested for, and accused of, the same crime, and defendant's use of the word
"charge" accorded with the popular meaning of the term: to accuse); *Avenatti v. Fox News
Network, LLC*, No. 20-CV-01541-SB, 2021 WL 3603035, at *1-4 (D. Del. Aug. 13, 2021),
*aff'd*, 41 F.4th 125 (3d Cir. 2022) (defendant's statements that plaintiff was "charged" with
domestic violence—even though he was only arrested on suspicion of domestic
violence—were not materially false because government officials initiated criminal
proceedings against plaintiff by arresting him, defendant's use of the word "charge" was

3.     Plaintiffs Have Not Plausibly Alleged Actual Malice

Plaintiffs must also plausibly allege that Ms. O'Hara-Rusckowski made the allegedly defamatory statements with actual malice, *i.e.*, that they were published "with actual knowledge that it was false or with reckless disregard for whether it was true." *See, e.g., L.S.S.*, 523 P.3d at 1288. "Reckless disregard exists when the defendant, in fact, entertained serious doubts about the truth of his publication." *Seible v. Denver Post Corp.*, 782 P.2d 805, 808 (Colo. App. Ct. 1989).

There is absolutely nothing in the FAC that plausibly suggests that Ms. O'Hara-Rusckowski *knew* that what she was telling the Archdiocese (or the other unnamed recipients of allegedly defamatory statements) was false or that she recklessly disregarded the truth of any such statement. Plaintiffs instead repeat a pair of undifferentiated and conclusory recitations in support of their claim that Ms. O'Hara-Rusckowski acted with actual malice:

> Through Rusckowski's affiliation and partnership with Fitzpatrick and her knowledge of Fitzpatrick's work in Avodah's programs and operations, Rusckowski had actual knowledge that the statement that Fitzpatrick had perpetrated crimes is false.

> Because Rusckowski had actual knowledge that the statement that Fitzpatrick had perpetrated crimes was false when Rusckowski published this statement to third parties, or Rusckowski at minimum published this statement to third parties with reckless disregard for whether the statement was true, Rusckowski published this statement to third parties with actual malice.

FAC ¶¶ 119-120; s*ee also* FAC ¶¶ 82-83, 89-90, 86-97,105-106, 112-113,125-126.

_____

synonymous with the common meaning of the term—to "accuse," and the gist of the statement would have the same effect on average readers as the actual truth).

Those incantations—pled without any factual support—are insufficient as a matter of law to survive a motion to dismiss. *See, e.g., Resolute Forest Prods., Inc. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1019 (N.D. Cal. 2017) (dismissing complaint where plaintiff did not "provide any specific allegations that would support a finding that [defendants] harbored serious subjective doubts as to the validity" of statements); *Fry v. Lee*, 408 P.3d 843 (Co. Ct. App. 2013) ("While Fry made a conclusory allegation in her amended complaint that defendants acted with actual malice, in our view she made no factual allegations to support this conclusion of law, and accordingly, we disregard it.").

At most, Plaintiffs allege on baseless "information and belief" that Ms. O'Hara-Rusckowski and her husband have some financial interest in the O'Connell House.[7]  *See* FAC ¶¶ 37-38.  But the Supreme Court has expressly held that the "fact that the defendant published the defamatory material in order to increase its profits"—even if true, which it is not here—cannot "suffice to prove actual malice."  *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989); *see also Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 715-16 (4th Cir. 1991) (financial motives, self-interest, "and the related desire to place opposing views and persons in an unfavorable light" cannot, alone, establish actual malice); *Fink v. Combined Commc'ns Corp.*, 679 P.2d 1108, 1111 (Colo. App. 1984) ("[I]ll will and bad motive toward the plaintiff are not elements of actual malice").

## III.     This Court Should Dismiss Plaintiffs' Derivative Tort Claims

---

[7] There is no factual basis set forth in the First Amended Complaint to support the bare allegation that Ms. O'Hara-Rusckowski and her husband have some sort of financial interest in the operations of the O'Connell House, and such an allegation defies logic, particularly given the mission and non-profit status of the O'Connell House and the other allegations in the First Amended Complaint.

Plaintiffs have also raised claims for tortious interference with contract, tortious interference with prospective business relations, and extreme and outrageous conduct. To the extent that this Court dismisses Plaintiffs' defamation claims, it must also dismiss Plaintiffs' ancillary tort claims as barred by the First Amendment. *See Fry,* 408 P.3d at 856 (aggregating Colorado substantive and federal procedural authority). In any event, these claims also fail for lack of causation, which is a requisite element under Colorado law for all tort claims. *See June v. Union Carbide Corp.*, 577 F.3d 1234, 1238 (10th Cir. 2009). To survive a motion to dismiss, a plaintiff must rely on more than rote legal conclusions in alleging causation. *See VDARE Found. V. City of Colorado Springs*, 11 F.4th 1151, 1173 (10th Cir. 2021); *A.G. ex rel. Maddox v. v. Elsevier, Inc.,* 732 F.3d 77, 82 (1st Cir. 2013). The allegations must also render causation *plausible* rather than merely possible. *See Twombley*, 550 U.S at 546. Causation is not adequately pled where "an event other than the defendant's alleged conduct appears predominant." *A.B. by Ybarra v. City of Woodland Park*, No. 14-CV-00151-RM-KMT, 2016 WL 1237195, at *5 (D. Colo. Mar. 29, 2016) (applying Colorado law).

The FAC fails to plausibly plead causation. Plaintiffs assert harm because Sisters terminated employment contracts, donors and partners ceased their involvement with Plaintiffs, and Plaintiffs were shunned at religious conferences. But the FAC connects none of this to Ms. O'Hara-Rusckowski. *See generally* FAC. Such allegations would be necessary to plead causation and the existence of an *intentional* tort.

Plaintiffs may argue that Ms. O'Hara-Rusckowski communicated these statements through various intermediaries. Their theory is that Ms. O'Hara-Rusckowski allegedly communicated with various and partially unidentified intermediaries, who then—at some

unspecified time, in some unspecified medium, and using unidentified language—conveyed information to an undefined group of Sisters, donors, and partnering organizations.  But, again, Plaintiffs do not allege that the Archdiocese specifically communicated with the Sisters identified in paragraphs 130 through 135 of the Amended Complaint who terminated their employment agreements based on visa concerns—which were unrelated to the claims Ms. O'Hara-Rusckowski even allegedly made to the Archdiocese—or that the unidentified third parties relayed Ms. O'Hara-Rusckowski's alleged statements to the specific third-party donors and organizations listed in paragraph 143 of the Amended Complaint.  This is mere conjecture that cannot state a claim.

Ultimately, this Court is not required to eschew common sense in evaluating Plaintiffs' claims.  *See Ashcroft*, 556 U.S. 663-64.  Nor is it required to ignore Plaintiffs' own allegations and matters properly before the Court by way of judicial notice.  Those sources reflect that, in less than two years of operation, Plaintiffs' actions resulted in: (1) systematic complaints by Sisters concerning their working conditions; (2) concerns that Avodah was a "cult" and that Mr. Fitzpatrick had a "personality disorder"; (3) an investigation by the Archdiocese of Denver that led to its disavowal of Avodah as a Catholic Ministry in 2022; (4) independent decisions of two other organizations to cease their relationships with Avodah; (5) the decision by local law enforcement to enter Plaintiffs' property and remove Sisters therefrom; and (6) an ongoing investigation by federal law enforcement agencies into Plaintiffs' potential illegal activities.  *See* Exs. A-B; FAC ¶¶ 60-61, 70-72.  In light of these occurrences—almost all of which occurred before Ms. O'Hara-Rusckowski allegedly harmed Plaintiffs—it is clear that Plaintiffs did not—and could not—plead any facts to show that Ms. O'Hara-Rusckowski was somehow the

proximate cause of Plaintiffs' harm. Plaintiffs' failure to do so makes clear that the only reasonable inference is that Ms. O'Hara-Rusckowski's alleged statements were, at best, of *de minimis* consequence, given the storm of controversy surrounding Plaintiffs.

## IV.    Plaintiffs Have Not Stated Tortious Interference Claims

Plaintiffs' claims for tortious interference with contract (Count III) and tortious interference with prospective business relations (Count IV) fare no better. Both claims require that the defendant "knew or should have known of" the existence of the contract or prospective relation, and "intentionally induced the other party to the contract not to perform the contract with the plaintiff" or proceed with the prospective relationship. *Shell v. Am. Fam. Rts. Ass'n,* 899 F. Supp. 2d 1035, 1059–60 (D. Colo. 2012) (cleaned up).

***No Knowledge of Contract or Prospective Relations.*** Tortious interference claims require a plaintiff to allege that the defendant was aware of the contracts and prospective business relations at issue. *See generally id.* Plaintiffs do not allege any facts explaining why Ms. O'Hara-Rusckowski's limited experience with Plaintiffs in connection with the Lowell Home would render Ms. O'Hara-Rusckowski aware of Plaintiff's contracts with the Sisters of the Eucharistic Heart of Jesus—who consented to removal by the local law enforcement from Plaintiff's Denver property—the Sisters of the Nativity, the Passionist Sisters in their entirety, the Sisters of St. Louis, or the Dominican Sisters of the Most Holy Rosary. Nor do Plaintiffs plausibly explain how Ms. O'Hara-Rusckowski was aware of the putatively non-public identities of Plaintiffs' prospective donors and partner organizations.

***No intentional interference.*** The tortious interference claims also require Plaintiffs to plead facts showing that Ms. O'Hara-Rusckowski "intentionally induced" the third parties to breach their contracts or cease their involvement with Plaintiffs. *Shell v.*

*Am. Fam. Rts. Ass'n*, 899 F. Supp. 2d 1035, 1059–60 (D. Colo. 2012) (dismissing claim on motion to dismiss); *DTC Energy Grp., Inc. v. Hirschfeld*, 420 F. Supp. 3d 1163, 1178 (D. Colo. 2019) (dismissing tortious interference claim for lack of plausible allegations explaining how defendant induced third party to breach contract). Plaintiffs do not even allege that Ms. O'Hara-Rusckowski was aware of the identities of any of these third parties, much less that she directly communicated with them. Nor do they allege that she communicated with the third parties with the intent that those third parties would then communicate with other third parties in a manner that would "interfer[e] with [the Sisters'] performance of the contract" or with Plaintiffs' business relationships. Restatement (Second) of Torts § 766 (1979), cmt. i.

       ***No Reasonable Likelihood of Forming Prospective Business Relations.*** The prospective business relations claim requires Plaintiffs to plausibly allege a "reasonable likelihood of contracting with a particular third party." *See Crocs, Inc. v. Effervescent, Inc.*, 248 F. Supp. 3d 1040, 1060 (D. Colo. 2017). This requires the allegation of *facts* "related to the likelihood of a contractual relationship arising." *Id.* at 1060 n.17. Plaintiffs do not, and cannot, provide any for the reasons described in full above.

**V.**      **This Court Should Dismiss Plaintiffs' Claim for Extreme and Outrageous Conduct**

       Plaintiffs' final claim is for extreme and outrageous conduct as to Fitzpatrick, which is essentially a claim for intentional infliction of emotional distress ("IIED"). *See English v. Griffith*, 99 P.3d 90, 93 (Colo. App. Ct. 2004) (describing nature of extreme and outrageous conduct claim). To establish this claim, Plaintiffs must allege that: "(1) the defendant engaged in extreme and outrageous conduct; (2) the defendant engaged in such conduct recklessly or with the intent of causing the plaintiff severe emotional

distress; and (3) the defendant's conduct caused plaintiff to suffer severe emotional distress." *McCarty v. Kaiser-Hill Co.*, 15 P.3d 1122, 1126 (Colo. App. Ct. 2000).

This claim fails for many of the reasons the defamation claim fails. Mr. Fitzpatrick cannot state a claim as a matter of law because the criticism is related to his "public persona" as Avodah's Executive Director, and Mr. Fitzpatrick is a limited-purpose public figure. *See Brooks v. Paige*, 773 P.2d 1098, 1101-03 (Colo. App. Ct. 1988). Plaintiffs also cannot plausibly allege the second element of an IIED claim for the same reasons they fail to prove actual malice—namely, that Ms. O'Hara-Rusckowski would have had no reason to know the falsity of her statements and no motivation to randomly attack a fellow Catholic working to serve sex trafficking victims without a justifiable basis for doing so. *See, e.g., Tatten v. Bank of Am. Corp.,* 912 F. Supp. 2d 1032, 1044 (D. Colo. 2012) (dismissing claim for lack of intentional or reckless conduct).

The complained-of conduct is also not sufficiently extreme and outrageous. The tort of IIED "was designed to create liability for a very narrow type of conduct." *Maiteki v. Marten Transportation Ltd.,* 4 F. Supp. 3d 1249, 1256 (D. Colo. 2013) (applying Colorado law). ***"[T]he level of outrageousness required to create liability is extremely high."*** *Id.* (cleaned up) (emphasis added). As courts have repeatedly acknowledged:

> Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities are insufficient. Only conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized community, will suffice.

*Id.* (internal quotations omitted). "[V]ery few fact situations give rise to a cognizable claim for intentional infliction of emotional distress." *Rawson v. Sears Roebuck & Co.*, 530 F. Supp. 776, 780 (D. Colo. 1982). As a result, courts may dismiss claims upon a determination that reasonable people could not conclude that the defendant's conduct

29

was outrageous.  *See, e.g.,  Maiteki,* 4 F. Supp. 3d at 1256; *see also Morales v. L. Firm of Michael W. McDivitt, P.C.,* 641 F. Supp. 3d 1035, 1040 (D. Colo. 2022) (dismissing IIED claim as "allegations fail to meet the exacting and very high bar to successfully pleading an IIED claim under Colorado common law.").

Allegations of defamation are not enough to state a claim for extreme and outrageous harm.  *See, e.g.*, *Gordon v. Boyles*, 99 P.3d 75, 82 (Colo. App. Ct. 2004) (dismissing claim upon finding that false allegation of abuse was not outrageous); *Han Ye Lee v. Colorado Times, Inc.,* 222 P.3d 957, 969 (Colo. App. Ct. 2009) (Dailey, J., concurrence in part) (aggregating authority) (no "outrageous conduct" even based on false allegations that the "plaintiff stole money and used drugs," or was  "misappropriating church funds," or, in the context of a police officer, guilty of "a criminal offense . . . and of serious sexual misconduct.").

Here, Plaintiffs' allegations that Defendants accused them of financial impropriety and questionable employment practices are clearly less extreme than accusing a police officer of a crime and sexual misconduct.  Additionally, and as alleged by Plaintiffs, Ms. O'Hara-Rusckowski criticized Plaintiffs based on her perception of their business operations.  Such complaints as to a plaintiff's work performance are not considered sufficiently extreme enough to give rise to liability for IIED.  *See Steinberg v. Thomas*, 659 F. Supp. 789, 795 (D. Colo. 1987); *Goodwin v. Student Movers, Inc.*, No. 11-CV-02486-WYD-KLM, 2012 WL 1090427, at *3 (D. Colo. Apr. 2, 2012).

## CONCLUSION

For the foregoing reasons, Ms. O'Hara-Rusckowski respectfully requests that the Court dismiss Plaintiffs' Complaint with prejudice.

DATED this 30th day of August, 2024.

Respectfully submitted,

COZEN O'CONNOR

By:  *s/ Sarah Krissoff*
Michael B. de Leeuw (admission pending)
Sarah Krissoff
Arianna K. McLaughlin
Cozen O'Connor
3 WTC
175 Greenwich St. 55th Floor
New York, New York 10007
Phone: (212) 908-1388
mdeleeuw@cozen.com
skrissoff@cozen.com
amclaughlin@cozen.com

*Attorneys for Deborah O'Hara-Rusckowski*

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing was filed electronically through the CM/ECF

system on August 30, 2024, which will provide notice to all counsel of record.


/s/ Sarah Krissoff
Sarah Krissoff