**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 24-cv-00233-NYW-CYC

AVODAH FARMS, and
KEENAN FITZPATRICK,

     Plaintiffs,

v.

DEBORAH O'HARA-RUSCKOWSKI,

     Defendant.

---

## ORDER ON MOTIONS TO DISMISS

---

     This matter is before the Court on Defendant Deborah O'Hara-Rusckowski's Motion to Dismiss Plaintiffs' Amended Complaint (the "Rule 12(b)(6) Motion to Dismiss"), [Doc. 84], and Defendant Deborah O'Hara-Rusckowski's Special Motion to Dismiss Plaintiffs' Amended Complaint (the "Special Motion to Dismiss," and together with the Rule 12(b)(6) Motion to Dismiss, the "Motions" or "Motions to Dismiss"), [Doc. 85].  The Court has reviewed the Motions and the related briefing.  For the reasons stated herein, the Rule 12(b)(6) Motion to Dismiss is **GRANTED in part** and **DENIED in part** and the Special Motion to Dismiss is **GRANTED in part** and **DENIED in part**.

## BACKGROUND

     These facts are taken from the First Amended Complaint and Jury Demand (the "Amended Complaint"), [Doc. 72], and are presumed true for purposes of this Order. Plaintiff Keenan Fitzpatrick ("Mr. Fitzpatrick") is the executive director of Plaintiff Avodah Farms ("Avodah," and together with Mr. Fitzpatrick, "Plaintiffs"), a nonprofit corporation

that "works to restore and reintegrate women survivors of sex trafficking . . . through comprehensive, Christ-centered care provided by Catholic religious sisters and the faith-based community."  [*Id.* at ¶¶ 1, 4, 12].  Plaintiffs "have worked to develop a 'Sister Care' program model through which religious sisters live in residence and provide long-term care to survivors and their children at survivor safe homes throughout the U.S."  [*Id.* at ¶ 13].

In 2021, Plaintiffs partnered with Defendant Deborah O'Hara-Rusckowski ("Defendant" or "Ms. O'Hara-Rusckowski") "to develop a survivor safe home and implement the Sister Care model at a survivor safe home in Massachusetts" (the "Lowell Home").  [*Id.* at ¶¶ 20–21].  Over the course of several months, Ms. O'Hara-Rusckowski helped Avodah secure donations to, inter alia, help develop the Sister Care model, renovate the Lowell Home, and fund four religious Sisters from the Passionist Sisters of St. Paul of the Cross (the "Passionist Sisters") to serve at the Lowell Home.  [*Id.* at ¶¶ 24, 27–28].  On one occasion, after the announcement of a $250,000 donation for renovations and construction on the Lowell Home—but before Avodah received those funds—payments were due for the construction work.  [*Id.* at ¶¶ 28–29].  Ms. O'Hara-Rusckowski instructed Avodah to pay for the construction work with funds that had been earlier donated by the Order of Malta, American Association, U.S.A. ("Malta") to fund the Passionist Sisters.  [*Id.* at ¶¶ 6, 27, 29].  In addition, due to supply chain issues and labor shortages, Avodah could not immediately house survivors at the Lowell Home, so it arranged "internships for the Passionist Sisters" at other organizations.  [*Id.* at ¶ 32].

In November 2022, Ms. O'Hara-Rusckowski invited Mr. Fitzpatrick and Avodah members to Lowell, Massachusetts for a meeting with her and her husband.  [*Id.* at ¶ 41].

However, when Mr. Fitzpatrick arrived at the meeting, he encountered "unannounced members of Malta" and "other unidentified third[ ]parties who, upon information and belief, are influential in the faith-based and charitable communities." [*Id.* at ¶ 42]. Ms. O'Hara-Rusckowski told Mr. Fitzpatrick that he could not leave the meeting unless and until he agreed to transfer ownership rights in the Lowell Home to Defendant, return unused donated funds, and "agree that the Passionist Sisters would be managed by [Ms. O'Hara-]Rusckowski at the Lowell Home." [*Id.*]. Mr. Fitzpatrick agreed to these terms "[u]nder coercion and duress," transferred contractual rights in the Lowell Home to Ms. O'Hara-Rusckowski, and returned all unused funds that Malta had donated. [*Id.* at ¶¶ 43–45]. Thereafter, Ms. O'Hara-Rusckowski renamed the Lowell Home the O'Connell House, named herself the founder, and implemented the Sister Care model. [*Id.* at ¶¶ 46–47].

Plaintiffs allege that, after the November 2022 meeting, Ms. O'Hara-Rusckowski "initiated a campaign to tarnish the reputation and public standing of Avodah and [Mr.] Fitzpatrick with influential partners and donors in the faith-based and charitable communities through knowingly false and defamatory statements." [*Id.* at ¶ 55]. Specifically, Ms. O'Hara-Rusckowski told members of faith-based and charitable communities, representatives from the Archdiocese of Denver (the "Archdiocese"), Avodah's partners and donors, and Avodah's prospective partners and donors that Plaintiffs were "'labor trafficking' religious Sisters"; had stolen, misappropriated, and misused grant funds "in the amount of $130,000"; had "perpetrated crimes"; and had "been federally charged with labor trafficking religious Sisters." [*Id.* at ¶¶ 56–57].

Moreover, in February 2023, Defendant sent a group text message to "a network of prospective Avodah partners and donors in the faith-based and charitable

communities" and inadvertently included Mr. Fitzpatrick in the message.  [*Id.* at ¶ 64].
After recognizing that she included Mr. Fitzpatrick as a recipient, Defendant sent follow-
up messages stating:  "Unfortunately, the culprit is still on our 'Friends of Deb' List--[Mr.
Fitzpatrick] is NO friend--more demon than friend!!  I will create another list for just TRUE
Friends of Deb!" and "[e]veryone please delete this list--he'll probably try to go after you!"
[*Id.*].  And in the spring of 2023, Ms. O'Hara-Rusckowski told "an Avodah partner and
prominent figure in both the Catholic community and national anti-trafficking field" that
Plaintiffs "misappropriated funds and were labor trafficking religious sisters who Avodah
employed to care for victims of sex trafficking."  [*Id.* at ¶ 65].

Plaintiffs claim that, as a result of Defendant's defamatory statements, donors and
partner organizations who had pledged financial commitments to Avodah withdrew their
donations or commitments, [*id.* at ¶¶ 67–68], and Avodah has been "shunned" and
disinvited seminars and conferences, [*id.* at ¶¶ 69–71].  Plaintiffs also allege that
Defendant's statements caused the Archdiocese to "confirm[] its decision to disavow
Avodah as a Catholic organization and issue[] public statements to the Catholic
community about its decision to disavow Avodah" in February 2023.  [*Id.* at ¶ 60].  That
same month, and based on Defendant's statements, Archdiocesan representatives
"utilized local law enforcement to induce the removal of several Eucharistic Heart of Jesus
Sisters who were living and caring for survivors on Avodah's campus in Denver,
Colorado."  [*Id.* at ¶ 61].  In addition, Plaintiffs allege that Defendant's statements "caused
or otherwise contributed to the U.S. Attorney's Office for the District of Massachusetts
convening a federal criminal investigation against Plaintiffs regarding allegations that
Avodah had labor trafficked religious sisters."  [*Id.* at ¶ 72].

Plaintiffs initiated this lawsuit on January 25, 2024, [Doc. 1], and filed their Amended Complaint on July 10, 2024, [Doc. 72]. They assert five claims in total: (1) a defamation claim asserted by Avodah, [*id.* at ¶¶ 76–98]; (2) a defamation claim asserted by Mr. Fitzpatrick, [*id.* at ¶¶ 99–128]; (3) a claim for intentional interference with contract asserted by both Plaintiffs, [*id.* at ¶¶ 129–41]; (4) a claim for intentional interference with prospective business relations asserted by both Plaintiffs, [*id.* at ¶¶ 142–49]; and (5) an extreme and outrageous conduct claim asserted by Mr. Fitzpatrick, [*id.* at ¶¶ 150–55]. On August 30, 2024, Defendant filed her two Motions to Dismiss. [Doc. 84; Doc. 85]. The Motions are fully briefed and ripe for disposition.

## LEGAL STANDARDS

### I.    Rule 12(b)(6)

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion under Rule 12(b)(6), the Court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quotation omitted). The plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted).

### II.   Colorado's Anti-SLAPP Statute

To "discourage strategic lawsuits against public participation" ("SLAPP"), Colorado

enacted an "anti-SLAPP" statute in 2019.  *Coomer v. Make Your Life Epic LLC*, 659 F. Supp. 3d 1189, 1196 (D. Colo. 2023).  The anti-SLAPP statute is intended to "encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, to protect the rights of persons to file meritorious lawsuits for demonstrable injury."  *Salazar v. Pub. Tr. Inst.*, 522 P.3d 242, 246 (Colo. App. 2022) (quoting Colo. Rev. Stat. § 13-20-1101(1)(b)).[1]

The anti-SLAPP statute "provides a process for weeding out, at an early stage, nonmeritorious lawsuits brought in response to a defendant's petitioning or speech activity."  *Petrocco v. Sharkey*, No. 21CA1493, 2023 WL 12057334, at *3 (Colo. App. June 1, 2023).  "If the plaintiff's claim arises from the defendant's conduct falling within the statute's purview, a district court may grant a 'special motion to dismiss' the plaintiff's claim."  *Murphy Creek Dev., Inc. v. Matise*, No. 24CA0230, 2024 WL 4850149, at *2 (Colo. App. Nov. 14, 2024); *see also* Colo. Rev. Stat. § 13-20-1101(3)(a).  Resolving a special motion to dismiss involves a two-step process.  *Murphy Creek*, 2024 WL 4850149, at *2. First, "the defendant bears the burden to show that their conduct underlying the plaintiff's claim falls within the statute."  *Id.*  Then, if the defendant meets that burden, then the plaintiff must "establish a reasonable likelihood that they will prevail on the claim."  *Id.*

---

[1]  The "issue of whether to apply anti-SLAPP statutes . . . in federal court is a challenging one and has divided the circuits."  *Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, 956 F.3d 1228, 1239 (10th Cir. 2020).  The United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") has not definitively ruled on this issue, but a number of courts in the United States District Court for the District of Colorado have concluded that Colorado's anti-SLAPP law applies in federal court.  *See, e.g.*, *Moreau v. U.S. Olympic & Paralympic Comm.*, 641 F. Supp. 3d 1122, 1133 (D. Colo. 2022); *Make Your Life Epic LLC*, 659 F. Supp. 3d at 1199.  Moreover, neither Party argues that the anti-SLAPP statute is inapplicable in federal court.  *See* [Doc. 85; Doc. 92].

Here, the Parties agree that Plaintiffs' claims fall within the anti-SLAPP statute, *see* [Doc. 85 at 2–7; Doc. 92 at 1], so the Court's discussion is limited to the second step in the analysis.

At step two, if the special motion mounts a legal challenge—i.e., attacks the legal sufficiency of the plaintiff's allegations—then the trial court reviews the motion under the standards articulated in Rule 12(b)(6). *Timmins v. Henderson*, No. 22-cv-00754-CNS-NRN, 2023 WL 2466020, at *3 (D. Colo. Mar. 10, 2023). But if the motion raises a factual challenge (or in other words, challenges the accuracy of the factual allegations), then Rule 56 standards apply.[2] *Id.*; *see also Moreau v. U.S. Olympic & Paralympic Comm.*, 641 F. Supp. 3d 1122, 1133 (D. Colo. 2022).[3]

## ANALYSIS

### I.    Documents Considered

Before turning to the Parties' substantive arguments, the Court first addresses the materials it can consider at this stage of the proceeding. Defendant argues that the Court may consider a number of exhibits in ruling on the Rule 12(b)(6) Motion to Dismiss, including screen captures from Avodah's website and a letter sent by the Archbishop of

---

[2] The Court observes that many out-of-Circuit courts have concluded that "similar state anti-SLAPP statutes impermissibly alter the Rule 56 standard." *Todd v. Lovecruft*, No. 19-cv-01751-DMR, 2020 WL 60199, at *7 (N.D. Cal. Jan. 6, 2020) (collecting cases). The Parties do not raise this argument.

[3] Courts in this District uniformly adopted this framework. *See Moreau*, 641 F. Supp. 3d at 1138; *Timmins*, 2023 WL 2466020, at *3; *Make Your Life Epic LLC*, 659 F. Supp. 3d at 1203; *Rocky Mtn. Rebar Inc. v. Wanzek Constr. Inc.*, No. 24-cv-01433-CNS-TPO, 2025 WL 887418, at *2 (D. Colo. Mar. 21, 2025); *Am. Muckrakers PAC, Inc. v. Boebert*, No. 23-cv-01463-RMR-KAS, 2024 WL 3738932, at *6 (D. Colo. June 9, 2024); *Hoid v. Gray Media Grp., Inc.*, No. 24-cv-01127-PAB-MEH, 2024 WL 5452665, at *3 (D. Colo. Dec. 13, 2024), *recommendation adopted*, 2025 WL 395893 (D. Colo. Feb. 5, 2025). The Parties also appear to apply this standard. [Doc. 85 at 7–8; Doc. 92 at 3–7].

Denver. *See* [Doc. 84 at 7 n.3]. Specifically, Defendant urges this Court to take judicial notice of "[m]aterials from Plaintiffs' website" on the basis that they are "matters of public record and are also central to Plaintiffs' attempt to prove damages and harm based on the Archdiocese's disavowal of Avodah, which the . . . webpages address." [*Id.*]. She also argues that the Court must take judicial notice of the Archbishop's letter, which she characterizes as a "press release," arguing that it "is subject to judicial notice because it reflects material that Plaintiffs referred to in their Complaint, is central to Plaintiffs' claims, and is available online on the Archdiocese's official website, such that it is "a matter of public record not subject to reasonable dispute." [*Id.* at 8 n.4 (quoting *Hastey ex rel. YRC Worldwide, Inc. v. Welch*, 449 F. Supp. 3d 1053, 1060 (D. Kan. 2020))].[4] Though Plaintiffs do not directly respond to Defendant's arguments regarding judicial notice, *see generally* [Doc. 91; Doc. 92], they do argue that Ms. O'Hara-Rusckowski's reliance on extraneous documents introduces "factual challenges which cannot be resolved through analysis of the four corners of Plaintiffs' complaint" or "under a Federal Rule of Civil Procedure 12(b)(6) legal standard," [Doc. 92 at 7].

The Court is respectfully unpersuaded by Defendant's arguments, which conflate two separate grounds permitting consideration of extraneous documents in ruling on a motion to dismiss. First, a court may consider documents outside of the pleadings if the documents are (1) attached to or referenced in the complaint; (2) central to the plaintiffs'

---

[4] Defendants do not argue that this Court may look at these documents pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, which governs motions to dismiss for lack of subject matter jurisdiction. *See generally* [Doc. 84]. Indeed, despite arguing a lack of subject matter jurisdiction, Defendants do not invoke Rule 12(b)(1) at all. *See* [*id.* at 13–15]. And the only extraneous document that may be related to the ecclesiastical abstention arguments is the Archbishop's letter, but the letter and the Archdiocese's other actions are adequately described in the Amended Complaint. *See* [Doc. 72 at ¶ 60].

claims; and (3) indisputably authentic. *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017). Here, while the Archbishop's letter is referenced generally in the Amended Complaint, [Doc. 72 at ¶ 60], Avodah's website is not, *see generally* [*id.*], and Defendant's suggestion that the Court can consider extraneous documents so long as they "reflect material that Plaintiffs referred to in their Complaint," *see* [Doc. 84 at 8 n.4], is contrary to Tenth Circuit authority, *see Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (stating that this exception "applies only to documents referred to in the complaint" (quotation omitted)). Accordingly, this limited exception does not apply to the website pages. *See King ex rel. Est. of King v. Home Depot U.S.A., Inc.*, No. 22-cv-01050-PAB-MEH, 2023 WL 2574374, at *2 (D. Colo. Mar. 20, 2023) (declining to consider document not referenced in complaint); *SEC v. Goldstone*, 952 F. Supp. 2d 1060, 1218 (D.N.M. 2013) (same).

Separately, a court may also consider "sources of which [the court] can take judicial notice, including public records." *Hooper v. City of Tulsa*, 71 F.4th 1270, 1280 n.8 (10th Cir. 2023). However, those documents "may only be considered to show their contents, not to prove the truth of matters asserted therein." *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006). In other words, the Court "cannot take the facts asserted in the [documents] to be true." *Schendzielos v. Silverman*, 139 F. Supp. 3d 1239, 1251 (D. Colo. 2015).

As a preliminary matter, the Court is not convinced that these documents fit within the "public record" exception. Materials deemed "public records" include filings in administrative proceedings, official documents published by government agencies, and court records. *See In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Pracs. & Prods. Liab.*

*Litig.*, 288 F. Supp. 3d 1087, 1210 (D.N.M. 2017); *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979).  Some courts have "found that information or documents from private, non-governmental websites are not properly subject to judicial notice." *PS Audio, Inc. v. Allen*, No. 18-cv-00206-WJM-STV, 2018 WL 5309834, at *4 n.5 (D. Colo. Aug. 10, 2018) (collecting cases).  Nor do the contents of the documents constitute facts "whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b)(2), given that the very nature of the Parties' dispute.

Even if the Court did consider those documents, though, it could not assume their contents as accurate or true, *Tal*, 453 F.3d at 1264 n.24, which Defendant effectively asks this Court to do.  "When a court takes judicial notice of publications like websites . . ., the court merely notices what was in the public realm at the time, not whether the contents of those [pages] were in fact true."  *Hampton v. Root9b Techs., Inc.*, No. 15-cv-02152-MSK-MEH, 2016 WL 7868823, at *4 (D. Colo. Aug. 3, 2016), *recommendation adopted*, 2016 WL 9735744 (D. Colo. Sept. 21, 2016), *aff'd*, 897 F.3d 1291 (10th Cir. 2018); *see also Mundt v. Gadziala*, No. 24-1041, 2024 WL 5087212, at *4–5 (10th Cir. Dec. 12, 2024) (rejecting argument that the "contents of the exhibits [attached to the defendants' motion to dismiss] prevail over the allegations in the complaint" and determining that the district court erred in crediting the content of those exhibits over the allegations in the complaint).

A trial court has "broad discretion in determining whether or not to accept materials beyond the pleadings."  *Lowe v. Town of Fairland*, 143 F.3d 1378, 1381 (10th Cir. 1998).  For the above reasons, the Court declines to consider the additional exhibits attached to Defendant's Rule 12(b)(6) Motion to Dismiss.

II.    **Ecclesiastical Abstention**

Turning to the Parties' substantive arguments, Defendant first asserts that the Court does not have jurisdiction over some portion of Plaintiffs' claims under the ecclesiastical abstention doctrine.  [Doc. 84 at 13–15].  Courts do not have subject matter jurisdiction over matters that are "strictly and purely ecclesiastical."  *Watson v. Jones*, 80 U.S. 679, 733 (1871).  The ecclesiastical abstention doctrine "prohibits secular courts from adjudicating religious controversies involving 'questions of discipline, or of faith, or ecclesiastical rule, custom, or law.'"  *Middleton v. United Church of Christ Bd.*, 483 F. Supp. 3d 489, 497 (N.D. Ohio 2020) (quoting *Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 710 (1976)), *aff'd*, No. 20-4141, 2021 WL 5447040 (6th Cir. Nov. 22, 2021).  Because whether a federal court has subject matter jurisdiction over a claim is considered "fundamentally preliminary," *Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979), this Court turns first to this issue to define the scope of the causes of action before it.

"While civil courts have jurisdiction to render decisions in religious controversies involving rights outside the doctrinal realm, such disputes must be resolved by application of secular or neutral principles of law, thereby avoiding any impermissible inquiry into ecclesiastical questions."  *Jones v. Crestview S. Baptist Church*, 192 P.3d 571, 573 (Colo. App. 2008).  "[T]he application of the ecclesiastical abstention doctrine is fact-specific, and civil courts may adjudicate secular issues that arise in the context of church disputes 'when inquiry "into religious law and polity" is not required.'"  *Hyung Jin Moon v. Hak Ja Han Moon*, 431 F. Supp. 3d 394, 406 (S.D.N.Y. 2019) (quoting *Kavanagh v. Zwilling*, 997 F. Supp. 2d 241, 250 (S.D.N.Y. 2014)).

Ms. O'Hara-Rusckowski argues that the ecclesiastical abstention doctrine bars "at least some of" Plaintiffs' theories of relief.[5]   [Doc. 84 at 13 (emphasis omitted)].   She argues that "the Court must dismiss [Plaintiffs'] claims that [(1)] relate in any way to the decision by the Denver Archdiocese to disavow Avodah and [(2)] all claims relating to 'demons'" because these claims involve "matters of religious administration and belief." [*Id.* at 14–15].   Plaintiffs disagree, asserting that they do not challenge the Archdiocese's decision to disavow Avodah (or any Archdiocesan action at all), but instead challenge Defendant's "secular efforts as a private individual, not as a religious official, to tarnish the public standing of Plaintiffs through knowingly false and defamatory statements." [Doc. 91 at 5].

As for the defamation theory premised on Ms. O'Hara-Rusckowski calling Mr. Fitzpatrick a "demon," the Court finds that Plaintiffs' defamation claim can be resolved without inquiry into religious law and polity.  *Hyung Jin Moon*, 431 F. Supp. 3d at 406.  In *Kliebenstein v. Iowa Conference of United Methodist Church*, 663 N.W.2d 404 (Iowa 2003), the Supreme Court of Iowa considered whether the ecclesiastical abstention doctrine barred a defamation claim premised on a minister's public announcement that the plaintiff embodied "the spirit of Satan."  *Id.* at 405, 407.  The court concluded that the answer required a determination not of "the meaning of 'spirit of Satan' within an ecclesiastical context" but "whether the phrase has a secular meaning," such that a factfinder could determine the plaintiff was defamed without resorting to "theological

---

[5] While Ms. O'Hara-Rusckowski characterizes her arguments regarding the ecclesiastical abstention doctrine to apply to certain "claims" by Plaintiffs, *see* [Doc. 84 at 13], it is more precise to describe these arguments as pertaining to theories of relief, as Plaintiffs' various causes of action are based on allegations beyond those related to the Archdiocese, *see generally* [Doc. 72].

reflection." *Id.* at 407.  Reviewing dictionary definitions and finding that the term used "carrie[d] a common, and largely unflattering, secular meaning," and also observing that the statements were published to non-church members, the court determined that the ecclesiastical abstention doctrine did not bar the defamation claim. *Id.* at 407–08.

*Kliebenstein* is instructive.  Although "demon" could have particular connotations in some sectarian contexts, it also has a common secular and colloquial meaning that could connote certain personality traits or behavior.  For instance, Webster's Third New International Dictionary defines "demon" to include not only "an evil spirit : devil" but also "having the characteristics of a demon." *Demon*, Webster's Third New Int'l Dictionary 600 (1993).  Other sources also provide both sectarian and secular definitions. *See Demon*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/demon (last visited May 22, 2025) ("an evil spirit"; "a person who behaves very badly"); *Demon*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/demon (last visited May 22, 2025) (defining "demon" as both "an evil spirit" and "a source or agent of evil, harm, distress, or ruin").  Associating Mr. Fitzpatrick with the secular meaning of the term "demon" could affect the public's perception of his character, and the fact that a term may also have a sectarian meaning "does not mandate application of the ecclesiastical abstention doctrine." *In re Diocese of Lubbock*, 592 S.W.3d 196, 205 (Tex. App. 2019).

Moreover, Plaintiffs allege that, like *Kliebenstein*, Ms. O'Hara-Rusckowski disseminated this statement beyond a particular religious group:  Defendant allegedly used the term in a "group text message to a network of prospective Avodah partners and donors in the faith-based and charitable communities."  [Doc. 72 at ¶ 64].  This lends

additional support to the Court's conclusion that resolution of the defamation claim would not require Court intervention into "ecclesiastical rule, custom, or law." *Middleton*, 483 F. Supp. 3d at 497; *see also Kliebenstein*, 663 N.W.2d at 407 ("The fact that [the] communication about [the plaintiff] was published outside the congregation weakens this ecclesiastical shield."); *Ausley v. Shaw*, 193 S.W.3d 892, 896 (Tenn. Ct. App. 2005) (statements made outside of church community to law enforcement and community members were not ecclesiastical in nature); *Lubbock*, 592 S.W.3d at 202 (collecting cases and concluding that disclosing matters to the public means that those communications "enter[] the civil realm").  The ecclesiastical abstention doctrine does not bar this portion of the defamation claims.

Additionally, Defendant seeks dismissal of all claims "that relate in any way to the decision by the Denver Archdiocese to disavow Avodah." [Doc. 84 at 15].  She insists that adjudication of those claims would require the Court to "determine whether it was proper for Ms. O'Hara-Rusckowski to explain her experiences with Plaintiffs to the Denver Archdiocese and religious donors, whether the Denver Archdiocese's decision to disavow Plaintiffs was properly within its discretion in church administration, and whether that decision was justified based on Plaintiffs' actions." [*Id.*].  These assertions are unsupported by any explanatory argument or authority and are respectfully unpersuasive. Plaintiffs allege that, based on Defendant's alleged defamatory statements, the Archdiocese "confirmed its decision to disavow Avodah as a Catholic organization and issued public statements to the Catholic community about its decision to disavow Avodah." [Doc. 72 at ¶ 60].  But how the Archdiocese responded to Ms. O'Hara-Rusckowski's reports does not bear on the basic elements of a defamation claim.  No

factfinder would be required to evaluate the Archdiocese's actions to determine whether or not Ms. O'Hara-Rusckowski defamed Avodah or Mr. Fitzpatrick. The fact that the statements caused consequences in the religious realm does not mean that the ecclesiastical abstention doctrine applies. *Lubbock*, 592 S.W.3d at 205 ("Secular courts are not barred from adjudicating all controversies touching sectarian interests.").[6]

For these reasons, the ecclesiastical abstention doctrine does not deprive the Court of jurisdiction to hear any portion of Plaintiffs' claims.

### III.    The Sufficiency of Plaintiffs' Allegations

In both Motions, Ms. O'Hara-Rusckowski seeks dismissal of Plaintiffs' claims in their entirety. [Doc. 84; Doc. 85]. The Rule 12(b)(6) Motion to Dismiss argues that Plaintiffs fail to allege sufficient facts to render any of their claims plausible. [Doc. 84 at 6]. And in the Special Motion to Dismiss, Defendant asserts that Plaintiffs' lawsuit must be dismissed under Colorado's anti-SLAPP law. [Doc. 85 at 1]. Because the Special Motion to Dismiss and related briefing simply incorporate the arguments raised in the Rule 12(b)(6) Motion to Dismiss and related briefing, [*id.* at 7–8],[7] the Court addresses

---

[6] The Court does not construe Plaintiffs' latter three claims—intentional interference with a contract, intentional interference with prospective business relations, and extreme and outrageous conduct—as based on the Archdiocese's decision to disavow Avodah, as none of these claims tie the relevant allegations (such as, for example, the termination of contracts between Avodah and various groups of religious Sisters) to the Archdiocese's decision. *See* [Doc. 72 at ¶¶ 129–55]. Therefore, Defendant's argument is not clearly directed to these claims.

[7] Neither the Federal Rules nor the Local Rules permit a party to incorporate other filings or arguments into a motion. Courts within this District routinely reject this practice as an impermissible circumvention of applicable page limitations. *See, e.g.*, *Bagoue v. Developmental Pathways, Inc.*, No. 16-cv-01804-PAB-MJW, 2017 WL 4236316, at *2 n.2 (D. Colo. Sept. 25, 2017); *Maccagnan v. Cherry Creek Sch. Dist. No. 5*, No. 22-cv-00503-CMA-KLM, 2023 WL 6127904, at *2 (D. Colo. Sept. 18, 2023); *Lee v. Denver Pub. Sch.*, No. 20-cv-01989-WJM-MEH, 2022 WL 5241884, at *7 n.5 (D. Colo. Oct. 6, 2022). This is particularly true here, where the Court granted the Parties unusually large extensions

both Motions together to the extent it can.   First, the Court addresses Defendants'
arguments invoking the anti-SLAPP statute and its applicable standards.   Then, the Court
addresses the appropriate framework for consideration of Defendant's arguments before
turning to the Parties' substantive contentions.

### A.    Whether Defendant Raises a Legal or Factual Challenge

As discussed above, the analytical framework this Court applies to Defendant's
Special Motion to Dismiss depends upon whether Defendant mounts a legal or factual
challenge.  *See supra* page 7.  Defendant generally argues, without explanation, that her
Special Motion to Dismiss mounts a legal challenge and that the Court should grant the
Special Motion to Dismiss under Rule 12(b)(6) standards.   [Doc. 85 at 7–8].   Plaintiffs
respond first by asserting that "this Court can *and should* accept the First Amended
Complaint's factual allegations as true, construe all reasonable inferences most favorably
to Plaintiffs, and deny [the] Special Motion" under Rule 12(b)(6) standards.   [Doc. 92 at
3–4 (emphasis added)].   But they then argue that Defendant actually mounts a *factual*
challenge, identifying "at minimum fifteen principal factual challenges to Plaintiffs' claims"
in the Rule 12(b)(6) Motion (which are incorporated into the Special Motion to Dismiss by
reference).  [*Id.* at 5].   In her Reply, Ms. O'Hara-Rusckowski maintains that she mounts a
legal challenge, primarily relying on the simple assertion that her Rule 12(b)(6) Motion to

---

of the page limitations for their Rule 12(b)(6) Motion to Dismiss briefing, but the Parties
neither sought nor obtained any such extension for the Special Motion to Dismiss.
Because both Parties employed this practice of incorporation, the Court will consider the
incorporated arguments in ruling on the Special Motion to Dismiss.  However, the Parties
are advised that the Court will not permit incorporated arguments in any other motions or
briefs filed in this case, and any arguments incorporated by reference in future filings will
not be considered.  This does not apply to adoption by reference as contemplated by Rule
10(c) of the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 10(c).

Dismiss is filed under Rule 12(b)(6).  [Doc. 98 at 2].  She insists that her exhibits "are the mandatory subject of judicial notice" and that her submission of exhibits does not render her challenges factual.  [*Id.* at 4].

Upon review of the record before it, the Court concludes that Defendant raises both factual and legal challenges to the sufficiency of Plaintiffs' claims.  To be sure, the majority of Defendant's arguments attack the legal sufficiency of Plaintiffs' allegations, arguing that even taking those allegations as true, Plaintiffs cannot state a claim under Rule 12(b)(6).  *See, e.g.*, [Doc. 84 at 17–18, 21–25].  But Defendant *also* tries to discredit some of Plaintiffs' allegations by insisting those allegations are inaccurate or misleading, or by asking the Court to consider facts not alleged in the Amended Complaint or documents outside the four corners of the pleading.  *See, e.g.*, [*id.* at 11, 23]; *see also Timmins*, 2023 WL 2466020, at *4 (finding that the submission of exhibits "underscore[d] the factual nature" of the challenge).

To the extent Defendant attempts to raise a factual challenge to Plaintiffs' claims, the Special Motion to Dismiss is respectfully **DENIED**.  The Special Motion to Dismiss and Plaintiffs' response thereto were both filed before discovery commenced in this case.  *See* [Doc. 84; Doc. 92; Doc. 93 (the Scheduling Order)].  "When an anti-SLAPP motion challenges the factual sufficiency of a claim, 'discovery must be allowed, with opportunities to supplement evidence based on the factual challenge before any decision is made by the court.'"  *Timmins*, 2023 WL 2466020, at *3 (quoting *Moreau*, 641 F. Supp. 3d at 1134).  Plaintiffs had not had an opportunity to conduct any discovery at the time they filed their Response brief, and the Court finds it premature and imprudent to rule on factual challenges at the pleading stage.  *See id.* (declining to rule on anti-SLAPP motion

raising factual challenges "until the parties have conducted discovery"). Moreover, while Defendant has attached exhibits to her Rule 12(b)(6) Motion to Dismiss, the Court has already decided that judicial notice does not apply, and Defendant offers no authority explaining how the Court can consider them otherwise in the context of the Special Motion to Dismiss without triggering discovery and the Rule 56 standard. *See* [Doc. 85]. As such, the Court addresses only Defendant's arguments attacking the legal sufficiency of Plaintiffs' allegations based on averments within the four corners of the Amended Complaint.

### B.     Defendant's Legal Challenges Under Rule 12(b)(6)

Some Colorado courts of appeal have described the second step in the anti-SLAPP analysis "as a summary judgment-like procedure in which the court reviews the pleadings and the evidence to determine whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment." *L.S.S. v. S.A.P.*, 523 P.3d 1280, 1286 (Colo. App. 2022) (quotation omitted); *see also Murphy Creek*, 2024 WL 4850149, at *5 ("[T]o defeat an anti-SLAPP motion, the plaintiff must go further and present *evidence* establishing a reasonable likelihood of success."); *Jogan Health, LLC v. Scripps Media, Inc.*, 565 P.3d 1160, 1167 (Colo. App. 2025) (to defeat an anti-SLAPP motion, the plaintiff must establish that "a reasonable probability exists that [the plaintiff] could prove its claims by clear and convincing evidence at trial").

This suggests to the Court that the anti-SLAPP analysis is not perfectly congruous with Rule 12(b)(6) analysis. But as explained above, Defendant's Special Motion to Dismiss raises arguments *only under* Rule 12(b)(6). *See* [Doc. 85 at 7–8 ("For the

reasons set forth in [the Rule 12(b)(6) Motion to Dismiss], . . . Plaintiffs have failed to state plausible claim. . . .  This Court should grant Ms. O'Hara-Rusckowski relief under Colorado's anti-SLAPP statute *as a result*.") (emphasis added)]; *see also* [Doc. 84 at 14–30].  Moreover, as explained above, Plaintiffs had essentially no opportunity to submit evidence in opposition to the Special Motion to Dismiss because discovery had not begun at the time their Response was due.

The Court cannot construct arguments on behalf of Parties or resolve issues not presented to the Court.  *See United States v. Davis*, 622 F. App'x 758, 759 (10th Cir. 2015) ("[I]t is not this court's duty, after all, to make arguments for a litigant that he has not made for himself."); *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) (a court has no obligation to make arguments or perform research on behalf of litigants).  Because Defendant seeks dismissal solely on Rule 12(b)(6) grounds in both Motions, the Court's analysis—including its analysis as to whether Plaintiffs have "establish[ed] a reasonable likelihood that they will prevail on the claim," *Murphy Creek*, 2024 WL 4850149, at *2—is limited to the arguments raised under Rule 12(b)(6).

### 1.    Defamation

To plausibly allege a defamation claim based on a matter of public concern,[8] the plaintiff must allege facts showing that the statement (1) was defamatory; (2) was materially false; (3) concerned the plaintiff, (4) was published to a third party; (5) was published with actual malice; and (6) caused actual or special damages. *Brokers' Choice of Am.*, 861 F.3d at 1109.

---

[8] The Parties agree that Defendant's statements involved a matter of public concern. [Doc. 84 at 19–20; Doc. 91 at 17].

As framed in Plaintiffs' Surreply, *see* [Doc. 104 at 2], Plaintiffs' defamation claims are based on seven alleged defamatory statements:[9]

- Defendant published statements that Avodah was "labor trafficking" religious Sisters, [Doc. 72 at ¶ 77];

- Defendant published statements that Mr. Fitzpatrick was "labor trafficking" religious Sisters, [*id.* at ¶ 100];

- Defendant published statements that Avodah "had stolen and misappropriated grant funds," [*id.* at ¶ 84];

- Defendant published statements that Mr. Fitzpatrick "had stolen and misappropriated grant funds donated to Avodah," [*id.* at ¶ 107];

- Defendant published statements that Avodah "had perpetuated crimes and had been federally charged with labor trafficking religious Sisters," [*id.* at ¶ 91];

- Defendant published statements that Mr. Fitzpatrick "had perpetuated crimes," [*id.* at ¶ 114]; and

- Defendant published statements that Mr. Fitzpatrick is a "demon," [*id.* at ¶ 121].

Ms. O'Hara-Rusckowski asserts that Plaintiffs' defamation claims should be dismissed in their entirety, raising various arguments that Plaintiffs cannot state a defamation claim based on any of the above statements.  *See* [Doc. 84 at 15–25].

### a.    Non-Literal Hyperbole

First, Defendant argues that her statement that Mr. Fitzpatrick is "more demon than friend" is non-actionable hyperbole that cannot be proven or disproven as true or false. [*Id.* at 16].  This is the only statement challenged on this basis.  *See* [*id.*; Doc. 99 at 12–

---

[9] Plaintiffs filed an opposed motion to file a surreply to address "new legal arguments" raised in Defendant's reply brief.  [Doc. 100 at 2].  The Court granted Plaintiffs' motion, but reserved ruling on whether Defendant's reply brief raised new arguments and whether a surreply was necessary.  [Doc. 103].  Upon further review of the briefing, the Court finds that Plaintiffs' Surreply is properly considered in this Order.  Moreover, the Court adopts Plaintiffs' position, articulated in the Surreply, that their defamation claims are based on these seven alleged statements.  [Doc. 104 at 2].

13].   Plaintiffs respond that Ms. O'Hara-Ruszkowski "fails to account for the requisite inquiry of the statement's context, audience, and circumstances."  [Doc. 91 at 16].   They argue that "there is a reasonable inference that as a member of a faith-based community communicating specifically to other faith-based community members, [Defendant] represented this statement as factual."  [Id. at 17].[10]  They also insist that a factfinder could conclude whether Mr. Fitzpatrick is indeed an "agent of evil, harm, distress, or ruin." [Id. (quoting Demon, Merriam-Webster Online Dictionary)].

"While false statements of fact and opinions that reasonably imply undisclosed defamatory facts as their premise are actionable, pure opinion is not."  Sall v. Barber, 782 P.2d 1216, 1218 (Colo. App. 1989).  An opinion statement may be actionable "if it's based on false, defamatory facts that aren't disclosed in the context of the statement."  Orvis v. Seiber, No. 23CA0374, 2024 WL 4022064, at *6 (Colo. App. May 23, 2024).  To decide whether an opinion statement is actionable, Colorado courts use a two-part test. Keohane v. Stewart, 882 P.2d 1293, 1299 (Colo. 1994).  First, the Court must determine whether the defamatory statement is "sufficiently factual to be susceptible of being proved true or false."  Id. (quotation omitted).  This threshold is met if "the statement contains or implies a verifiable fact about the plaintiff."  NBC Subsidiary (KCNC-TV), Inc. v. Living Will

_____

[10] It is somewhat unclear what Plaintiffs mean when they say that Ms. O'Hara-Ruszkowski could have "represented this statement as factual."  If Plaintiffs' position is that Ms. O'Hara-Ruszkowski did, in fact, mean to say that that Mr. Fitzpatrick is a literal demon in the sectarian sense of the word, then such a framing of the defamation claim on this statement would indeed require the factfinder to delve into matters of religious law and polity, and any theory of liability based on this statement would be barred by the ecclesiastical abstention doctrine.  But the Court has already concluded that this statement does not invoke the doctrine because of the colloquial, secular meaning associated with the term "demon."  The Court limits its analysis of the statement to the common secular meaning of the word.

*Ctr.*, 879 P.2d 6, 10 (Colo. 1994). Second, the Court asks "whether reasonable people would conclude that the assertion is one of fact," considering the statement's phrasing, context, and surrounding circumstances. *Keohane*, 882 P.2d at 1299.

Plaintiffs' argument skips the first inquiry and goes straight to examining the context, contents, and circumstances of the statement. But before examining those factors, the Court must first decide whether the statement is "sufficiently factual to be susceptible of being proved true or false." *Id.* Here, even considering the secular meaning of the word "demon," Ms. O'Hara-Rusckowski's statement does not contain, either implicitly or explicitly, "a verifiable fact about the plaintiff," *NBC Subsidiary (KCNC-TV), Inc.*, 879 P.2d at 10, and is not sufficiently factual to be capable of being proved true or false. Rather, the statement is a subjective, hyperbolic opinion statement, and although the term was allegedly used to cast Mr. Fitzpatrick in a negative light, it is not actionable. Indeed, courts routinely dismiss defamation claims based on similar innuendo. *See Giduck v. Niblett*, 408 P.3d 856, 868 (Colo. App. 2014) (statement that the plaintiff was a "charlatan" was nonactionable as a "subjective judgment[] expressed in imaginative and hyperbolic terms" that could not be proved true or false (quotation omitted)); *Small Bus. Bodyguard Inc. v. House of Moxie, Inc.*, 230 F. Supp. 3d 290, 315 (S.D.N.Y. 2017) ("Saying that someone acted like a 'raging, irresponsible asshole' is also not an assertion of fact being capable of being proven true or false, so [it] cannot be defamatory."); *Sherr v. HealthEast Care Sys.*, 416 F. Supp. 3d 823, 845 (D. Minn. 2019) ("[T]he statements allegedly made by members of the HealthEast Neuro Group that Dr. Sherr is a 'hack,' 'not a good surgeon,' 'not a good doctor,' 'worst goddamn surgeon,' 'asshole,' and 'son of a bitch' are not precise or verifiable and cannot reasonably be

interpreted as stating actual facts.  Thus, they are not actionable."), *aff'd*, 999 F.3d 589 (8th Cir. 2021); *Tuvell v. Marshall*, 2019 WL 5654950, at *2 (Mass. Ct. App. Oct. 31, 2019) (statements that the plaintiff was a "jerk" and "whiny" were not actionable); *Blomberg v. Cox Enters., Inc.*, 491 S.E.2d 430, 433 (Ga. Ct. App. 1997) (statement that plaintiff was a "silver-tongued devil" was not actionable because it could not be proven false).

The Court agrees with Defendant that her statement that Mr. Fitzpatrick is a "demon" cannot support a viable theory of defamation.  The Motion to Dismiss and Special Motion to Dismiss are **GRANTED** insofar as they seek dismissal of the defamation claims based on this statement.

### b.    Specificity

Next, Defendant argues that the alleged defamatory statements are not described with sufficient specificity.  [Doc. 84 at 17–18; Doc. 99 at 8–12].  She suggests that Plaintiffs must allege "the specific words, the date(s) of any communications, the place(s) where they were allegedly made, the recipient(s) of the communications, and the context of the allegedly defamatory statements," and without more context for each of the challenged statements, Plaintiffs fail to state a claim.  [Doc. 84 at 17–18].[11]  Plaintiffs respond that Defendant's argument improperly heightens the pleading standard for defamation claims.  [Doc. 91 at 7–9].  They contend that there is no requirement to identify the precise defamatory statement at issue or provide robust factual allegations, so long

---

[11] To the extent Defendant argues that dismissal is appropriate because "it is reasonable to infer that, in communicating with third parties concerning her experiences with Plaintiffs, Ms. O'Hara-Rusckowski disclosed the facts giving rise to her alleged opinions" and opinions based on disclosed facts cannot support a defamation claim, [Doc. 84 at 18], accepting this argument would require the Court to construe allegations and draw inferences in *Defendant's* favor, which the Court cannot do.

as they put Defendant on notice of the nature of their claims.  [*Id.* at 9].

"Although a defamation claim 'requires a certain degree of specificity,' . . . the plaintiff is not required to quote each defamatory statement verbatim in its entirety." *Coomer v. Donald J. Trump for President, Inc.*, 552 P.3d 562, 584 (Colo. App. 2024) (quoting *Corporon v. Safeway Stores, Inc.*, 708 P.2d 1385, 1390 (Colo. App. 1985)). "Federal courts relying on a Rule 8 standard have held that some specificity about the allegedly defamatory communication is required in order to give the defendant adequate notice." *McCoy v. Houston*, No. 16-cv-01377-MCA-LF, 2018 WL 4375111, at *15 (D.N.M. Sept. 13, 2018).  "[T]he degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context." *Royal Pac. Ltd. v. Faith Elec. Manufacture Co.*, Ltd, 322 F. Supp. 3d 1178, 1184 (D.N.M. 2018) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008)).

As mentioned above, Plaintiffs assert defamation claims based on statements that both Plaintiffs were "labor trafficking" religious Sisters and had been federally charged with crimes, [Doc. 72 at ¶¶ 77, 91, 100, 114]; and that both Plaintiffs "had stolen and misappropriated grant funds" and "perpetuated crimes," [*id.* at ¶¶ 84, 107, 114].   The Court finds that Plaintiffs' allegations are sufficient to put Defendant on notice of the claims against her.   Plaintiffs describe the contents of these alleged defamatory statements, asserting that Defendant publicized that Plaintiffs "misappropriated funds and were labor trafficking religious sisters," [*id.* at ¶ 65]; *see also* [*id.* at ¶ 58]; and that "Avodah had caused grant money to go 'missing,' was 'not following grant restrictions,' had 'misused' grant funding, and had 'failed to account for grant money in the amount of $130,000,'" [*id.* at ¶ 57]; *see also* [*id.* at ¶ 58].  They also allege that unspecified defamatory statements

were made to Kristen Meyer, "an influential Catholic leader," and that Ms. Meyer then "told a network of prospective Avodah partners and donors" that Mr. Fitzpatrick was "an interloper" and had "scammed [her] good friends out of 500k [sic]" and was "ironically and sadly trafficking religious sisters." [*Id.* at ¶ 63]. A reasonable inference may be drawn in Plaintiffs' favor about the contents of the statements Ms. O'Hara-Rusckowski made to Ms. Meyer.

Plaintiffs also allege, albeit often not by express name, people or groups to whom the statements were made. *See* [*id.* at ¶ 57 ("representatives of the Archdiocese of Denver"); *id.* at ¶ 58 ("influential partners and donors in the faith-based and charitable communities"); *id.* at ¶ 63 (Ms. Meyer); *id.* ¶ 65 ("an Avodah partner and prominent figure in both the Catholic community and national anti-trafficking field")]. Although these allegations often do not identify the statement's recipient by name, the Court finds them sufficient to give notice to Defendant of the basis of the defamation claims, especially with the added context of when many of the various statements were made. *See* [*id.* at ¶¶ 57–58 (winter of 2023); *id.* at ¶ 63 (February 2023); *id.* at ¶ 65 (spring of 2023)]. Moreover, the Court is mindful of the asymmetry of information available to Plaintiffs and Defendant when it comes to the particular recipients of particular statements made by Defendant.

The Court is respectfully unpersuaded by Defendant's arguments to the contrary, as Plaintiffs' allegations are more robust than those in many of Defendant's cited cases. *Compare* [Doc. 72], *with Banks v. Jackson*, No. 20-cv-02074-KMT, 2021 WL 4149618, at *9 (D. Colo. Sept. 13, 2021) (dismissing pro se defamation claim that was based on "vulgar and quite despicable lies," but which was supported by no supporting factual allegations), *and Carosella v. One World Translation & Assocs., Inc.*, No. 16-cv-00805-

WJM-KMT, 2017 WL 11545380, at *3 (D. Colo. Mar. 1, 2017) (dismissing defamation

claim based on "disparaging remarks, both written and oral" for lack of specificity), *and*

*Ross v. Gallegos*, No. 13-cv-00831-REB-KLM, 2013 WL 6283910, at *4 (D. Colo. Dec. 3,

2013) (dismissing pro se plaintiff's claim for "defamation of character" that included no

supporting facts), *and Partminer Worldwide Inc. v. Siliconexpert Techs. Inc.*, No. 09-cv-

00586-MSK-MJW, 2010 WL 502718, at *5 (D. Colo. Feb. 10, 2010) (dismissing

defamation claim that "fail[ed] to allege a defamatory statement at all").   Accordingly,

dismissal is not appropriate on this basis.

### c.   Material Falsity

To succeed on a defamation claim involving matters of public concern, "[t]he

plaintiff must show the statement is not only false, but "'materially false.'"  *Brokers' Choice*

*of Am.*, 861 F.3d at 1107 (quoting *Bustos v. A & E Television Networks*, 646 F.3d 762,

767 (10th Cir. 2011)).  "Unless a statement contains a *material* falsehood it simply is not

actionable."  *Bustos*, 646 F.3d at 764 (applying Colorado law).  To determine materiality,

courts "assess the materiality of a misstatement by comparing the damage it has done to

the plaintiff's public reputation to the damage the truth would have caused."  *Id.*  "To

qualify as *material* the alleged misstatement must be likely to cause reasonable people

to think 'significantly less favorably' about the plaintiff than they would if they knew the

truth; a misstatement is not actionable if the comparative harm to the plaintiff's reputation

is real but only modest."   *Id.* at 765 (quoting Colo. Jury Inst. Civ. 22:13).   Minor

inaccuracies or misstatements causing modest reputational harm are not actionable.

*Brokers' Choice of Am.*, 861 F.3d at 1111.  In conducting this analysis, "a court must

determine how the publication would have been understood by a reasonable or average

lay reader." *Fry v. Lee*, 408 P.3d 843, 850 (Colo. App. 2013).

Ms. O'Hara-Rusckowski asserts that Plaintiffs have not plausibly alleged material falsity.  [Doc. 84 at 21–23].  Her arguments focus on the statements about misuse of funds and labor trafficking, *see* [*id.*], and the Court's analysis takes this limited focus as well.  According to Defendant, the Amended Complaint does not allege material falsity, but actually "substantiate[s]" the defamatory statements.  [*Id.* at 22].  Specifically, Defendant argues that:

> Plaintiffs allege they received funds to train the Passionist Sisters and house survivors at the Lowell Home, spent funds dedicated towards those purposes, yet, the Lowell Home was incomplete, no survivors were cared for there, the Passionist Sisters were sent off to third parties, and, when confronted on these matters, Plaintiffs conceded their wrongdoing by returning unused funds and relinquishing control of the property and the Passionist Sisters.

[*Id.* at 22–23 (citing [Doc. 72 at ¶¶ 27–28, 31–32, 43–45])].  She also argues that any falsity could not be material, because it is undisputed that (1) the Archdiocese disavowed Avodah before the alleged statements were made; (2) Denver law enforcement raided Plaintiffs' Denver campus and removed religious Sisters; (3) the federal government is currently investigating Plaintiffs for labor trafficking and "financial impropriety"; and (4) Plaintiffs turned over funds and relinquished control over the Lowell Home.  [*Id.* at 23 (citing [Doc. 72 at ¶¶ 27–28, 31–32, 43–45, 60–61, 70–72])].

The Court is respectfully unpersuaded by these arguments.  First, Defendant's framing of the allegations related to the Passionist Sisters improperly disregards the actual contents of Plaintiffs' allegations, adds in allegations that do not appear in the Amended Complaint, and construes the allegations that *do* appear in the Amended Complaint in a light favorable to Defendant.  Plaintiffs actually allege that they received a

donation to fund four Passionist Sisters to serve at the Lowell Home, but supply chain shortages caused construction delays on the Lowell Home; due to those delays, "Avodah could not immediately house survivors at the Lowell Home." [Doc. 72 at ¶¶ 27, 31–32]. Therefore, Plaintiffs allege, Avodah "arranged internships for the Passionist Sisters at similar faith-based and charitable partner organizations across the U.S., in accordance with both the Passionist Sisters' employment agreement and Avodah's mission." [*Id.* at ¶ 32]. After an alleged unexpected confrontation with Ms. O'Hara-Rusckowski and other people who are "influential in the faith-based and charitable communities," Plaintiffs agreed "[u]nder coercion and duress" to transfer all contractual rights in the Lowell Home to Ms. O'Hara-Rusckowski and returned all of the unused donated funds. [*Id.* at ¶¶ 42–45]. The Court must accept these allegations as true. *Casanova*, 595 F.3d at 1124.

Similarly, Defendant's insistence that Plaintiffs cannot plead material falsity because law enforcement raided Plaintiffs' property and removed religious Sisters and a federal investigation was launched into Plaintiffs' conduct ignores Plaintiff's assertions that these events occurred *because of* Defendant's alleged defamatory statements. *See* [Doc. 72 at ¶¶ 61, 72]. And Defendant's argument that "the Archdiocese had already disavowed Avodah as a Catholic ministry because of systemic complaints from individuals working with Plaintiffs . . . before the allegedly defamatory statements were made," [Doc. 84 at 23], ignores the allegations in Plaintiffs' Amended Complaint and considers materials not properly before the Court. *See supra* Section I; [Doc. 72 at ¶ 60 ("On February 3, 2023, as a direct result of Rusckowksi's knowingly false and defamatory statements, the Archdiocese confirmed its decision to disavow Avodah as a Catholic organization and issued public statements to the Catholic community about its decision

to disavow Avodah.")].

Plaintiffs allege that Ms. O'Hara-Rusckowski knowingly spread false statements that Plaintiffs stole and misappropriated grant funds and labor trafficked religious Sisters. [Doc. 72 at ¶¶ 56–58, 65, 81, 88, 95, 104, 111, 118].  They also allege that, due to these defamatory statements, law enforcement removed religious Sisters from Avodah's property and the Archdiocese disavowed Avodah as a Catholic organization, [*id.* at ¶¶ 60–62], and the federal government launched an investigation into Plaintiffs, [*id.* at ¶ 72]. Plaintiffs also allege that religious organizations have "shunned Avodah and disallowed Avodah's attendance and participation at seminars, conferences, and other prominent activities pertinent to Avodah's operations and development."  [*Id.* at ¶ 69].  Given that Plaintiffs' mission is caring for trafficking survivors, [*id.* at ¶¶ 12, 68], and Defendant allegedly spread false statements that Plaintiffs *themselves* were guilty of trafficking religious Sisters, the Court concludes that Plaintiffs have alleged sufficient facts that the alleged defamatory statements "would have a different effect on the mind of the reader from that which the pleaded truth would have produced," *Brokers' Choice of Am.*, 861 F.3d at 1107, and they have sufficiently alleged material falsity.

### d.    Actual Malice

Finally, Defendant argues that Plaintiffs have not alleged sufficient facts demonstrating that she acted with actual malice.  [Doc. 84 at 24–25].  "A statement is published with actual malice if it is published with actual knowledge that it was false or with reckless disregard for whether it was true."  *L.S.S.*, 523 P.3d at 1288.  "A publisher acts with 'reckless disregard for the truth' if the publisher 'entertained serious doubts as to the truth of the statement or acted with a high degree of awareness of its probable

falsity.'"  *Rosenblum v. Budd*, 538 P.3d 354, 365 (Colo. App. 2023) (quoting *Creekside Endodontics, LLC v. Sullivan*, 527 P.3d 424, 431 (Colo. App. 2022)).  And although "ill will and bad motive toward the plaintiff are not elements of actual malice," *Fink v. Combined Commc'ns Corp.*, 679 P.2d 1108, 1111 (Colo. App. 1984), "evidence of the defendant's anger and hostility toward the plaintiff may serve as circumstantial evidence of actual malice to the extent that it reflects on the subjective attitude of the publisher," *L.S.S.*, 523 P.3d at 1288 (quotation omitted).

Ms. O'Hara-Rusckowski argues that the Amended Complaint fails to plead actual malice because it includes only a "pair of undifferentiated and conclusory recitations in support of [Plaintiffs'] claim that [she] acted with actual malice."  [Doc. 84 at 24].  She argues that Plaintiffs' allegations are conclusory and lack the factual support necessary to plausibly allege the actual malice element.  [*Id.* at 25].

Plaintiffs disagree, directing the Court to several allegations they say demonstrate actual malice.  As for the statements about labor trafficking, Plaintiffs highlight their allegations showing Ms. O'Hara-Rusckowski's familiarity with and knowledge about Plaintiffs' operations with religious Sisters and with the Lowell Home, which they argue "allow a reasonable inference that [Defendant] knew Avodah placed Sisters in internships with their voluntary approval in accordance with their employment agreements, such that [Ms. O'Hara-Rusckowski knew that] Plaintiffs were not 'labor tracking' religious Sisters." [Doc. 91 at 24–25].  With respect to the statements about Plaintiffs stealing and misappropriating grant funds, Plaintiffs point the Court to allegations that Ms. O'Hara-Rusckowski helped secure and administer grant funds donated to Plaintiffs, gave Plaintiffs instructions for how to handle certain funds, and that Plaintiffs followed those

instructions.  [*Id.* at 25].  They assert that these allegations "allow a reasonable inference that through [Defendant's] personal administration and oversight of grant funds donated to Plaintiffs, [Defendant] had knowledge that Plaintiffs had not stolen or misappropriated grant funds."  [*Id.*].  Finally, Plaintiffs rely on all of the above-referenced allegations to argue that Ms. O'Hara-Rusckowski knew that Plaintiffs had not perpetuated crimes, as she they had not labor trafficked any nuns and had not stolen or misappropriated grant funds.  [*Id.* at 25–26].

Considering the allegations in combination, the Court agrees with Plaintiffs that they have plausibly alleged actual malice, based on the below three categories of allegations:

***Defendant's Familiarity With Plaintiffs' Operations and Work.***  Plaintiffs allege that their partnership with Ms. O'Hara-Rusckowski began in 2021.  [Doc. 72 at ¶ 20].  That year, Defendant helped Avodah secure a $100,000 donation to develop the Sister Care model and "helped administer the expenditure and management of [those] funds."  [*Id.* at ¶ 24].  Ms. O'Hara-Rusckowski also "helped Avodah secure" a $400,000 donation from Malta to fund the Passionist Sisters' service at the Lowell Home.  [*Id.* at ¶ 27].  Later, Defendant helped secure an additional $250,000 donation for construction of the Lowell Home, but Avodah "was never given access to" those funds, which were "maintained by" Defendant or Malta.  [*Id.* at ¶ 28].  Ms. O'Hara-Rusckowski also gave Plaintiffs explicit instructions about how to manage certain donated funds, [*id.* at ¶ 29], and Plaintiffs complied with those instructions, [*id.* at ¶ 45].  These allegations support a reasonable inference that Ms. O'Hara-Rusckowski knew that the statements about Plaintiffs misusing or stealing grant funds were false.  *See Chastain v. Hodgdon*, 202 F. Supp. 3d 1216,

1222 (D. Kan. 2016) ("If defendant knew that the events were false, and nonetheless wrote the detailed narrative describing [the false events], it is axiomatic that she wrote the narrative with actual malice, or actual knowledge that it was false.").

**Defendant's Hostility Toward Plaintiffs.**  Plaintiffs allege that in November 2022, Mr. Fitzpatrick attended a meeting with Ms. O'Hara-Rusckowski and other faith community leaders "to purportedly discuss renovation progress of the Lowell Home," but when he arrived, Ms. O'Hara-Rusckowski "threatened [him] that [he] could not leave the meeting unless and until [he] agreed to transfer all . . . contractual rights to the Lowell Home to [Defendant], return allegedly unused restricted funds for the Lowell Home to Malta, and agree that the Passionist Sisters would be managed by [Defendant] at the Lowell Home."  [Doc. 72 at ¶ 41–42].  Ms. O'Hara-Rusckowski also sent a text message to a network of partners and donors stating that Mr. Fitzpatrick is "NO friend--more demon than friend!!" and that she was "up against" "evil."  [*Id.* at ¶ 64].  Although ill will is not sufficient alone to demonstrate actual malice, these allegations demonstrate Ms. O'Hara-Rusckowski's hostility towards Plaintiffs, which lends support to an inference of actual malice.  *See S.M.S v. M.M.*, No. 24CA0451, 2025 WL 800875, at *4 (Colo. App. Mar. 13, 2025) (evidence of animosity "could support a finding" of actual malice).

**Defendant's Motives.**  Finally, Plaintiffs allege that they were among the first to develop and implement the Sister Care model and that when they partnered with Ms. O'Hara-Rusckowski, they contributed their "expertise in . . . the Sister Care model which they had developed," while Ms. O'Hara-Rusckowski contributed network connections with donors and Catholic organizations.  [Doc. 72 at ¶¶ 14, 22].  They allege that Ms. O'Hara-Rusckowski "recognized the value and business potential of the Sister Care model" and

that she derives a personal financial benefit from her public standing as an expert in the care of human trafficking victims. [*Id.* at ¶¶ 33, 35, 37]. According to Plaintiffs, "[a]ccreditation with and attribution of the development of the Sister Care model and its implementation at survivor safe homes would bolster [Defendant's] reputation and public standing as an expert and thought leader in the care of human trafficking victims," as well as her career and commercial success. [*Id.* at ¶¶ 39–40]. Finally, Plaintiffs allege that after the November 2022 meeting and after Plaintiffs transferred the rights in the Lowell Home to Ms. O'Hara-Rusckowski, Ms. O'Hara-Rusckowski converted the Lowell Home into the O'Connell House and named herself the founder of the O'Connell House, and now holds the O'Connell House out as providing a "unique" "Sister Care Model." [*Id.* at ¶¶ 46–50]. Again, while these allegations by themselves would likely be insufficient to demonstrate actual malice, allegations suggesting that Ms. O'Hara-Rusckowski stood to benefit financially from Plaintiffs' reputational harm lends support to a finding of actual malice. *See L.S.S.*, 523 P.3d at 1288 (explaining that evidence of the defendant's motive may bear on the actual malice inquiry).

Considering all of these allegations in combination and construing them in Plaintiffs' favor, the Court finds that Plaintiffs have met their burden to establish a probability that they will be able to meet their burden to show actual malice at trial. *Cf. id.* at 1290 (affirming denial of special motion to dismiss even though the plaintiff's showing was not "particularly compelling").

In sum, to the extent the defamation claims are based on Ms. O'Hara-Rusckowski calling Mr. Fitzpatrick a "demon," the Motion to Dismiss and the Special Motion to Dismiss are **GRANTED**. With respect to the other six allegedly defamatory statements, Plaintiffs

have met their burden to demonstrate a reasonable likelihood that they will succeed on

their claims and have plausibly stated a claim under Rule 12(b)(6).    The Motions to

Dismiss are **DENIED** with respect to those portions of the defamation claims.

### 2.    Intentional Interference Claims

To state a claim for intentional interference with a contract or prospective business

relations, a plaintiff must allege facts showing:

> (1) the existence of a valid contract or reasonable prospect of having a
> business relationship; (2) that the defendant knew of the contract or
> prospective relationship; (3) the defendant intended to induce a breach of
> the contract or interfere with the prospective business relationship;
> (4) defendants engaged in conduct which produced a breach of contract or
> prevented the plaintiff from acquiring or continuing a prospective business
> relationship; (5) the interference was improper; and (6) the plaintiff suffered
> damages.

*Titan Mfg. Sols., Inc. v. Nat'l Cost, Inc.*, No. 19-cv-01749-WJM-SKC, 2021 WL 307509,

at *5 (D. Colo. Jan. 29, 2021) (quotation omitted).    The two claims have identical

elements, "with the exception that an existing contract need not be alleged for interference

with prospective business relations."    *Id.* (quotation omitted).    Instead, for a claim based

on wrongful interference with prospective business relations, the plaintiff must allege that

"there was a reasonable likelihood that a contract would have resulted but for the wrongful

interference."    *Ascentium Cap. LLC v. Premiere Copier, Inc.*, 751 F. Supp. 3d 1164, 1170

(D. Colo. 2023) (quoting *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111,

1122 (10th Cir. 2008)).

Plaintiffs' claim for intentional interference with a contract is based on Defendant's

alleged interference with contracts between Plaintiffs and certain groups of religious

Sisters, [Doc. 72 at ¶¶ 130–41], and their claim for intentional interference with

prospective business relations is based on Defendant's alleged interference with

"advantageous prospective business relationships with third-party donors and partner organizations," [*id.* at ¶ 143]. Ms. O'Hara-Rusckowski argues that Plaintiffs' intentional interference claims should be dismissed because Plaintiffs do not allege that she had knowledge of Plaintiffs' contracts with the religious Sisters or Plaintiffs' prospective business relationships with various donors and organizations. [Doc. 84 at 28]. She argues that there are no facts tying her "limited experience with Plaintiffs in connection to the Lowell Home" to Plaintiffs' various other business relationships. [*Id.*].

The Court agrees with Ms. O'Hara-Rusckowski. With respect to Defendant's knowledge of Plaintiffs' contracts with religious Sisters, Plaintiffs argue that the Amended Complaint plausibly establishes Defendant's knowledge of the contracts because it alleges that (1) Defendant was "involved in and had access to information regarding Plaintiffs' operation of the Sister Care model," (2) "Plaintiffs' operation of the Sister Care model involved partnerships and contracts with the religious Sisters," and (3) Defendant knew "of Plaintiffs' capacity to implement the Sister Care model at the Lowell Home" and that the model could be "replicated." [Doc. 91 at 28 (cleaned up)]. They also assert that, at minimum, Defendant had specific knowledge of Plaintiffs' contract with the Passionist Sisters because Defendant "demand[ed] that Plaintiffs transfer management of the Passionist Sisters to" her. [*Id.*].

However, the Amended Complaint contains no well-pleaded factual allegations plausibly suggesting that Ms. O'Hara-Rusckowski had specific knowledge of any specific contracts with the religious Sisters named in the Amended Complaint. *See* [Doc. 72 at ¶¶ 131–35]. Plaintiffs' suggestion that Ms. O'Hara-Rusckowski *must* have known about the contracts because she was familiar with a portion of Plaintiffs' work related to the

Lowell Home or knew that Plaintiffs could expand their use of the Sister Care model relies entirely on speculation and conjecture to make connections that are unsupported by the facts in the Amended Complaint.    Indeed, there are no factual allegations directly demonstrating Defendant's knowledge of any connection between Plaintiffs and the religious Sister groups, aside from the Passionist Sisters.    And to state a claim, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.    As for Plaintiffs' argument that Ms. O'Hara-Rusckowski knew about Plaintiffs' contract with the Passionist Sisters because Ms. O'Hara-Rusckowski demanded that Plaintiffs "transfer all [purchase and sale agreement] rights to the Lowell Home" to Defendant and "agree that the Passionist Sisters would be managed by [Defendant] at the Lowell Home," [Doc. 72 at ¶ 42], the Court is unconvinced.    The only contract these allegations involve is Avodah's purchase agreement for the Lowell Home, *see* [*id.* at ¶ 26], and vague allegations about the "manage[ment]" of the Passionist Sisters do not plausibly establish that Ms. O'Hara-Rusckowski knew of any particular contract between the Passionist Sisters and Plaintiffs.[12]

The Court reaches the same conclusion on the claim for intentional interference with business relations.    Plaintiffs allege that they had developed prospective business relationships with the Dominican Sisters of St. Catherine Siena, the Tim Tebow

---

[12] Even if Plaintiffs had plausibly alleged that Ms. O'Hara-Rusckowski knew of Plaintiffs' contract with the Passionist Sisters, the Court further agrees with Defendant that Plaintiffs have not plausibly alleged causation, or that Defendant "engaged in conduct which produced a breach of contract."    *Titan*, 2021 WL 307509, at *5; [Doc. 84 at 26–28]. Plaintiffs have not alleged facts showing that Ms. O'Hara-Rusckowski made any of the allegedly defamatory statements directly to the Passionist Sisters or that the statements were what caused the Passionist Sisters to terminate the contract, *see* [Doc. 72 at ¶¶ 56–58, 65], and the Court cannot rely on speculation to find that Plaintiffs have stated a claim.

Foundation, Opus AMDG, Wellspring, Generate Hope, and the Her Campaign. [*Id.* at ¶ 143]. However, aside from cursorily asserting that Defendant "knew about Plaintiffs' prospective business relationships with [these] third-party donors and partner organizations," [*id.* at ¶ 144], Plaintiffs do not allege any facts demonstrating Ms. O'Hara-Rusckowski's knowledge of Plaintiffs' prospective relations with these entities. Again, Plaintiffs' defense of this claim relies purely on speculation, arguing that Ms. O'Hara-Ruscowski must have known about these relationships because she is a prominent figure in faith-based and charitable communities, had partnered with Plaintiffs on the Lowell Home, and was involved in certain aspects of Plaintiffs' partnerships with donors. [Doc. 91 at 33]. But these allegations are too far removed from the claim at hand to plausibly allege Ms. O'Hara-Rusckowski's specific knowledge of Plaintiffs' potential relationships with these specific organizations. *Twombly*, 550 U.S. at 555.

Accordingly, the Court agrees with Defendant that Plaintiffs have not plausibly alleged the requisite elements of their intentional interference claims. It follows that Plaintiffs have not demonstrated a reasonable probability that they will succeed on these claims. The Motions to Dismiss are thus **GRANTED** with respect to Plaintiffs' intentional interference claims.

### 3.    Extreme and Outrageous Conduct

Finally, Ms. O'Hara-Rusckowski seeks dismissal of Mr. Fitzpatrick's claim for extreme and outrageous conduct, which is often referred to as a claim for intentional infliction of emotional distress (or "IIED"). *See Maiteki v. Marten Transp. Ltd.*, 4 F. Supp. 3d 1249, 1256 (D. Colo. 2013). To state a claim for extreme and outrageous conduct, Mr. Fitzpatrick must allege that (1) Defendant engaged in "extreme and outrageous

conduct," (2) she did so recklessly or with intent to cause Mr. Fitzpatrick severe emotional distress, and (3) Defendant's conduct caused Mr. Fitzpatrick to suffer severe emotional distress.  *Culpepper v. Pearl St. Bldg., Inc.*, 877 P.2d 877, 882 (Colo. 1994).

"The level of outrageousness required to constitute extreme and outrageous conduct is extremely high."  *Reigel v. SavaSeniorCare L.L.C.*, 292 P.3d 977, 990 (Colo. App. 2011).  The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 666 (Colo. 1999) (quoting Restatement (Second) of Torts § 46 (1965)).  "Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities are insufficient."  *Pearson v. Kancilia*, 70 P.3d 594, 597 (Colo. App. 2003).   Whether the defendant's conduct meets this level of outrageousness is generally a question of fact reserved for the jury, but "it is the initial responsibility of a court to determine whether reasonable persons could differ on the question."  *McCarty v. Kaiser-Hill Co.*, 15 P.3d 1122, 1126 (Colo. App. 2000); *see also Coors Brewing Co.*, 978 P.2d at 665 ("Before permitting a plaintiff to present a claim for outrageous conduct to the jury, the trial court must initially rule on the threshold issue of whether the plaintiff's allegations of outrageous conduct are sufficiently outrageous as a matter of law.").

Aside from arguments tied to challenges to the defamation claims that have already been rejected, Defendant asserts that Mr. Fitzpatrick fails to allege state a claim for extreme and outrageous conduct because "[a]llegations of defamation are not enough to state a claim for extreme and outrageous harm."  [Doc. 84 at 31].  In response, Plaintiffs argue that Mr. Fitzpatrick states a plausible IIED claim because "through false and

defamatory statements, and with improper business and personal incentive, [Defendant] ridiculed and publicly tarnished [Mr.] Fitzpatrick and his work, character, morality, and faith in the in the professional, civic, and faith-based communities that mattered most to him." [Doc. 91 at 38].

As a preliminary matter, Defendant's blanket statement that defamatory statements can never be the basis of an IIED claim is incorrect. Just last year, the Colorado Court of Appeals found that a plaintiff's allegations that the defendant accused him, without evidence, of rigging the 2020 election were sufficient to survive a special motion to dismiss. *See Coomer v. Donald J. Trump for President, Inc.*, 552 P.3d 562, 601 (Colo. App. 2024). The court found that the defamatory statements "went beyond mere insults, annoyances, or trivialities" and "struck at the core of American democracy and made [the plaintiff] a personification of claims that the presidential election had been stolen." *Id.* And given the magnitude of the accusations, the court concluded that there was a reasonable likelihood that a jury could find dissemination of the false claims "atrocious," "utterly intolerable," and "beyond all possible bounds of decency." *Id.* (quotation omitted). Even more recently, the Colorado Court of Appeals found that allegations that the defendant falsely accused the plaintiff of sexually abusing his stepson went beyond mere insults, indignities, or other trivialities and were sufficient to survive a special motion to dismiss. *S.M.S.*, 2025 WL 800875, at *5; *see also Hupfer v. Kaufman*, No. 21-cv-02332-LTB-STV, 2022 WL 19559093, at *2 (D. Colo. Jan. 4, 2022) (defamatory statements about sexual misconduct involving minors were sufficiently outrageous).

Of course, not all defamation-based allegations will be sufficient to state a claim for extreme and outrageous conduct. *See Gordon v. Boyles*, 99 P.3d 75, 82 (Colo. App.

2004) (affirming, without substantive discussion, the trial court's decision that statements
that the plaintiff had a history of domestic violence and had had an extramarital affair were
"not sufficiently extreme and outrageous to go beyond all bounds of decency in a civilized
community"); *see also Han Ye Lee v. Colo. Times, Inc.*, 222 P.3d 957, 968–69 (Colo.
App. 2009) (Dailey, J., dissenting in relevant part) ("[T]he spreading of rumors or the
making of false accusations [do not] qualify, without more, as extreme and outrageous
conduct. . . .  [I]t is the nature of the defamation, the rumor, or the false accusation,
that *could* make the conduct actionable as outrageous conduct.").  The relevant question
is whether reasonable persons could differ on whether the defendant's conduct was
sufficiently outrageous; if the answer is yes, then the claim must be submitted to the jury.
*Reigel*, 292 P.3d at 991.

Here, Mr. Fitzpatrick alleges that Ms. O'Hara-Rusckowski told numerous
"influential" members of the Catholic and other faith-based communities that Mr.
Fitzpatrick had labor trafficked religious Sisters and stolen and misappropriated $130,000
in grant funds.  [Doc. 72 at ¶¶ 56–58, 63–64].  Ms. O'Hara-Rusckowski also characterized
Mr. Fitzpatrick as "evil" and a "demon" to "a network of prospective Avodah partners and
donors in the faith-based and charitable communities," and further told those partners
and donors that Mr. Fitzpatrick would "probably try to go after [them]!"  [*Id.* at ¶ 64].  As
explained above, Plaintiffs have plausibly alleged that Ms. O'Hara-Rusckowski acted with
actual malice in making these statements.  *See supra* Section III.B.1.d.

An accusation that Mr. Fitzpatrick, the executive director of an organization that
"works to restore and reintegrate women survivors of sex trafficking," [Doc. 72 at ¶ 12],
had engaged in criminal conduct of labor trafficking and theft in connection to his work

with sex-trafficking victims goes beyond "insults, indignities, threats, annoyances, petty oppressions, or other trivialities," *Pearson*, 70 P.3d at 597. This is particularly true where the alleged defamatory statements were made by an influential member of Mr. Fitzpatrick's faith-based community to other members of that community. *See Zalnis v. Thoroughbred Datsun Car Co.*, 645 P.2d 292, 294 (Colo. App. 1982) ("Conduct, otherwise permissible, may become extreme and outrageous if it is an abuse by the actor of a position in which [s]he has . . . the power to affect the other's interests."). Given the weight of these accusations, the Court finds that a reasonable jury could find the alleged defamatory conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Coors Brewing Co.*, 978 P.2d at 666. The Motions to Dismiss are **DENIED** with respect to the claim of extreme and outrageous conduct.

## CONCLUSION

For the reasons set forth above, **IT IS ORDERED** that:

(1)     Defendant Deborah O'Hara-Rusckowski's Motion to Dismiss Plaintiffs' Amended Complaint [Doc. 84] is **GRANTED in part** and **DENIED in part**;

(2)     Defendant Deborah O'Hara-Rusckowski's Special Motion to Dismiss Plaintiffs' Amended Complaint [Doc. 85] is **GRANTED in part** and **DENIED in part**;[13] and

---

[13] Defendant asks that the Court award her attorney's fees "incurred in connection with responding to, and obtaining dismissal of, this lawsuit." [Doc. 85 at 8]. Colorado's anti-SLAPP statute provides that "a prevailing defendant on a special motion to dismiss is entitled to recover the defendant's attorney fees and costs." Colo. Rev. Stat. § 13-20-1101(4)(a). Any request for fees at this juncture is premature. At the conclusion of the case, Defendant may renew its request in accordance with D.C.COLO.LCivR 54.3.

(3)    Plaintiffs' claims for intentional interference with a contract and intentional

interference with business relations are **DISMISSED without prejudice**.[14]


DATED:  June 13, 2025                          BY THE COURT:

                                               Nina Y. Wang
                                               United States District Judge

---

[14] Defendant seeks dismissal of Plaintiffs' claims "with prejudice," [Doc. 84 at 31; Doc. 85 at 1], but does not explain why dismissal with prejudice is appropriate.  "[D]ismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile."  *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006).  The Court declines to undertake a futility analysis sua sponte and instead dismisses the intentional interference claims without prejudice.