IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-233-NYW-MEH

**AVODAH FARMS**, a Colorado nonprofit corporation, and
**KEENAN FITZPATRICK**, an individual

      Plaintiffs,

v.

**DEBORAH O'HARA-RUSCKOWSKI**,
Individually, and in a representative capacity
for **ORDER OF MALTA, AMERICAN
ASSOCIATION, U.S.A.,** a Delaware
limited liability company,

      Defendants.

---

## DEFENDANT DEBORAH O'HARA-RUSCKOWSKI'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM WITH JURY DEMAND

---

      Defendant, Deborah O'Hara-Rusckowski, by and through her undersigned counsel, Cozen O'Connor, submits this Answer, Affirmative Defenses, and Counterclaim with Jury Demand in response to the First Amended Complaint ("Complaint") of Plaintiffs Avodah Farms, a Colorado nonprofit corporation ("Avodah"), and Keenan Fitzpatrick. Ms. O'Hara-Rusckowski responds, states, and alleges as follows:

## INTRODUCTION[1]

      Plaintiffs' unnumbered Introduction paragraph summarizes Plaintiffs' Complaint, claims, and demand for relief against Ms. O'Hara-Rusckowski, and therefore no response is required. To

---

[1] Ms. O'Hara-Rusckowski repeats the Complaint's headings and sub-headings for organizational purposes only. No response to these headings and sub-headings is required because they are not numbered paragraphs. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations contained in the Complaint's headings and sub-headings.

the extent a response is required, Ms. O'Hara-Rusckowski denies Plaintiffs' allegations, claims, and entitlement to any relief summarized in the Introduction and in this action.

## PARTIES

1.      Ms. O'Hara-Rusckowski lacks information and knowledge at this time sufficient to form a belief as to the truth of the allegations contained in Paragraph 1, and therefore denies these allegations.

2.      Ms. O'Hara-Rusckowski lacks information and knowledge at this time sufficient to form a belief as to the truth of the allegation contained in Paragraph 2, and therefore denies this allegation.

3.      Ms. O'Hara-Rusckowski lacks information and knowledge at this time sufficient to form a belief as to the truth of the allegation contained in Paragraph 3, and therefore denies this allegation.

4.      Ms. O'Hara-Rusckowski lacks information and knowledge at this time sufficient to form a belief as to the truth of the allegations contained in Paragraph 4, and therefore denies this allegation.

5.      Ms. O'Hara-Rusckowski admits the allegation in Paragraph 5.

6.      Ms. O'Hara-Rusckowski admits the allegations in Paragraph 6.

7.      Ms. O'Hara-Rusckowski admits the allegations in Paragraph 7.

## JURISDICTION AND VENUE

8.      Paragraph 8 sets forth a legal conclusion as to jurisdiction to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski does not dispute the Court's jurisdiction over this action.

9.      Paragraph 9 sets forth a legal conclusion as to jurisdiction to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski does not dispute the Court's jurisdiction over this action.

10.     Ms. O'Hara-Rusckowski denies the allegations in Paragraph 10 that she tortiously interfered with any contracts or business relationships, that Plaintiffs lost contracts or business relationships as a result of anything that she did, or that Plaintiffs were damaged by any of her actions. Further, the Court dismissed Plaintiffs' Intentional Interference with Contract Claim and Intentional Interference with Prospective Relations Claim in its Order on Motion to Dismiss, dated June 13, 2025 (ECF 114) (the "MTD Order"). Paragraph 10 otherwise sets forth a legal conclusion as to jurisdiction to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski does not dispute the Court's venue over this action.

## GENERAL ALLEGATIONS

**A. Avodah and Fitzpatrick work to develop and implement a "Sister Care" program model at safe houses across the U.S. for sex trafficking survivors.**

11.     Ms. O'Hara-Rusckowski generally admits the allegations in Paragraph 11, although she notes that the U.S. Department of State website referenced in the Complaint is not active so she cannot verify the 2021 forced labor and commercial sexual exploitation figures presented in the Complaint.

12.     Ms. O'Hara-Rusckowski lacks information and knowledge at this time sufficient to form a belief as to the truth of the allegation contained in Paragraph 12 as to when Avodah was formed, and therefore denies this allegation. Ms. O'Hara-Rusckowski denies the remaining allegations in Paragraph 12.

13.     Ms. O'Hara-Rusckowski denies the allegations in Paragraph 13.

14.     Ms. O'Hara-Rusckowski admits that the Sister Care model was initially developed in the U.S. by Father Jeffery Bayhi and implemented at Metanoia Manor in Baton Rouge, Louisiana. Ms. O'Hara-Rusckowski denies based on information and belief that Fitzpatrick is a friend of Father Bayhi and that Avodah and Fitzpatrick developed and implemented the Sister Care model across the United States.

15.     Ms. O'Hara-Rusckowski admits the allegations in Paragraph 15 to the extent she was aware that Avodah had relationships with certain groups of religious sisters. But she lacks information and knowledge at this time regarding any specific contracts that Avodah had with any groups of religious sisters, and therefore denies these allegations. Ms. O'Hara-Rusckowski also denies that Avodah worked to implement the Sister Care model across the United States.

16.     Ms. O'Hara-Rusckowski admits the allegations in Paragraph 16 to the extent she was aware that Avodah had relationships with certain groups of religious sisters. But she lacks information and knowledge at this time regarding any specific contracts or the terms of the contracts that Avodah had with any groups of religious sisters, and therefore denies these allegations. Upon information and belief, Ms. O'Hara-Rusckowski denies that any contracts between Avodah and religious sisters were implemented by Avodah without coercion of the religious sisters.

17.     Ms. O'Hara-Rusckowski denies the allegations in Paragraph 17.

18.     Ms. O'Hara-Rusckowski denies the allegations in Paragraph 18.

19.     Ms. O'Hara-Rusckowski admits the allegations in Paragraph 19 to the extent that they allege Avodah and Fitzpatrick conduct fundraising activities and recruit both individual and institutional donors to contribute financially to Avodah. She lacks information and knowledge at

this time regarding the remaining allegations in this paragraph, and therefore denies these allegations.

**B. Avodah and Fitzpatrick partner with Rusckowski to develop the Lowell Home, including planned implementation of the Sister Care model.**

20.     Ms. O'Hara-Rusckowski denies the allegation in Paragraph 20 that she met Avodah and Fitzpatrick in 2021. Paragraph 20 also sets forth a legal conclusion regarding whether Avodah and Fitzpatrick partnered with Ms. O'Hara-Rusckowski, to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski admits that she met Fitzpatrick in 2020 and that—based on representations that Fitzpatrick made about his and Avodah's experience—she began working with Avodah and Fitzpatrick in 2021.

21.     Paragraph 21 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski admits that—based on representations that Fitzpatrick made about himself and/or Avodah—she started working with Fitzpatrick and Avodah to develop a survivor safe home and implement the Sister Care model at a survivor safe home in Massachusetts.

22.     Ms. O'Hara-Rusckowski admits the allegations in Paragraph 22 to the extent that they allege she contributed funds and her experience, and provided access to her network of donors and charitable organizations in the Catholic religious community, to develop a survivor safe home and implement the Sister Care model at a survivor safe home in Massachusetts. She also admits that Avodah and Fitzpatrick *represented* that they had experience and expertise in survivor safe homes and the Sister Care model; but she *denies* that they actually had that expertise, "developed" the model, and contributed any such experience and expertise to the project.  Ms. O'Hara-Rusckowski denies the remaining allegations in this paragraph.

5

23.     Ms. O'Hara-Rusckowski states that the allegations in Paragraph 23 refer to a publicly available podcast, which speaks for itself. Ms. O'Hara-Rusckowski refers to the podcast for its true and correct contents, and any characterizations contrary thereto are denied. Ms. O'Hara-Rusckowski denies the remaining allegations in this paragraph.

24.     Ms. O'Hara-Rusckowski denies the allegations in Paragraph 24.

25.     Ms. O'Hara-Rusckowski admits the allegations in Paragraph 25.

26.     Ms. O'Hara-Rusckowski admits the allegations in Paragraph 26.

27.     Ms. O'Hara-Rusckowski denies the allegations in Paragraph 27.

28.     Ms. O'Hara-Rusckowski denies the allegations in Paragraph 28.

29.     Ms. O'Hara-Rusckowski denies the allegations in Paragraph 29.

30.     Ms. O'Hara-Rusckowski denies the allegations in Paragraph 30.

**C. Rusckowski recognizes the value and business potential of the Sister Care model for her own career, coerces Avodah and Fitzpatrick out of their contractual rights in the Lowell Home, and seizes control of the Lowell Home.**

31.     Ms. O'Hara-Rusckowski denies the allegations in Paragraph 31 to the extent that they suggest ordinary course of business problems, and not Plaintiffs' malfeasance, misfeasance, and incompetence, delayed the renovation and development of the Lowell Home.

32.     Ms. O'Hara-Rusckowski denies the allegations in Paragraph 32.

33.     Ms. O'Hara-Rusckowski states that the allegations in Paragraph 33 refer to a publicly available podcast, which speaks for itself. Ms. O'Hara-Rusckowski refers to the podcast for its true and correct contents, and any characterizations contrary thereto are denied.  Ms. O'Hara-Rusckowski admits that she recognized the value of the Sister Care model, and denies the remaining allegations in this paragraph.

34.     Ms. O'Hara-Rusckowski admits that she is a thought leader in the care of human trafficking victims, and denies the remaining allegations in Paragraph 34.

35.    Ms. O'Hara-Rusckowski denies the allegations in Paragraph 35.

36.    Ms. O'Hara-Rusckowski admits that GSO provides training services and programs to healthcare systems, among other institutional and corporate clients, in the identification of trafficking victims. Ms. O'Hara-Rusckowski refers to the website for its true and correct contents, and any characterizations contrary thereto are denied. Ms. O'Hara-Rusckowski denies the remaining allegations in this paragraph.

37.    Ms. O'Hara-Rusckowski denies the allegations in Paragraph 37.

38.    Ms. O'Hara-Rusckowski admits the allegations in Paragraph 38 that she is married to Steve Rusckowski, the former CEO of Quest Diagnostics. Ms. O'Hara-Rusckowski denies the remaining allegations in this paragraph.

39.    Ms. O'Hara-Rusckowski denies the allegations in Paragraph 39, as she does not seek credit or attribution for the Sister Care Model. The Sister Care model was developed in the United States by her friend, Father Bayhi.

40.    Ms. O'Hara-Rusckowski denies the allegations in Paragraph 40, as she has not sought—and never will seek—credit or attribution for the Sister Care Model. The Sister Care model was developed in the United States by her friend, Father Bayhi. Ms. O'Hara-Rusckowski also denies that she or GSO, a nonprofit organization, engage in Catholic charitable work to assist victims of sex trafficking, or otherwise, for financial benefit or for any reason at all other than to improve the lives of trafficking victims.

41.    Ms. O'Hara-Rusckowski admits the allegation in Paragraph 41 that she invited Fitzpatrick and Avodah members to Lowell, Massachusetts for a meeting on November 7, 2022. She denies the remaining allegations in this paragraph.

42.     Ms. O'Hara-Rusckowski admits the allegations in Paragraph 42 to the extent that they allege that there was a meeting at the Lowell Home with Fitzpatrick and Alexandra Tilton of Avodah, Ms. O'Hara-Rusckowski, Mr. Rusckowski, a member of the Passionist Sisters, and certain local volunteers. She denies the remaining allegations in this paragraph.

43.     Ms. O'Hara-Rusckowski states that the allegations in Paragraph 43 refer to a November 7, 2022, written memorandum of understanding among Fitzpatrick, Alexandra Tilton, Ms. O'Hara-Rusckowski, and the Superior Sister of the Passionist Sisters (the "November 7 MOU"), which is a written document that speaks for itself. Ms. O'Hara-Rusckowski refers to the November 7 MOU for its true and correct contents, and any characterizations contrary thereto are denied. Ms. O'Hara-Rusckowski denies the remaining allegations in this Paragraph.

44.     Ms. O'Hara-Rusckowski denies the allegations in Paragraph 44.

45.     Ms. O'Hara-Rusckowski denies the allegations in Paragraph 45.

**D. Rusckowski converts the Lowell Home into The O'Connell House and names herself the Founder, takes credit for the Sister Care model, and tarnishes the reputation and public standing of Avodah and Fitzpatrick with influential partners and donors.**

**1.     Rusckowski converts the Lowell Home into The O'Connell House, names herself the Founder, and takes credit for the Sister Care model.**

46.     Ms. O'Hara-Rusckowski denies the allegations in Paragraph 46 as stated. Ms. O'Hara-Rusckowski admits that she continued to lead the effort to open the Lowell Home after Plaintiffs were removed from the Lowell Home project due to their malfeasance, misfeasance, and incompetence. Ms. O'Hara-Rusckowski also admits that she renamed the Lowell Home as The O'Connell House in honor of the former rector, Father Terry O'Connell, who was her long time spiritual advisor and the person who introduced all parties to the relevant property. Ms. O'Hara-Rusckowski further admits that she currently serves as the President and Chair of the nonprofit organization The O'Connell House, Inc.

47.    Ms. O'Hara-Rusckowski denies the allegations in Paragraph 47 as stated. Ms. O'Hara-Rusckowski admits that she continued to lead the effort to open The O'Connell House after Plaintiffs were removed from the Lowell Home project due to their malfeasance, misfeasance, and incompetence, and that she currently serves as the President and Chair of the nonprofit organization The O'Connell House, Inc.

48.    Ms. O'Hara-Rusckowski admits the allegations in Paragraph 48.

49.    Ms. O'Hara-Rusckowski states that the allegations in Paragraph 49 refer to a website, which is a writing that speaks for itself. Ms. O'Hara-Rusckowski refers to the website for its true and correct contents, and any characterizations contrary thereto are denied. Ms. O'Hara-Rusckowski specifically denies the scurrilous implication that she sought to take credit for the Sister Care Model, which she has always acknowledged was brought to the United States by her friend Father Bayhi, who did so with the support of Sister Eugenia Bonetti in Rome, Italy, who created the model.

50.    Ms. O'Hara-Rusckowski states that the allegations in Paragraph 50 refer to a website, which is a writing that speaks for itself. Ms. O'Hara-Rusckowski refers to the website for its true and correct contents, and any characterizations contrary thereto are denied. Ms. O'Hara-Rusckowski specifically denies the scurrilous implication that she sought to take credit for the Sister Care Model, which she has always acknowledged was brought to the United States by her friend Father Bayhi, who did so with the support of Sister Eugenia Bonetti in Rome, Italy, who created the model.

51.    Ms. O'Hara-Rusckowski states that the allegations in Paragraph 51 refer to a website, which is a writing that speaks for itself. Ms. O'Hara-Rusckowski refers to the website for its true and correct contents, and any characterizations contrary thereto are denied. Ms. O'Hara-

Rusckowski specifically denies the scurrilous implication that she sought to take credit for the Sister Care Model, which she has always acknowledged was brought to the United States by her friend Father Bayhi, who did so with the support of Sister Eugenia Bonetti in Rome, Italy, who created the model.

52.     Ms. O'Hara-Rusckowski states that the allegations in Paragraph 52 refer to an article on the National Catholic Register website, which is a writing that speaks for itself. Ms. O'Hara-Rusckowski refers to the website for its true and correct contents, and any characterizations contrary thereto are denied. Ms. O'Hara-Rusckowski specifically denies the scurrilous implication that she sought to take credit for the Sister Care Model, which she has always acknowledged was brought to the United States by her friend Father Bayhi, who did so with the support of Sister Eugenia Bonetti in Rome, Italy, who created the model.

53.     Ms. O'Hara-Rusckowski states that the allegations in Paragraph 53 refer to an article on the National Catholic Register website, which is a writing that speaks for itself. Ms. O'Hara-Rusckowski refers to the website for its true and correct contents, and any characterizations contrary thereto are denied. Ms. O'Hara-Rusckowski specifically denies the scurrilous implication that she sought to take credit for the Sister Care Model, which she has always acknowledged was brought to the United States by her friend Father Bayhi, who did so with the support of Sister Eugenia Bonetti in Rome, Italy, who created the model.

54.     Ms. O'Hara-Rusckowski states that the allegations in Paragraph 54 refer to a website, which is a writing that speaks for itself. Ms. O'Hara-Rusckowski refers to the website for its true and correct contents, and any characterizations contrary thereto are denied. Ms. O'Hara-Rusckowski specifically denies the scurrilous implication that she sought to take credit for the Sister Care Model, which she has always acknowledged was brought to the United States by her

friend Father Bayhi, who did so with the support of Sister Eugenia Bonetti in Rome, Italy, who

created the model.

> **2.      Rusckowski tarnishes the reputation and public standing of Avodah and Fitzpatrick with influential partners and donors in the faith-based and charitable communities.**

55.     Ms. O'Hara-Rusckowski denies the allegations in Paragraph 55.

56.     Ms. O'Hara-Rusckowski admits the allegations in Paragraph 56 only to the extent

that they allege she made certain statements concerning Plaintiffs, and only to the extent that those

statements are contained in written documents, which are writings that speak for themselves. Ms.

O'Hara-Rusckowski refers to these written documents for their true and correct contents, and any

characterizations contrary thereto are denied. By way of further answer, Ms. O'Hara-Rusckowski

denies that these statements constitute defamation because, among other reasons, any such

statements about Plaintiffs were true or substantially true, non-literal hyperbole, and/or

constitutionally-protected opinions. Ms. O'Hara-Rusckowski further answers that any such

statements were not made with actual malice and did not damage Plaintiffs. Ms. O'Hara-

Rusckowski denies the remaining allegations in this paragraph.

57.     Ms. O'Hara-Rusckowski admits the allegations in Paragraph 57 only to the extent

that they allege she made certain statements concerning Plaintiffs, and only to the extent that those

statements are contained in written documents, which are writings that speak for themselves. Ms.

O'Hara-Rusckowski refers to these written documents for their true and correct contents, and any

characterizations contrary thereto are denied. By way of further answer, Ms. O'Hara-Rusckowski

denies that these statements constitute defamation because, among other reasons, any such

statements about Plaintiffs were true or substantially true, non-literal hyperbole, and/or

constitutionally-protected opinions. Ms. O'Hara-Rusckowski further answers that any such

statements were not made with actual malice and did not damage Plaintiffs. Ms. O'Hara-Rusckowski denies the remaining allegations in this paragraph.

58.    Ms. O'Hara-Rusckowski lacks information and knowledge at this time sufficient to form a belief as to the truth of the allegations contained in Paragraph 58, and therefore denies these allegations.

59.    Ms. O'Hara-Rusckowski denies the allegations in Paragraph 59.

60.    Ms. O'Hara-Rusckowski denies the allegations in Paragraph 60 and further notes that the Archdiocese's original decision to disavow Avodah occurred before she had any communications with the Archdiocese regarding Avodah or Fitzpatrick.

61.    Ms. O'Hara-Rusckowski denies the allegations in Paragraph 61.

62.    Ms. O'Hara-Rusckowski denies the allegations in Paragraph 62.

63.    Ms. O'Hara-Rusckowski admits the allegations in Paragraph 63 only to the extent that they allege she made certain statements concerning Plaintiffs, and only to the extent that those statements are contained in written documents, which are writings that speak for themselves. Ms. O'Hara-Rusckowski refers to these written documents for their true and correct contents, and any characterizations contrary thereto are denied. By way of further answer, Ms. O'Hara-Rusckowski denies that these statements constitute defamation because, among other reasons, any such statements about Plaintiffs were true or substantially true, non-literal hyperbole, and/or constitutionally-protected opinions. Ms. O'Hara-Rusckowski further answers that any such statements were not made with actual malice and did not damage Plaintiffs. Ms. O'Hara-Rusckowski denies the remaining allegations in this paragraph.

64.    Ms. O'Hara-Rusckowski admits the allegations in Paragraph 64 only to the extent that they allege she made certain statements concerning Plaintiffs, and only to the extent that those

statements are contained in written documents, which are writings that speak for themselves. Ms. O'Hara-Rusckowski refers to these written documents for their true and correct contents, and any characterizations contrary thereto are denied. By way of further answer, Ms. O'Hara-Rusckowski denies that these statements constitute defamation because, among other reasons, any such statements about Plaintiffs were true or substantially true, non-literal hyperbole, and/or constitutionally-protected opinions. Ms. O'Hara-Rusckowski further answers that any such statements were not made with actual malice and did not damage Plaintiffs. Ms. O'Hara-Rusckowski denies the remaining allegations in this paragraph. In addition, any allegations regarding references to Plaintiff Fitzpatrick as a "demon" have been dismissed from the case.

65.    Ms. O'Hara-Rusckowski admits the allegations in Paragraph 65 only to the extent that they allege she made certain statements concerning Plaintiffs, and only to the extent that those statements are contained in written documents, which are writings that speak for themselves. Ms. O'Hara-Rusckowski refers to these written documents for their true and correct contents, and any characterizations contrary thereto are denied. By way of further answer, Ms. O'Hara-Rusckowski denies that these statements constitute defamation because, among other reasons, any such statements about Plaintiffs were true or substantially true, non-literal hyperbole, and/or constitutionally-protected opinions. Ms. O'Hara-Rusckowski further answers that any such statements were not made with actual malice and did not damage Plaintiffs. Ms. O'Hara-Rusckowski denies the remaining allegations in this paragraph.

66.    Ms. O'Hara-Rusckowski denies the allegations in Paragraph 66.

67.    Ms. O'Hara-Rusckowski denies the allegations in Paragraph 67.

68.    Ms. O'Hara-Rusckowski lacks information and knowledge at this time sufficient to form a belief as to the truth of the allegations contained in Paragraph 68 regarding Plaintiffs'

purported discussions with potential donors, and therefore denies these allegations. Ms. O'Hara-Rusckowski denies the remaining allegations in this paragraph.

69.    Ms. O'Hara-Rusckowski denies the allegations in Paragraph 69.

70.    Ms. O'Hara-Rusckowski lacks information and knowledge at this time sufficient to form a belief as to the truth of the allegations contained in Paragraph 70 regarding whether Plaintiffs were disinvited from the Napa Institute and the circumstances surrounding the same, and therefore denies these allegations. Ms. O'Hara-Rusckowski denies the remaining allegations in this paragraph.

71.    Ms. O'Hara-Rusckowski lacks information and knowledge at this time sufficient to form a belief as to the truth of the allegations contained in Paragraph 71 regarding whether Plaintiffs were disinvited from the FOCUS SEEK Conference and the circumstances surrounding the same, and therefore denies these allegations. Ms. O'Hara-Rusckowski denies the remaining allegations in this paragraph.

72.    Ms. O'Hara-Rusckowski denies the allegations in Paragraph 72.

73.    Ms. O'Hara-Rusckowski lacks information and knowledge at this time sufficient to form a belief as to the truth of the allegations contained in Paragraph 73, and therefore denies these allegations.

74.    Ms. O'Hara-Rusckowski admits the allegations in Paragraph 74 only to the extent that they allege she made certain statements concerning Plaintiffs, and only to the extent that those statements are contained in written documents, which are writings that speak for themselves. Ms. O'Hara-Rusckowski refers to these written documents for their true and correct contents, and any characterizations contrary thereto are denied. By way of further answer, Ms. O'Hara-Rusckowski denies that these statements constitute defamation because, among other reasons, any such

statements about Plaintiffs were true or substantially true, non-literal hyperbole, and/or constitutionally-protected opinions. Ms. O'Hara-Rusckowski further answers that any such statements were not made with actual malice and did not damage Plaintiffs. Ms. O'Hara-Rusckowski denies the remaining allegations in this paragraph.

75.    Ms. O'Hara-Rusckowski denies the allegations in Paragraph 75.

## FIRST CAUSE OF ACTION
### (Defamation of Avodah)

76.    Ms. O'Hara-Rusckowski repeats and re-alleges each of the foregoing responses as if set forth fully herein.

77.    Ms. O'Hara-Rusckowski admits the allegations in Paragraph 77 only to the extent that they allege she made certain statements concerning Plaintiffs, and only to the extent that those statements are contained in written documents, which are writings that speak for themselves. Ms. O'Hara-Rusckowski refers to these written documents for their true and correct contents, and any characterizations contrary thereto are denied. By way of further answer, Ms. O'Hara-Rusckowski denies that these statements constitute defamation because, among other reasons, any such statements about Plaintiffs were true or substantially true, non-literal hyperbole, and/or constitutionally-protected opinions. Ms. O'Hara-Rusckowski further answers that any such statements were not made with actual malice and did not damage Plaintiffs. Ms. O'Hara-Rusckowski denies the remaining allegations in this paragraph.

78.    Paragraph 78 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

79.    Paragraph 79 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

80.     Paragraph 80 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

81.     Paragraph 81 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

82.     Paragraph 82 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

83.     Paragraph 83 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

84.     Ms. O'Hara-Rusckowski admits the allegations in Paragraph 84 only to the extent that they allege she made certain statements concerning Plaintiffs, and only to the extent that those statements are contained in written documents, which are writings that speak for themselves. Ms. O'Hara-Rusckowski refers to these written documents for their true and correct contents, and any characterizations contrary thereto are denied. By way of further answer, Ms. O'Hara-Rusckowski denies that these statements constitute defamation because, among other reasons, any such statements about Plaintiffs were true or substantially true, non-literal hyperbole, and/or constitutionally-protected opinions. Ms. O'Hara-Rusckowski further answers that any such statements were not made with actual malice and did not damage Plaintiffs. Ms. O'Hara-Rusckowski denies the remaining allegations in this paragraph.

85.     Paragraph 85 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

86.     Paragraph 86 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

87.     Paragraph 87 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

88.     Paragraph 88 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

89.     Paragraph 89 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

90.     Paragraph 90 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

91.     Ms. O'Hara-Rusckowski admits the allegations in Paragraph 91 only to the extent that they allege she made certain statements concerning Plaintiffs, and only to the extent that those statements are contained in written documents, which are writings that speak for themselves. Ms. O'Hara-Rusckowski refers to these written documents for their true and correct contents, and any characterizations contrary thereto are denied. By way of further answer, Ms. O'Hara-Rusckowski denies that these statements constitute defamation because, among other reasons, any such statements about Plaintiffs were true or substantially true, non-literal hyperbole, and/or constitutionally-protected opinions. Ms. O'Hara-Rusckowski further answers that any such statements were not made with actual malice and did not damage Plaintiffs. Ms. O'Hara-Rusckowski denies the remaining allegations in this paragraph.

92.     Paragraph 92 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

93.     Paragraph 93 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

94.     Paragraph 94 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

95.     Paragraph 95 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

96.     Paragraph 96 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

97.     Paragraph 97 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

98.     Paragraph 98 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

## SECOND CAUSE OF ACTION
### (Defamation of Fitzpatrick)

99.     Ms. O'Hara-Rusckowski repeats and re-alleges each of the foregoing responses as if set forth fully herein.

100.     Ms. O'Hara-Rusckowski admits the allegations in Paragraph 100 only to the extent that they allege she made certain statements concerning Plaintiffs, and only to the extent that those statements are contained in written documents, which are writings that speak for themselves. Ms. O'Hara-Rusckowski refers to these written documents for their true and correct contents, and any characterizations contrary thereto are denied. By way of further answer, Ms. O'Hara-Rusckowski denies that these statements constitute defamation because, among other reasons, any such statements about Plaintiffs were true or substantially true, non-literal hyperbole, and/or constitutionally-protected opinions. Ms. O'Hara-Rusckowski further answers that any such statements were not made with actual malice and did not damage Plaintiffs. Ms. O'Hara-Rusckowski denies the remaining allegations in this paragraph.

101.    Paragraph 101 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

102.    Paragraph 102 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

103.    Paragraph 103 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

104.    Paragraph 104 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

105.    Paragraph 105 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

106.    Paragraph 106 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

107.    Ms. O'Hara-Rusckowski admits the allegations in Paragraph 107 only to the extent that they allege she made certain statements concerning Plaintiffs, and only to the extent that those statements are contained in written documents, which are writings that speak for themselves. Ms. O'Hara-Rusckowski refers to these written documents for their true and correct contents, and any characterizations contrary thereto are denied. By way of further answer, Ms. O'Hara-Rusckowski denies that these statements constitute defamation because, among other reasons, any such statements about Plaintiffs were true or substantially true, non-literal hyperbole, and/or constitutionally-protected opinions. Ms. O'Hara-Rusckowski further answers that any such statements were not made with actual malice and did not damage Plaintiffs. Ms. O'Hara-Rusckowski denies the remaining allegations in this paragraph.

108.    Paragraph 108 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

109.    Paragraph 109 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

110.    Paragraph 110 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

111.    Paragraph 111 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

112.    Paragraph 112 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

113.    Paragraph 113 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

114.    Ms. O'Hara-Rusckowski admits the allegations in Paragraph 114 only to the extent that they allege she made certain statements concerning Plaintiffs, and only to the extent that those statements are contained in written documents, which are writings that speak for themselves. Ms. O'Hara-Rusckowski refers to these written documents for their true and correct contents, and any characterizations contrary thereto are denied. By way of further answer, Ms. O'Hara-Rusckowski denies that these statements constitute defamation because, among other reasons, any such statements about Plaintiffs were true or substantially true, non-literal hyperbole, and/or constitutionally-protected opinions. Ms. O'Hara-Rusckowski further answers that any such statements were not made with actual malice and did not damage Plaintiffs. Ms. O'Hara-Rusckowski denies the remaining allegations in this paragraph.

115.    Paragraph 115 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

116.    Paragraph 116 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

117.    Paragraph 117 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

118.    Paragraph 118 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

119.    Paragraph 119 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

120.    Paragraph 120 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

121.    The Court dismissed Fitzpatrick's defamation claim relating to the alleged "demon" statement in its MTD Order, and therefore no response to this allegation is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in Paragraph 121.

122.    The Court dismissed Fitzpatrick's defamation claim relating to the alleged "demon" statement in its MTD Order, and therefore no response to this allegation is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in Paragraph 122.

123.    The Court dismissed Fitzpatrick's defamation claim relating to the alleged "demon" statement in its MTD Order, and therefore no response to this allegation is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in Paragraph 123.

124.    The Court dismissed Fitzpatrick's defamation claim relating to the alleged "demon" statement in its MTD Order, and therefore no response to this allegation is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in Paragraph 124.

125.    The Court dismissed Fitzpatrick's defamation claim relating to the alleged "demon" statement in its MTD Order, and therefore no response to this allegation is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in Paragraph 125.

126.    The Court dismissed Fitzpatrick's defamation claim relating to the alleged "demon" statement in its MTD Order, and therefore no response to this allegation is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in Paragraph 126.

127.    The Court dismissed Fitzpatrick's defamation claim relating to the alleged "demon" statement in its MTD Order, and therefore no response to this allegation is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in Paragraph 127.

128.    Paragraph 128 sets forth a legal conclusion to which no response is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in this paragraph.

### THIRD CAUSE OF ACTION
**(Intentional Interference with Contract)**

129.    Ms. O'Hara-Rusckowski repeats and re-alleges each of the foregoing responses as if set forth fully herein.

130.    The Court dismissed Plaintiffs' Intentional Interference with Contract claim in its MTD Order, and therefore no response to this allegation is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in Paragraph 130.

131.    The Court dismissed Plaintiffs' Intentional Interference with Contract claim in its MTD Order, and therefore no response to this allegation is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in Paragraph 131.

132.    The Court dismissed Plaintiffs' Intentional Interference with Contract claim in its MTD Order, and therefore no response to this allegation is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in Paragraph 132.

133.    The Court dismissed Plaintiffs' Intentional Interference with Contract claim in its MTD Order, and therefore no response to this allegation is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in Paragraph 133.

134.    The Court dismissed Plaintiffs' Intentional Interference with Contract claim in its MTD Order, and therefore no response to this allegation is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in Paragraph 134.

135.    The Court dismissed Plaintiffs' Intentional Interference with Contract claim in its MTD Order, and therefore no response to this allegation is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in Paragraph 135.

136.    The Court dismissed Plaintiffs' Intentional Interference with Contract claim in its MTD Order, and therefore no response to this allegation is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in Paragraph 136.

137.    The Court dismissed Plaintiffs' Intentional Interference with Contract claim in its MTD Order, and therefore no response to this allegation is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in Paragraph 137.

138.    The Court dismissed Plaintiffs' Intentional Interference with Contract claim in its MTD Order, and therefore no response to this allegation is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in Paragraph 138.

139.    The Court dismissed Plaintiffs' Intentional Interference with Contract claim in its MTD Order, and therefore no response to this allegation is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in Paragraph 139.

140.    The Court dismissed Plaintiffs' Intentional Interference with Contract claim in its MTD Order, and therefore no response to this allegation is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in Paragraph 140.

141.    The Court dismissed Plaintiffs' Intentional Interference with Contract claim in its MTD Order, and therefore no response to this allegation is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in Paragraph 141.

## FOURTH CAUSE OF ACTION
### (Intentional Interference with Prospective Relations)

142.    Ms. O'Hara-Rusckowski repeats and re-alleges each of the foregoing responses as if set forth fully herein.

143.    The Court dismissed Plaintiffs' Intentional Interference with Prospective Relations claim in its MTD Order, and therefore no response to this allegation is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in Paragraph 143.

144.    The Court dismissed Plaintiffs' Intentional Interference with Prospective Relations claim in its MTD Order, and therefore no response to this allegation is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in Paragraph 144.

145.    The Court dismissed Plaintiffs' Intentional Interference with Prospective Relations claim in its MTD Order, and therefore no response to this allegation is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in Paragraph 145.

146.    The Court dismissed Plaintiffs' Intentional Interference with Prospective Relations claim in its MTD Order, and therefore no response to this allegation is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in Paragraph 146.

147.    The Court dismissed Plaintiffs' Intentional Interference with Prospective Relations claim in its MTD Order, and therefore no response to this allegation is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in Paragraph 147.

148.    The Court dismissed Plaintiffs' Intentional Interference with Prospective Relations claim in its MTD Order, and therefore no response to this allegation is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in Paragraph 148.

149.    The Court dismissed Plaintiffs' Intentional Interference with Prospective Relations claim in its MTD Order, and therefore no response to this allegation is required. To the extent a response is required, Ms. O'Hara-Rusckowski denies the allegations in Paragraph 149.

## FIFTH CAUSE OF ACTION
### (Extreme and Outrageous Conduct – Fitzpatrick)

150.    Ms. O'Hara-Rusckowski repeats and re-alleges each of the foregoing responses as if set forth fully herein.

151.    Ms. O'Hara-Rusckowski denies the allegations in Paragraph 151.

152.    Ms. O'Hara-Rusckowski denies the allegations in Paragraph 152.

153.    Ms. O'Hara-Rusckowski denies the allegations in Paragraph 153.

154.    Ms. O'Hara-Rusckowski denies the allegations in Paragraph 154.

155.    Ms. O'Hara-Rusckowski denies the allegations in Paragraph 154.

## AFFIRMATIVE DEFENSES

1.      Plaintiffs' claims are barred because the alleged defamatory statements about Plaintiffs were true, substantially true, non-literal hyperbole, and/or constitutionally-protected pure opinions.

2.      Plaintiffs' claims are barred because they cannot show that Ms. O'Hara-Rusckowski acted with reckless disregard for the truth or that she made any statements with actual knowledge of their falsity.

3.      Plaintiffs' claims are barred because none of the alleged defamatory statements are capable of defamatory meaning.

4.      Plaintiffs' claims are barred because Ms. O'Hara-Rusckowski's statements about Plaintiffs concern matters of public concern and Plaintiffs cannot show that she made any such statements with knowledge of their falsity or reckless disregard of their truth.

5.      Plaintiffs' claims are barred because they cannot show that Ms. O'Hara-Rusckowski acted with any actual malice.

6.      Plaintiffs' claims are barred because none of the alleged defamatory statements are defamatory per se and there are no damages to support a non-defamation per se defamation claim.

7.      Upon information and belief, Plaintiffs' claims are barred because they have been released in accordance with the terms of the confidential settlement agreement between Plaintiffs and former Defendants Order of Malta, American Association, U.S.A. ("Malta"), Order of Malta, Western Association, U.S.A., and Order of Malta Worldwide Relief Malteser International Americas, Inc. (the "Confidential Settlement Agreement"). At all relevant times, and as alleged in the Complaint, Ms. O'Hara-Rusckowski served as a member of the Board of Councillors of Malta, a Delegate and Special Advisor on Human Trafficking to the Ambassador for the Order of Malta at the United Nations, and a Board Member of Malteser International, worldwide relief agency of

the Order of Malta, and she engaged in all of the conduct alleged in the Complaint in her official capacity in these roles. Upon information and belief, the Confidential Settlement Agreement includes a release of all members of boards of directors and persons otherwise affiliated with the former Order of Malta defendants. Therefore, Plaintiffs released their claims against Ms. O'Hara-Rusckowski under the Confidential Settlement Agreement.

8.     Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of limitations.

9.     Plaintiffs' claims are barred by Plaintiffs' fraudulent conduct.

10.     Plaintiffs' claims are barred by the doctrines of waiver and estoppel due to Plaintiffs' own conduct.

11.     Plaintiffs' claims are barred by the doctrine of unclean hands and/or *in pari delicto*.

12.     Plaintiffs' claims are barred because they suffered no damages as a result of any conduct by Ms. O'Hara-Rusckowski.

13.     Plaintiffs' claims are barred because any damages they suffered—which Ms. O'Hara- Rusckowski expressly denies—are a result of their own conduct or the conduct of third-parties.

14.     Plaintiffs' claims are barred to the extent they failed to mitigate their damages, if any.

15.     Plaintiffs' claims are barred because there is no causal connection between Ms. O'Hara-Rusckowski's alleged defamatory statements and Plaintiffs' alleged harm.

16.     Ms. O'Hara-Rusckowski reserves the right to assert additional affirmative defenses based on information gathered during discovery.

## COUNTERCLAIM

Defendant/Counterclaim-Plaintiff Deborah O'Hara-Rusckowski, by and through her undersigned counsel, Cozen O'Connor, hereby asserts this Counterclaim against Plaintiffs/Counterclaim-Defendants Avodah Farms, a Colorado nonprofit corporation ("Avodah"), and Keenan Fitzpatrick, and states and alleges as follows:

## INTRODUCTION

1.      This Counterclaim seeks to hold Keenan Fitzpatrick and Avodah accountable for fraudulently soliciting a partnership with, and a $500,000 donation from, Deborah O'Hara-Rusckowski, and for abusing the legal process to threaten, intimidate, discredit, and retaliate against Ms. O'Hara-Rusckowski for cooperating with a federal criminal investigation into Fitzpatrick's and Avodah's fraud and misconduct detailed herein.

2.      Ms. O'Hara-Rusckowski, a philanthropist involved in Catholic faith-based and charitable endeavors, aspired to open a safe house for victims of human trafficking in Lowell, Massachusetts, that would operate using the "Sister Care" model (*i.e.*, staffed by religious sisters who live among the victims while providing them with long-term care). In furtherance of this project, she sought out a partner with strong Catholic roots who had the requisite experience in real estate development that she herself lacked.

3.      Fitzpatrick and Avodah represented themselves as just this partner. They not only represented themselves as experts in Catholic-focused real estate acquisition and development, impact investing, and fundraising, but also as operators of their own human trafficking safe house in Colorado who were recognized and supported by the Archdiocese of Denver (the "Denver Archdiocese").

4.      In reasonable reliance on Fitzpatrick's and Avodah's many representations about their Catholic identity and purported real estate development and anti-human trafficking work that

were conveyed in emails, text messages, and conversations throughout 2020, 2021, and early-2022, Ms. O'Hara-Rusckowski agreed to partner with Fitzpatrick and Avodah on the "Lowell Home" project. In connection with this, Ms. O'Hara-Rusckowski helped Fitzpatrick and Avodah source a property and groups of religious sisters to staff this and other safe houses through her contacts, and donated $500,000 to Avodah for the project.

5.      However, Fitzpatrick's and Avodah's representations turned out to be a complete fabrication, as evidenced by their gross mismanagement and failure to contribute one cent to the Lowell Home project. This caused significant project delays and cost overruns, which Ms. O'Hara-Rusckowski was forced to correct at her own personal expense. Ms. O'Hara-Rusckowski and others asked Fitzpatrick and Avodah to step away from the project in November 2022, but they did not go away quietly, and thereby caused Ms. O'Hara-Rusckowski considerable additional expense. Ms. O'Hara-Rusckowski seeks these additional, otherwise avoidable costs as damages in this Counterclaim.

6.      Around the same time, even more troubling revelations about Fitzpatrick and Avodah also surfaced.

7.      **First**, the religious sisters who were to staff the Lowell Home informed Ms. O'Hara-Rusckowski in October 2022 that Fitzpatrick and Avodah mistreated them, including by forcing them to work extreme hours, failing to pay them for many months, moving them around the country against their will, and controlling their passports and visas. This suggested to Ms. O'Hara-Rusckowski that Fitzpatrick and Avodah may have been "labor trafficking" the sisters.

8.      **Second**, in late-January 2023, Ms. O'Hara-Rusckowski received a call from the Denver Archdiocese, who advised her that they had investigated and disavowed Avodah as a

Catholic ministry in August 2022, and that they were now investigating complaints that Fitzpatrick and Avodah were mistreating various groups of religious sisters.

9.    On February 3, 2023, the Denver Archdiocese issued a public letter communicating that it would not reconsider its August 2022 decision disavowing Avodah as a Catholic ministry, among other reasons, because they "began receiving complaints from the various groups of religious sisters that Avodah has trained and oversees in several cities. After inquiries by my staff, *we learned that these complaints are not isolated but systemic. Moreover, when Avodah was confronted with these issues, my staff was met with deception and excuses*." Denver Archdiocese, *An Open Letter Regarding the Catholic Identity of The Avodah Collective*, February 3, 2023 (*available* at [https://archden.org/an-open-letter-regarding-the-catholic-identity-of-the-avodah-collective/](https://archden.org/an-open-letter-regarding-the-catholic-identity-of-the-avodah-collective/) (last visited July 31, 2025) (the "February 3, 2023 Open Letter") (emphasis added).

10.    Upon information and belief, Fitzpatrick and Avodah threatened the religious sisters with deportation if they did not recant their complaints to the Denver Archdiocese and support Avodah in response to this letter.

11.    Upon information and belief, the U.S. Attorney's Office for the District of Massachusetts opened a criminal investigation into Fitzpatrick and Avodah as a result of these disturbing circumstances. Ms. O'Hara-Rusckowski has cooperated in this investigation as a witness.

12.    Fitzpatrick and Avodah—incorrectly—blame Ms. O'Hara-Rusckowski for initiating this investigation and their fall from grace within the Catholic faith-based and charitable community. Accordingly, they filed this outrageous lawsuit against Ms. O'Hara-Rusckowski. Beyond filing the lawsuit—which Ms. O'Hara-Rusckowski will successfully defend on the merits—they have misused and abused the legal process by disseminating the lawsuit to the

Denver Archdiocese, supporters of the Lowell Home project, the Catholic media, and presumably many others, in an effort to threaten, intimidate, discredit, and retaliate against Ms. O'Hara-Rusckowski. They also admit that they filed the lawsuit to publicly air their grievances against the non-party Denver Archdiocese. Ms. O'Hara-Rusckowski has suffered substantial financial, reputational, and personal harm from Fitzpatrick and Avodah's abuse of process.

13.     Through this Counterclaim, Ms. O'Hara-Rusckowski seeks substantial damages from Fitzpatrick and Avodah for (1) Fraud, (2) Negligent Misrepresentation, and (3) Abuse of Process.

## PARTIES

14.     Defendant/Counterclaim-Plaintiff Deborah O'Hara-Rusckowski is an individual who resides in Andover, Massachusetts.

15.     During times relevant to this Counterclaim, Ms. O'Hara-Rusckowski was a member of the Board of Councillors of the Order of Malta, American Association, U.S.A. ("Malta"), a Delegate and Special Advisor on Human Trafficking to the Ambassador for the Order of Malta at the United Nations, and a Board Member of Malteser International, a worldwide relief agency of the Order of Malta. Today Ms. O'Hara-Rusckowski continues to serve in her Special Advisor role, but not in the other roles. Indeed, due to the fraud and abuse of process perpetrated by the Fitzpatrick and Avodah, Malta has severed most of its ties with Ms. O'Hara Rusckowski and discontinued its human trafficking work.

16.     Upon information and belief, Plaintiff/Counterclaim Defendant Avodah Farms (a/k/a Avodah Farms, LLC and The Avodah Collective) (Avodah) is registered as a Colorado nonprofit organization with its principal place of business at 1130 E. Kenyon Ave., Englewood, Colorado.

17.     Avodah purports to be nonprofit organization that provides restorative care for women survivors of sex-trafficking and their children.

18.     Upon information and belief, Plaintiff/Counterclaim Defendant, Keenan Fitzpatrick is an individual residing in Englewood, Colorado.

19.     Fitzpatrick is the Executive Director of Avodah.

## JURISDICTION AND VENUE

20.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different States and the amount in controversy exceeds $75,000.

21.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the Counterclaim occurred in the District of Colorado.

22.     In addition, there is jurisdiction and venue because this Counterclaim arises out of the same facts and circumstances at issue in the Amended Complaint.

## FACTS

### A. Ms. O'Hara-Rusckowski Aspires to Open a Safe House for Human Trafficking Victims in Lowell, Massachusetts

23.     Ms. O'Hara-Rusckowski earned her bachelor's degree in nursing in 1982, and a master of business administration degree in 1994, both from Northeastern University. She worked as a critical care nurse for over 30 years. In 2014, she received her master's degree in theology from Boston College, with a focus on bioethics. Ms. O'Hara spent four years on the Board of Directors for the American Heart Association and five years on the Board of Boston's Healthcare of the Homeless Program.

24.     For many years, Ms. O'Hara-Rusckowski was involved with various Catholic faith-based and charitable organizations, with a particular focus on helping victims of human trafficking.

25.     As noted above, she was actively involved with the Order of Malta, a Catholic lay religious order that is focused today on providing humanitarian assistance to the most disadvantaged in society.

26.     In 2018, Ms. O'Hara-Rusckowski co-founded Global Strategic Operatives ("GSO"), a nonprofit organization affiliated with the Foundation United that trains healthcare providers worldwide to identify human trafficking victims and provide for their safety. To date, GSO has trained nearly 850,000 healthcare professionals to identify the signs and symptoms of sex trafficking, including at leading U.S. hospital organizations Baptist Health, Hackensack Meridian Health, Baylor Harris Health, RWJ Barabas Health, and Northwell Health, and around the world.

27.     Through her roles with GSO and as Special Advisor on Human Trafficking to the Ambassador for the Order of Malta at the United Nations, Ms. O'Hara-Rusckowski was acutely aware of the crisis of the shortage of "beds" and "safe homes" relative to providing safe places and services to victims of human trafficking.

28.     In 2019, it was reported that there were only 45 beds for trafficking victims in New England, where Ms. O'Hara-Rusckowski primarily resided, and not all of these were long-term beds. Many existing facilities were unable to house victims for more than 30 to 90 days, instead of the one to two years needed to help them recover and live normal lives. Victims placed in short term facilities are seven-times more likely to return to a life of trafficking. Moreover, beds for pregnant trafficking victims, or victims with small children, were practically non-existent.

29.     With the guidance of her professor at Boston College and her spiritual advisor, Father Terry O'Connell, O.M.I.—a priest with the Missionary Oblates of Mary Immaculate ("Oblates"), who served as the Rector of St. Joseph the Worker Shrine and Superior of the Andre

Garin District Community in Lowell, Massachusetts—Ms. O'Hara-Rusckowski became interested in developing a safe house for human trafficking victims at an underutilized church property in that community.

30.     In furtherance of this goal, Ms. O'Hara-Rusckowski began to work with her extensive Catholic faith-based and charitable networks and became acquainted with two men in early 2020: Father Jeff Bayhi, a genuine leader in this field; and Fitzpatrick, who said all the right things but turned out to be a fraud.

31.     Father Bayhi is a priest in the Archdiocese of Baton Rouge, Louisiana, who runs Metanoia Manor.

32.     Metanoia Manor is a safe house for human trafficking victims that utilizes the "Sister Care" model, where religious sisters live among victims in safe homes and provide them with long-term care.

33.     Father Bayhi brought the Sister Care model to the United States from Sister Eugenia Bonetti in Rome, Italy, and worked with Sister Bonetti to recruit sisters from Nigeria to Louisiana, train them, and open Metanoia Manor in 2018.

34.     Metanoia Manor proved that the Sister Care model worked, and Ms. O'Hara-Rusckowski sought to work with Father Bayhi and other likeminded Catholics to replicate it in Lowell.

35.     At the same time, Ms. O'Hara-Rusckowski began discussions with Father O'Connell and other Oblate priests in Lowell to identify a church property that could be redeveloped into a safe house.

B. **Ms. O'Hara-Rusckowski Partners with Fitzpatrick and Avodah to Develop the Lowell Home and Donates $500,000 to Avodah in Reliance on Their Representations**

36.    Fitzpatrick represented himself to Ms. O'Hara-Rusckowski as another seemingly likeminded Catholic and represented himself as passionate about helping victims of human trafficking.

37.    Fitzpatrick represented to Ms. O'Hara-Rusckowski that he and his wife operated a safe house for human trafficking victims in the Denver, Colorado, area through their nonprofit organization Avodah. He also represented that he and Avodah were involved with various other safe houses around the United States.

38.    Fitzpatrick represented that Avodah was a Catholic organization that worked closely with the Denver Archdiocese in furtherance of its mission.

39.    Fitzpatrick's representations regarding his and Avodah's Catholic identity and his representations concerning his Denver Archdiocese relationship were critical to Ms. O'Hara-Rusckowski, because these representations gave immediate credibility to Fitzpatrick, who she had only recently met, and Avodah, which was a newly organized nonprofit.

40.    Fitzpatrick also represented himself as an expert in acquiring and redeveloping church properties and impact investing. He represented that his business involved consulting with parishes to identify unused or underutilized church properties, raising funds from investors, deploying the funds to acquire properties and turn them into revenue generating Catholic mission-focused properties (such as student housing), some of which also supported non-revenue generating Catholic charitable purposes (such as health clinics), and providing the investors with below commercial market investment returns along with spiritual satisfaction. He referred to this as "impact investing."

41.    For example, in a March 26, 2020 email to Ms. O'Hara-Rusckowski and an Oblate priest, Fitzpatrick represented that:

> I have access to many developers across the country who would be the best on site partner for us. These developers in Boston, Texas California, etc, can all get a project built, but I am here to make sure it gets built with the best intentions for the Church and your community. The key is finding the component that makes this project Catholic and sustainable both spiritually and financially.

42.    Fitzpatrick represented that he had consulted with dozens of parishes on the disposition of church properties, led over $10 million of impact investment equity to pair with other financing sources, and that he had been involved in developing church properties into, among other things, Catholic-focused affordable housing, student housing, senior housing, health clinics, and mixed-use developments.

43.    He did so, among other times, in a May 4, 2020 email to Ms. O'Hara-Rusckowski and a potential donor, and in another email to Ms. O'Hara-Rusckowski on October 22, 2020, which both attached a brochure for his business Radix Consulting Group ("Radix"). According to Fitzpatrick, Radix was his private consulting firm that provided real estate consulting services to church parishes. This is how Fitzpatrick supposedly earned his living beyond his charitable work with Avodah.

44.    As another example, in a March 16, 2021 email, Fitzpatrick sent Ms. O'Hara-Rusckowski a background summary of Avodah that he hoped she would incorporate into her communications touting Avodah to her contacts in Catholic faith-based and charitable networks. This summary stated:

> Our Avodah Farms Denver site is currently underway with a $9M capital campaign to build three structures to provide restorative housing of 8-12 beds for women and their children who were sex trafficked.
>
> …

Avodah involved a [sic] impact lending team of individuals who brought 2.5M to the deal allowing us to receive a construction loan without any more equity. This team is ready to re invest with avodah into the next series of projects. Our first step to these projects is to complete our capital campaign.

One of the unique elements of this campaign is that we leveraged mission friendly investors to carry the heavy load and accomplish the project on an efficient timeline. Secondly, the campaign does not just cover the structures providing the above care for 8-12 women each year but also allows Avodah to use these proceeds to advance its mission to:

- Downtown Denver with 60 beds of Christian housing with 15 set aside for trafficked victims

- Boulder where 50 beds of Christian housing will be built along with 20 more beds for trafficked victims and a catholic women's health clinic serving 2000 patients a month with over 50 successful abortion pill reversals.

- Boston where another Catholic women's health clinic will be built alongside 8-12 beds for trafficked victims.

- Nebraska where a series of safe homes are being built with 2-4 sisters being placed to serve the women and children.

- Iowa where a safe home is being built with 2 sisters being placed to serve the women and children.

45.    And on June 22, 2021, in another example, Fitzpatrick again described himself and

Avodah to Ms. O'Hara-Rusckowski and another one of her contacts:

After spending 8 years in rescue and fundraising operations for anti sex trafficking, Keenan and Brianna Fitzpatrick founded a 501c3 called The AVODAH Collective in 2020 by acquiring land through impact investment to build its first location for its model restoration through creation. With great effort and funding being placed in rescue on a global and national scale there was a recognition to create space for these women to find long term and high level deep healing. AVODAH Collective creates space for trafficked women, young people and families to find restoration through the creative act of farming integrated with a life of teaching and prayer.

Two of the biggest obstacles in providing long term housing and care is real estate and staffing. On average 4-12 staff turnover every 4-8 months in shelters. AVODAH repurposes church assets to more efficiently scale and grow the safe home model by reusing old convents, rectories, seminaries etc. AVODAH solves the staffing issue by training orthodox religious sisters who live in the homes and care for the women with administrative and program Support coming from lay salaried staff or volunteers.

…

Phase two of the model is in progress in boulder Colorado with a 50 bed Aprtment [sic] building under development that will incorporate a Catholic women's health clinic and Christian female housing to build a healthy and safe environment for trafficking survivors who have graduated from the phase one location and are ready for independent housing. Continued support from a mental and physical health as well as a mentorship and healthy friendship allows the women to have a more lasting re-integration.

…

46.     Fitzpatrick and Avodah represented that, through their real estate development work, they had access to a network of real estate developers, real estate development professionals such as architects, engineers, and construction companies, investors, and donors.

47.     Fitzpatrick and Avodah represented that, through their impact investing work, they had the experience and expertise needed to shepherd the acquisition and development of an underutilized church property in Lowell into a safe house.

48.     Fitzpatrick and Avodah made these representations to Ms. O'Hara-Rusckowski individually and in the presence of others over and over again in 2020, 2021, and early-2022. He did so in telephone calls, virtual meetings, in person meetings, and in written communications. The above-referenced communications are only a small representative examples of these communications.

49.     Fitzpatrick and Avodah's representations about their safe house, real estate, and impact investing experience and connections referenced in paragraphs 37 to 48 were critical to Ms. O'Hara-Rusckowski's decision to work with him and later donate to Avodah.

50.     Fitzpatrick advised Ms. O'Hara-Rusckowski that opening a safe house is challenging work—something that is definitely true—and therefore recommended that she partner with him for the project, given his representations about his and Avodah's experience.

51.    Ms. O'Hara-Rusckowski relied upon Fitzpatrick's representations about his background, his purported real estate development and anti-human trafficking work, Avodah, and the excitement he conveyed about working with her on a safe house project.

52.    Accordingly, in reliance on the representations set forth in paragraphs 37 to 48 she agreed to partner with Fitzpatrick and Avodah on this critically important project.

53.    In furtherance of this partnership, beginning around spring 2020, Ms. O'Hara-Rusckowski introduced Fitzpatrick to influential members of her Catholic faith-based network. This included, but was not limited to:

a)    Father Bayhi, who began working with Fitzpatrick and Avodah to bring religious sisters from Nigeria to the United States in order to implement the sister care model through Avodah;

b)    Father O'Connell and other Oblate priests in Lowell, who began negotiating a Purchase and Sale Agreement ("PSA") and long-term lease with Avodah for a building known as the "Garin House"[2];

c)    Malta, who could donate to and assist Avodah with additional fundraising; and

d)    Other people and organizations who could support both Avodah's national Sister Care model project and the Lowell Home project, including the Tim Tebow Foundation, Foundation United, the Tippman Foundation, the Napa Institute, and many philanthropic-minded individuals in the Catholic community.

54.    With Ms. O'Hara-Rusckowski's endorsement, Fitzpatrick and Avodah began working with Father Bayhi to bring religious sisters to the United States. Ms. O'Hara-Rusckowski made the decision to endorse this endeavor on the condition that Fitzpatrick and Avodah would

---

[2] This property is referred to interchangeably in this Counterclaim as the "Garin House," the "Lowell Home," and "The O'Connell House." The Garin House is the name of the building. The Lowell Home is how Ms. O'Hara-Rusckowski, Fitzpatrick, and others referred to the safe house development project. The O'Connell House is the official name of the safe house that finally opened in September 2023. *See* https://theoconnellhouse.org/ (last visited July 31, 2025).

work with Catholic human trafficking organizations to utilize the sisters to support anti-human trafficking efforts.

55.    Fitzpatrick and Avodah also began working with the Oblates to negotiate a PSA and lease for the Garin House, and they supposedly began preparing to redevelop that property into a safe house then referred to as the "Lowell Home."

56.    Initially, Fitzpatrick included Ms. O'Hara-Rusckowski in some of his work and informed her about the work he represented he was doing.

57.    During this period, Fitzpatrick and Avodah represented to Ms. O'Hara-Rusckowski, among other things, that they: (1) were making progress securing initial internships followed by long-term placements for the sisters he proposed bringing to the United States; (2) were doing due diligence on the Garin House and developing a plan to redevelop it into a safe house; (3) would be able to raise more than $1.5 million from their network of impact investors to purchase the Garin House; and (4) would be able to raise hundreds of thousands of dollars of additional funds to redevelop the property and operate it as the Lowell Home.

58.    In reliance on all of the preceding representations, Ms. O'Hara-Rusckowski agreed to donate $500,000 to Avodah.

59.    Specifically, Ms. O'Hara-Rusckowski and her husband, Steven Rusckowski, established two $250,000 grants through Malta that were strictly earmarked and restricted as follows: (1) $100,000 to support Avodah's national Sister Care program (*i.e.*, to bring 24 sisters to the United States); (2) $160,000 to support four sisters in the Lowell Home for one year; and (3) $240,000 to staff the Lowell Home with three employees for one year.

60.    Fitzpatrick and Avodah agreed to these restrictions in accepting the grants.

61.     Ms. O'Hara-Rusckowski made her donation through Malta in an effort to generate excitement and encourage additional donations from Malta members and supporters. To be clear, however, the $500,000 was the Rusckowski's personal financial donation and it was intended only to fund Avodah as specified in the grants.

62.     Their strategy worked, as Malta raised an additional $250,000 to operate the Lowell Home and an additional $250,000 from the Malta-affiliated Flatley Foundation that was strictly earmarked and restricted for Garin House renovation and construction expenses (the "Flatley Grant").

63.     Ms. O'Hara-Rusckowski and Mr. Rusckowski funded the first $100,000 of their grants in November 2021 in order to jumpstart Avodah's efforts to bring the sisters to the United States. They did so in reliance on the preceding representations set forth in paragraphs 37 to 48 and 57.

64.     They then funded the $400,000 balance in February 2022.

65.     Before the February 2022 funding, Fitzpatrick and Avodah made a series of additional written representations in emails to Ms. O'Hara-Rusckowski, Mr. Rusckowski, and three senior members of Malta. The following communications are representative of, and certainly not the entirety of, the representations that Ms. O'Hara-Rusckowski relied on in deciding to donate this additional $400,000 to Avodah.

66.     On January 9, 2022, Fitzpatrick and Avodah sent Ms. O'Hara-Rusckowski, Mr. Rusckowski, and three senior members of Malta written materials that described Avodah and its Catholic mission, their current and long-term plan for the 24 sisters that Avodah brought to the United States in October 2021, their budget for supporting and employing the sisters, Avodah's

2020 Form 990, and an investor presentation for Fitzpatrick's supposed ongoing impact investment project in Boulder, Colorado (the "Boulder Impact Project").

67.    Fitzpatrick and Avodah represented that "Avodah had been working with Archbishop Aquila [of the Denver Archdiocese] in preparation for a home in Denver as well as sisters to be sent nationally."

68.    They represented that, in addition to the four sisters assigned to Avodah's Colorado safe house and the four sisters assigned to the Lowell Home, they were far along in negotiations with three different nonprofits "for one-to-three-year placements for the sisters. The contracts are expected to be completed by mid-January 2022."

69.    Ms. O'Hara-Rusckowski reasonably understood and believed these representations to mean that Fitzpatrick and Avodah had solid relationships with human trafficking organizations and a near-final plan to provide long-term, paying work for all 24 sisters that they brought to the United States in October 2021.

70.    This was critical because the sisters were the essential component of the Sister Care model, and their well-being, in addition to the well-being of the victims they served, was important to Ms. O'Hara-Rusckowski, as it would be to anyone.

71.    Fitzpatrick and Avodah represented the presentation for the Boulder Impact Project attached to their January 9, 2022 email as "our impact investment proposal for Boulder as there will be a similar one in place for Lowell." This document was an investor presentation for Fitzpatrick's purported ongoing multi-million dollar impact investment project to build Catholic student housing and a women's health clinic at University of Colorado, Boulder. In this group email, and in conversations with Ms. O'Hara-Rusckowski, Fitzpatrick represented that this was

his current project and a model for what he and Avodah were already working on to finance the

Lowell Home purchase.

72.    These representations about the Boulder Impact Project were critical because they

gave credibility to Fitzpatrick's and Avodah's purported ability to purchase and develop the Garin

House into the Lowell Home.

73.    In a January 11, 2022 email, Fitzpatrick and Avodah represented to Ms. O'Hara-

Rusckowski, Mr. Rusckowski, and three senior members of Malta:

    a)    Regarding "Fundraising," that "Avodah is blessed with a strong base of donors, including those who give on a monthly and one-time basis. We plan to continue efforts to raise additional money through donations and impact investing from those who support our mission."

    b)    Regarding the "Avodah Lowell Building," that "[w]e are still negotiating a potential purchase of the Garin House, and are ***currently working*** on heating repair work, painting, and other necessary renovations. We expect the purchase and sale agreement to go to Rome for approval over the next 60-90 days. During this timeframe, we will be able to enter the building to make improvements and prepare it for its future use as a home for women."

(Emphasis added.)

74.    The email attached two documents that represented:

    a)    "The funding for the purchase of the [Garin House] building is coming from a trusted group of impact investors seeking a 0-4% return on capital"; and

    b)    "The total budget to open the Lowell Avodah home is c. $2,350,000. Avodah Farms (the overarching non-profit) will put forward $1,500,000 of low-interest capital in order to secure the purchase of the Garin House. The remining $850,000 will be raised through other donations. An additional recently-donated gift of $250,000 is expected to be put toward necessary repairs for the house."

75.    Ms. O'Hara-Rusckowski reasonably understood these representations to mean that

Fitzpatrick and Avodah had specific investors and donors lined up to purchase the Garin House

and fund the Lowell Home development project.

76.    Fitzpatrick and Avodah also represented that, as a result of their ongoing due diligence and the fact that they were currently working at the building, they understood that the $250,000 Flatley Grant would cover the entirety of the Garin House redevelopment expenses, but that, if needed, Avodah would raise or provide additional funds to complete the project.

77.    In a January 13, 2022 email response to specific questions posed by Malta's president, Fitzpatrick and Avodah represented to Ms. O'Hara-Rusckowski, Mr. Rusckowski, and three senior members of Malta that "Avodah Farms specializes in access [sic] church real estate, bringing impact investors to accomplish safe home expansion, religious sister logistics and approvals, national networking with other programs."

78.    In this same response, they described Avodah Colorado's safe house. They clarified that the safe house had operated for only approximately one year and "cared for 1 woman and baby from [OMITTED[3]]." However, Fitzpatrick and Avodah represented that "[w]e will have 6 women and their babies starting in february [sic]" and "[l]ate January/early february [sic] is the goal for opening. We will open when 1M is committed, we are 90% through fundraising."

79.    Ms. O'Hara-Rusckowski reasonably understood and believed these representations to mean that Avodah operated a functioning safe house for human trafficking victims in Colorado and that they had the ability to do significant fundraising to support this project. This was critical because, in agreeing to work with Avodah and Fitzpatrick and donate $500,000 to Avodah, she was relying on Fitzpatrick and Avodah to open and operate two safe houses and to support various other partner sites around the United States with the Sister Care model. This was the entire purpose for the project and essential to the care of the human trafficking victims.

---

[3] The country is omitted in order to protect the victim's privacy.

80.    Based on these emails and their attachments, hundreds of similar emails, attachments, and text messages from Fitzpatrick and Avodah (including from Fitzpatrick and Chief Operating Officer Alexandra Tilton), and regular conversations with Fitzpatrick throughout 2020, 2021 and into early-2022, Ms. O'Hara-Ruschowski reasonably understood and believed that Fitzpatrick and Avodah had the financial wherewithal, the experience and expertise, and did the actual due diligence and leg work needed to budget and plan for the purchase and redevelopment of the Garin House into the Lowell Home.

81.    She further reasonably understood and believed that Fitzpatrick and Avodah had the experience and expertise needed to open and operate two safe houses for human trafficking victims and to support various other partner sites around the United States with the Sister Care model.

82.    Ms. O'Hara-Ruschowski donated $500,000 to Avodah—$100,000 in November 2021 and $400,000 in February 2022—in reasonable reliance on the aforementioned representations.

**C. Fitzpatrick's and Avodah's Representations Are Revealed to Be False As It Becomes Clear They Did Not Have the Ability or Resources To Develop the Lowell Home**

83.    In October 2021, Avodah brought 24 religious sisters from Nigeria to the United States for training and then supposed long-term employment providing the Sister Care model at Avodah's Colorado safe house, the Lowell Home, and at partner organization sites.

84.    These sisters came from The Sisters of St. Louis, Passionist Sisters of St. Paul of the Cross ("Lowell Passionist Sisters"), The Sisters of the Nativity, The Sisters of St. Michael the Archangel, and The Sisters of the Eucharistic Heart of Jesus ("EHJ Sisters"). Upon information and belief, months later Avodah later brought two Dominican sisters to the United States from the

Philippines (the "Dominican Sisters"). These groups of sisters are collectively referred to as the "Avodah Sisters."

85.    Ms. O'Hara-Rusckowski met the Avodah Sisters (except for the Dominican Sisters) during their October 2021 training at Metanoia Manor. She then maintained contact with the Lowell Passionist Sisters as they were placed at internships and other partner sites before they were ultimately to move into the Lowell Home.

86.    Also, on February 2, 2022, Lowell Sisters Building, LLC, an entity organized by Avodah, entered into a PSA to purchase the Garin House from the Oblates for $1.5 million along with a separate lease that allowed Avodah to access and begin redeveloping the property before closing.

87.    Unfortunately, the redevelopment efforts got off to a slow start after Avodah acquired the Garin House and Ms. O'Hara-Rusckowski fully funded her donation in February 2022.

88.    Ms. O'Hara-Rusckowski initially gave Fitzpatrick and Avodah the benefit of the doubt, and worked to assist them with the project.

89.    She supported and defended them for many months through spring and into summer 2022, even though nearly every other person involved with the project began raising red flags about Fitzpatrick and Avodah to Ms. O'Hara-Rusckowski.

90.    However, over the course of spring and summer 2022, it became clear to Ms. O'Hara-Rusckowski too that every material fact that Fitzpatrick and Avodah had represented to her was false.

91.    **First**, it was immediately apparent that the Garin House required major renovations before the City of Lowell would issue a Certificate of Occupancy and the property could be opened

as a safe house. Among other things, the fire sprinkler system had to be brought up to code, the elevator required significant repair, the building needed an outdoor terrace fence, and the HVAC unit required repair.

92.    It turned out that Fitzpatrick's and Avodah's $250,000 budget for the project and their proposed timeline to complete the repairs were completely insufficient.

93.    This establishes that Fitzpatrick and Avodah misrepresented that they did due diligence and planning for the project before February 2022, and, among other things, their January 11, 2022 statement that they "***are currently working*** on heating repair work, painting, and other necessary renovations" (emphasis added) was false. Fitzpatrick and Avodah would have known about the significant cost and scope of the renovations if they had been on site doing work as they represented.

94.    This also establishes that Fitzpatrick and Avodah misrepresented their background, experience, expertise, and contacts in real estate development. Any competent developer would have done adequate due diligence on the property, understood the actual cost and scope before signing a contract, and disclosed this to their partners like Ms. O'Hara-Rusckowski. But, contrary to their representations, Fitzpatrick and Avodah were totally incompetent.

95.    Accordingly, Fitzpatrick and Avodah also misrepresented their experience acquiring and redeveloping church properties and impact investing. Upon information and belief, Fitzpatrick and Avodah have never completed such a project and have never raised material funds from impact investors. In particular, they did not do so in connection with the Boulder Impact Project that they specifically touted to secure donations from Ms. O'Hara-Rusckowski and Malta. Upon information and belief, the Bolder Impact Project was not a real, viable project at all. If they

had such experience, Fitzpatrick and Avodah would have raised some funds and secured some investments for the Lowell Home project. But they never did.

96.    **Second**, Fitzpatrick and Avodah proved to be incapable of leading the Garin House redevelopment work. They made little progress renovating the Garin House in spring 2022, and had perpetual conflicts with engineers and contractors working on the building, the Oblates, and City of Lowell inspectors.

97.    Things became so bad with Fitzpatrick and Avodah that Ms. O'Hara-Rusckowski—who had zero real estate development experience—had to step in and work with these counterparties in an effort to move the project along.

98.    Ms. O'Hara-Rusckowski—and not Fitzpatrick and Avodah—did the meaningful work in spring and summer 2022 toward coordinating repairs of the elevator and HVAC, pushing Fitzpatrick and Avodah to schedule required inspections, coordinating with a youth ministry to clear debris from the property, hiring painters, and purchasing beds, securing donations of linens, ordering a stove, and coordinating the delivery of these items.

99.    In the summer of 2022, Ms. O'Hara-Rusckowski and Mr. Rusckowski spoke with the City Manager for the City of Lowell. He shockingly conveyed that Fitzpatrick and Avodah had threatened and isolated City of Lowell inspectors, managers, and fire department chiefs and deputy chiefs. Fitzpatrick also threatened a religious discrimination lawsuit against the City of Lowell when he did not get his way. By August 2022, the City of Lowell took the remarkable step of refusing to work with Fitzpatrick anymore.

100.    This establishes that Fitzpatrick and Avodah misrepresented their background, experience, expertise, and contacts in real estate development because any competent developer would have moved the project forward more productively and professionally than they did.

101.  **Third**, Fitzpatrick and Avodah failed to pay redevelopment costs on time and in full, which contributed to the delays and conflicts with the counterparties working on the project.

102.  Ms. O'Hara-Rusckowski repeatedly received calls from contractors and vendors complaining that Fitzpatrick and Avodah did not pay their bills.

103.  At one point, before the Flatley Grant for renovations was funded, Ms. O'Hara-Rusckowski was put in an untenable position of having to temporarily approve payments to counterparties and vendors from her grants that were earmarked and restricted for the Lowell Passionist Sisters and employees who would care for human trafficking victims at the Lowell Home.

104.  Even then, and after getting access to the Flatley Grant funds, Fitzpatrick and Avodah *still* failed to pay contractors and vendors.

105.  Fitzpatrick also boasted to Ms. O'Hara-Rusckowski that Avodah did not pay the Oblates under its lease for eight months.

106.  Fitzpatrick and Avodah never contributed one cent to the Lowell Home Project.

107.  This establishes that Fitzpatrick and Avodah misrepresented that they could secure donations and/or otherwise had the financial wherewithal to support the Lowell Home project.

108.  In particular, this establishes that Fitzpatrick and Avodah misrepresented on January 11, 2022 that they had specific investors and donors lined up to purchase the Garin House and fund the Lowell Home development project, which Ms. O'Hara-Rusckowski reasonably understood from their statements that: "Avodah is blessed with a strong base of donors, including those who give on a monthly and one-time basis. We plan to continue efforts to raise additional money through donations and impact investing from those who support our mission."; and "The

funding for the purchase of the [Garin House] building is coming from a trusted group of impact investors seeking a 0-4% return on capital."

109.    Upon information and belief, Fitzpatrick and Avodah misrepresented that they had a donor network at all, let alone an active donor network.

110.    Upon information and belief, Fitzpatrick and Avodah misrepresented that they had access to impact investors, including to investors who would ultimately fund the Garin House purchase under the PSA.

111.    If they had access to donors and impact investors, particularly those lined up to support the Lowell Home project, Fitzpatrick and Avodah would have been able to raise some funds and secure some investments for the project. But they never did.

112.    As a result, of the misrepresentations referenced in paragraphs 37-48, 57, 66-69, 71, 73-74, and 76-78, and the problems that materialized from these misrepresentations, Fitzpatrick and Avodah caused significant delays and cost overruns for the Lowell Home project.

113.    Ms. O'Hara-Rusckowski had to personally bear these additional costs out of her own pocket.

114.    **Fourth**, upon information and belief, Fitzpatrick and Avodah never actually operated a safe house for human trafficking victims in Colorado.

115.    Upon information and belief, only one victim of domestic violence—not human trafficking—and her child resided with Avodah in Colorado. While Ms. O'Hara-Rusckowski certainly does not diminish this, Fitzpatrick and Avodah misrepresented the victim's background and circumstances to further their fraud. Indeed, Ms. O'Hara-Rusckowski has since learned that Fitzpatrick and Avodah affirmatively solicited and raised donations in reliance on the victim's supposed background *after* they learned that she was not in fact a victim of human trafficking.

116.    Moreover, Avodah's Colorado "safe house" did not house "6 women and their babies starting in february" 2022, or any point thereafter, establishing that Fitzpatrick's and Avodah's January 13, 2022 representations about tangible plans to operate the safe house in earnest, and that they were "90% through fundraising" to do so, were false.

117.    If Fitzpatrick and Avodah had actually operated a safe house in Colorado, they would have been able to advance the non-property redevelopment components of the Lowell Home project, such as developing programming to care for future residents of the Lowell Home and training the Avodah Sisters. But they never did.

118.    **Fifth**, as a result of the troubling circumstances described herein, there is no question that Fitzpatrick and Avodah misrepresented that they had the ability and intention to place multiple groups of Avodah Sisters with partner organizations around the United States and replicate the Sister Care model to help victims of human trafficking.

119.    By October 2022, it was clear to Ms. O'Hara-Rusckowski that Fitzpatrick and Avodah could not manage the Lowell Home project. Although she was hoping to replace them with someone competent, she was still not looking to end their relationship together.

### D. Ms. O'Hara-Rusckowski Discovers That Fitzpatrick and Avodah May Be Labor Trafficking the Lowell Passionist Sisters

120.    This changed abruptly when Ms. O'Hara-Rusckowski discovered that Fitzpatrick and Avodah were mistreating and potentially labor trafficking the Lowell Passionist Sisters.

121.    The U.S. Department of Labor describes "labor trafficking":

Employers become human traffickers when they use force or physical threats, *psychological coercion*, abuse of the legal process, *fraud*, or *deception*, or *other coercive means* to compel someone to work and eliminate the individual's ability to leave. Examples of labor exploitation that are labor violations and clear signs of possible labor trafficking include:

• *Lack of control over earned wages*.

- Fraudulent recruitment practices that result in wages withheld to pay off debts to the employer.

- ***Unusual living conditions***.

- Workplace injuries.

- ***Movements restricted***.

- ***Passport and/or other identity documents taken***.

U.S. Department of Labor, *The Department of Labor's approach to human trafficking* (available at https://www.dol.gov/agencies/oasp/resources/trafficking/dols-approach (last visited on July 31, 2024) (emphasis added).

122.    Ms. O'Hara-Rusckowski is fully familiar with red flags for labor trafficking due to her extensive experience supporting victims of human trafficking.

123.    In October 2022, Ms. O'Hara-Rusckowski received a troubling late night call from one of the Lowell Passionist Sisters who was now staying at Avodah's Colorado property.

124.    On this call, the sister told Ms. O'Hara-Rusckowski that Fitzpatrick and Avodah soon planned to briefly send the Lowell Passionist Sisters to Lowell before splitting them up, sending two sisters to Atlanta, and sending two sisters to Montana for continued "internships."

125.    The sister told her that the Lowell Passionist Sisters had been working extreme hours, often from 9 a.m. to 2 a.m.

126.    The sister told her that the Lowell Passionist Sisters had been working for many months without pay.

127.    The sister also told her that the Lowell Passionist Sisters felt compelled to go along with Fitzpatrick and Avodah's plans for them because they controlled their passports and visas.

128.    Ms. O'Hara-Rusckowski later spoke with the Lowell Passionist Sisters' Mother Superior in Nigeria and confirmed that the sisters complained that Fitzpatrick and Avodah were

moving them around against their will and that Avodah did not pay the sisters salaries for 10 months, from October 2021 to August 2022.

129.    Ms. O'Hara-Rusckowski confronted Fitzpatrick regarding his treatment of the Lowell Passionist Sisters on various telephone calls, where Fitzpatrick sought to deflect blame and make excuses.

130.    Fitzpatrick accused the Lowell Passionist Sisters of acting like children and stated that they had to work out of obedience. As a result, he thought that they required more "training," and therefore did not need to be paid for their work.

131.    Ms. O'Hara-Rusckowski strongly disputed Fitzpatrick's contention. She knew the Lowell Passionist Sisters, and that they were college graduates, the lead sister had several masters degrees, and they all had been trained in anti-human trafficking and trauma informed care. It was outrageous and incredible for Fitzpatrick to blame the sisters for the way he had treated them.

132.    In one call, Ms. O'Hara Rusckowski insisted that Fitzpatrick provide the Lowell Passionist Sisters with their passports so they could travel from Colorado to Massachusetts.

133.    Ms. O'Hara-Rusckowski was gravely concerned that Fitzpatrick and Avodah were labor trafficking the sisters.

**E.  Ms. O'Hara-Rusckowski Terminates Her Relationship with Fitzpatrick and Avodah**

134.    On October 27, 2022, Ms. O'Hara-Rusckowski asked Fitzpatrick to come to Lowell on November 7, 2022 for "an urgent, extremely important, in person meeting." She advised Fitzpatrick that his recent communications suggested that "you do not understand the critical nature and crossing point we are at in our relationship. Steve [Rusckowski] and I are prayerfully discerning if we wish to continue to support you and AVODAH – with that we know comes many negative ramifications for you and this mission."

135.    Fitzpatrick responded that "I am aware of the severity of the issue at hand and desire to make every effort to move forward together."

136.    Ms. O'Hara-Rusckowski followed up this text message exchange with an email to Ms. Tilton, with copy to Fitzpatrick, stating that "[w]e have called for an urgent meeting regarding the future of the home on the afternoon … of November 7th at the Lowell house … . My husband will be in attendance, hopefully Malta leadership, and others. … You should decide, in addition to Keenan, who else from Avodah will attend—yourself? This will be a critically important meeting."

137.    Fitzpatrick responded: "Thank you for the invitation to be in attendance. We will, of course, be there with listening ears and receptive heart to maintain alignment towards the mission of rescue and rehabilitation of these women in Lowell."

138.    On November 7, 2022, Fitzpatrick and Ms. Tilton did attend a meeting at the Lowell Home as requested, with Ms. O'Hara-Rusckowski, Mr. Rusckowski, and some local volunteers.

139.    The Superior of the Lowell Passionist Sisters also attended the meeting. She asked to attend because the Passionist Sisters did not feel comfortable confronting Fitzpatrick on their own due to poor way he had treated them over the past few months and because he controlled the sisters' passports and visas.

140.    At this meeting, Ms. O'Hara-Rusckowski and the group confronted Fitzpatrick and Ms. Tilton about their mismanagement of the Lowell Home project, their treatment of the Lowell Passionist Sisters, and their lack of credibility with this group, their partner organizations, and the City of Lowell. They frankly asked Fitzpatrick and Avodah to walk away from the project and turn their focus to Avodah's mission in Colorado.

141.    Ms. O'Hara-Rusckowski then presented Fitzpatrick with a pre-drafted agreement providing that Avodah would relinquish control of the Garin House contracts and the sisters. Fitzpatrick and Avodah did not sign this agreement.

142.    Instead, **Ms. Tilton and Fitzpatrick** hand wrote a document that they and Avodah would be comfortable signing. This document, a memorandum of understanding, provided that:

> We agree to swiftly act toward accomplishing the below tasks in an effort to open a home for survivors of trafficking in Lowell, MA. …
>
> We also agree to maintain a spirit of good faith in all dealings related to the below tasks. …
>
> 1) Transfer of lease and/or PSA for home to another party without objection from Avodah.
>
> 2) Transfer funds unused for Lowell staff and the Passionist Sisters originating from the 2022 Malta grant to an account in the name of the Order of Malta.
>
> 3) Form an agreement with the management of the home to transfer training and supervision of the Passionist Sisters of St. Paul of the Cross so they may fulfill their mission of caring for survivors of the home.

(The "November 7 MOU").

143.    The November 7 MOU was signed by Fitzpatrick and Ms. Tilton on behalf of Avodah, Ms. O'Hara-Rusckowski, and Superior of the Lowell Passionist Sisters.

144.    Afterwards, the entire group ate pizza.

145.    Thereafter, Fitzpatrick and Avodah superficially began turning information over to Ms. O'Hara-Rusckowski and Malta regarding the Lowell Home project. They did not do so transparently or completely, but they did start the process.

146.    As part of this turnover, Malta asked Fitzpatrick and Avodah to account for their spending of Ms. O'Hara-Rusckowski's $500,000 grant donations and the $250,000 Flatley Grant. (Malta had not yet issued its $250,000 grant to Avodah.)

147.    Fitzpatrick and Avodah did provide some information, and they did ultimately return a portion of the unspent grant money, but they did so slowly, refused to provide bank statements at first, and never provided a complete set of bank statements justifying all expenditures.

148.    Malta's review found that Avodah did not spend the grant money consistently with its strictly earmarked and restricted purposes.

149.    Ms. O'Hara-Rusckowski and Mr. Rusckowski also closely reviewed the information that Avodah provided to Malta, and they observed that this information revealed inconsistencies, double counting, and improper expenditures. This included employee personal expenses, legal fees and engineering fees relating to the purchase and redevelopment of the Garin House, and operational costs that were not covered by the grants. These were always supposed to be Avodah's expenses as the Garin House's developer.

150.    As noted above, Ms. O'Hara-Rusckowski did temporarily approve payments to Lowell Home project counterparties and vendors from her grants and these payments were later reimbursed from the Flatley Grant. However, she only did so out of necessity in an effort to move a stalled project forward when Avodah failed to contribute any of its own money.

151.    Ms. O'Hara-Rusckowski's temporary concession only demonstrates that Fitzpatrick and Avodah mismanaged the Lowell Home project and Ms. O'Hara-Rusckowski's grant money, and that they materially misled Ms. O'Hara-Rusckowski about their experience, expertise, and financial wherewithal when soliciting her donation. Ms. O'Hara-Rusckowski had no choice but to use her grants in order to mitigate the real-time harm Fitzpatrick and Avodah were causing to the Lowell Home project.

152.    As a result of the foregoing, Ms. O'Hara-Rusckowski reasonably believed that Fitzpatrick and Avodah misused her $500,000 grant donations, including by misappropriating at least some of these funds for unapproved purposes.

**F.  The Denver Archdiocese Disavows Avodah as a Catholic Ministry, and the Federal Government Later Opens a Criminal Investigation into Fitzpatrick and Avodah**

153.    At the same time that their fraud and mistreatment of the Lowell Passionist Sisters was revealing itself in Lowell, and ***unbeknownst*** to Ms. O'Hara-Rusckowski, the Denver Archdiocese was investigating Avodah.

154.    Upon information and belief, the Denver Archdiocese commenced its investigation in spring 2022 after three whistleblowers came forward accusing Fitzpatrick and Avodah of spiritual manipulation, being a cult, and other failings.

155.    The Denver Archdiocese retained a private investigator to review Avodah's operations and held various meetings with Fitzpatrick and Ms. Tilton over many months.

156.    The investigation concluded on August 23, 2022, with the Denver Archdiocese issuing a letter communicating that Avodah could no longer call itself a Catholic ministry.

157.    Upon information and belief, both the Denver Archdiocese's investigation and the decision disavowing Avodah as a Catholic ministry were unprecedented.

158.    To be clear, Ms. O'Hara-Rusckowski had absolutely nothing to do with the Denver Archdiocese's investigation or decision.

159.    She did not even know about it. Indeed, Fitzpatrick and Avodah withheld this critical information from her as they were working together on the Lowell Home project. Ms. O'Hara-Rusckowski would have immediately terminated her relationship with Fitzpatrick and Avodah if she had been aware of these troubling circumstances.

160.    Ms. O'Hara-Rusckowski first learned about the Denver Archdiocese's investigation and decision on January 26, 2023, when the Denver Archdiocese contacted her as part of its continuing investigation after Avodah had asked for reconsideration of its prior decision.

161.    On February 3, 2023, Archbishop Aquila issued a public letter communicating that the Denver Archdiocese affirmed its decision disavowing Avodah as a Catholic ministry.

162.    His letter explained that, while reconsidering its initial decision, the Denver Archdiocese "began receiving complaints from the various groups of religious sisters that Avodah has trained and oversees in several cities. After inquiries by my staff, *we learned that these complaints are not isolated but systemic. Moreover, when Avodah was confronted with these issues, my staff was met with deception and excuses*." February 3, 2023 Open Letter.

163.    Due to this, the Denver Archdiocese "decided that the Catholic status of Avodah will not be restored and that further discussions will not be entertained." *Id.*

164.    Upon information and belief, Fitzpatrick and Avodah responded to the Denver Archdiocese's February 3, 2023 letter by threatening the Avodah Sisters with deportation if they did not recant their complaints to the Denver Archdiocese and support Avodah.

165.    Upon information and belief, the Denver Archdiocese contacted law enforcement and had the EHJ Sisters removed from Avodah's Colorado property on February 4, 2023 in response to these threats.

166.    In a February 6, 2023 letter, the Avodah Collective Board of Directors again threatened the Avodah Sisters with deportation if they did not publicly support Avodah:

> It is our hope to resolve these issues as expeditiously as possible. To this end, we would ask that by 10pm on Wednesday [February 8] you please respond to us with a letter stating your disagreement with these drastic accusations. Once we have heard from all superiors we will determine next steps aimed at allowing any and all sisters who wish to remain in this partnership to continue serving the women they have already impacted so much. ***Should you not feel that you wish to continue in***

***this partnership, Avodah will move forward with formally terminating the sisters'
employment with our organization. This would then also end their R1 visa, and
would necessitate that they return home immediately.*** We will continue to provide
the sisters with loving support during this process.

(Emphasis added.)

167.    In continuing response to these threats, the Denver Archdiocese sought to separate

all the Avodah Sisters from Avodah, find them safe places to live, ensure there were no immediate

negative consequences to their visa statuses, provide new long-term sponsors for their visas, and

find new long-term placements for them to care for victims of human trafficking.

168.    In furtherance of this, Archbishop Aquila sent a letter to Cardinal Sean O'Malley,

the Archbishop of Boston, on February 10, 2023, requesting that the Archdiocese of Boston accept

temporary transfer of the Lowell Passionist Sisters' visas. This letter explained that:

> [I]n late January 2023, more concerns came to light from the religious sisters who
> are overseen by Avodah, and we have now definitively determined that it cannot
> be considered a Catholic organization (Feb. 3, 2023, letter enclosed).
>
> ***The complaints we have received from the sisters include Avodah not sharing
> information with the superiors of the orders, manipulating what has been said by
> the sisters and members of my staff to achieve desired outcomes, having sisters
> travel for extended periods of time without respect for their communal religious
> life and exerting control over the sisters' spiritual schedule and their ability to
> communicate via phone.*** This list is not exhaustive and is a summary of the
> experiences of the four Nigerian religious communities. Every community did not
> necessarily experience all of these issues, but ***the manipulation and hiding of
> information, particularly about Avodah's loss of Catholic status in August 2022
> is universal***. ***Now, the leadership of Avodah has asked the sisters to retract their
> accusations or separate from Avodah and have their employment terminated,
> thus causing them to leave the country due to the change in their employment
> status***. In Denver, we have moved the Eucharistic Heart of Jesus Sisters to
> archdiocesan housing and secured temporary employment for them. It is my
> understanding that some of the sisters are housed in locations owned by Avodah
> and have cars titled to the organization as well.

(Emphasis added.)

169.    Ms. O'Hara-Rusckowski received a copy of this letter due to her involvement with

the Lowell Passionist Sisters who were then living in the Garin House.

170.    Upon information and belief, the U.S. Attorney's Office for the District of Massachusetts opened a criminal investigation into Fitzpatrick and Avodah as a result of these disturbing circumstances. In conjunction with the U.S. Attorney's Office, law enforcement officers from Homeland Security Investigations and the Department of Labor, Office of Inspector General, are actively investigating Fitzpatrick and Avodah's activities.

171.    Upon information and belief, the scope of this investigation includes the same topics addressed in this lawsuit, including Fitzpatrick and Avodah's treatment and suspected labor trafficking of Avodah Sisters, their purported work assisting human trafficking survivors, and their involvement in the Lowell Home project, among other topics.

172.    Ms. O'Hara-Rusckowski did not initiate this investigation, and nor could she. But she has cooperated with the investigation as requested by federal law enforcement officers and federal prosecutors, including by testifying under oath before a grand jury at the request of the U.S. Attorney's Office.

173.    Fitzpatrick and Avodah are aware of the criminal investigation, that Ms. O'Hara-Rusckowski is an important witness, and presumably that she has cooperated with the government. Indeed, they plead—incorrectly—in their Amended Complaint that Ms. O'Hara-Rusckowski is responsible for initiating the federal criminal investigation.

174.    Accordingly, Fitzpatrick and Avodah are using this lawsuit in a misguided attempt to threaten, intimidate, discredit, and retaliate against Ms. O'Hara-Rusckowski, as discussed further herein.

### G. Ms. O'Hara-Rusckowski Overcomes Fitzpatrick's and Avodah's Continuing Efforts to Destroy the Lowell Home Project and Opens The O'Connell House

175.    After the events of January and February 2023, Fitzpatrick and Avodah refused to "maintain a spirit of good faith" in connection with transferring the PSA and lease for the Garin Home to another party, notwithstanding their promises in the November 7 MOU.

176.    Instead, they doubled down by extending their lease with the Oblates so that Ms. O'Hara-Rusckowski could not take control of the project.

177.    As part of this duplicitous effort, in a March 30, 2023 letter, Fitzpatrick once again sought to leverage the Lowell Passionist Sisters, who found themselves in a precarious situation living in a building obstinately controlled by Avodah, with a renewed threat of deportation and a new threat of eviction:

> We have also continued to allow the sisters to reside in the home at [OMITTED[4]] in Lowell, as the home is under lease with Avodah and can serve the sisters' lodging needs under our duties as their R1 sponsors. ***Because you have elected to terminate any arrangement for the sisters' service with Avodah, including within the Lowell home, we have notified US Citizen and Immigration Services and will also terminate all other visa considerations, including their stay in the home***. Given the recent circumstances, we are pursuing alternative paths forward for the home to be used by a new group of partner organizations to serve survivors and are still open to discussions about your sisters partnering in this effort while remaining in the home under other visa sponsorship. ***If you do not wish to pursue this further, we would kindly request that the sisters' make plans to move out of the home by Saturday, April 22***. Please let us know if this is not sufficient time for them to make other arrangements.

178.    As a result, Ms. O'Hara-Rusckowski was forced to retain counsel, at her own personal expense, to protect the Lowell Passionist Sisters.

179.    At the same time, Ms. O'Hara-Rusckowski continued to lead and fund the Garin House redevelopment, identify a reliable partner organization to oversee the care for human

---

[4] The address of the Garin House is omitted to protect the privacy of people who currently reside at this safe house for victims of sex trafficking.

trafficking victims along with the Lowell Passionist Sisters, and do other work needed to fix Fitzpatrick's and Avodah's mess and overcome their continuing road blocks.

180.    For example, Ms. O'Hara-Rusckowski had to retain counsel, at her own personal expense, to communicate with the Oblates because they refused to speak with her and Mr. Rusckowski while under contract with Avodah. Counsel informed the Oblates about the November 7 MOU and the fact that Ms. O'Hara-Rusckowski, and not Avodah, was paying the Garin House's utilities and other bills. But the Oblates refused to engage with Ms. O'Hara-Rusckowski for many months until Avodah defaulted on the contract.

181.    In or about June 2023, following the default, Ms. O'Hara-Rusckowski and Mr. Rusckowski purchased the Garin House from the Oblates at their own personal expense.

182.    Months later, Ms. O'Hara-Rusckowski succeeded in opening The O'Connell House—named after the late Father Terry O'Connell, her spiritual advisor who proposed this project and introduced her to the Garin House.

183.    The O'Connell House formally opened on September 13, 2023, with a ribbon cutting by Cardinal O'Malley, and welcomed its first resident in January 2024.

184.    In total, Ms. O'Hara-Rusckowski has spent over $2 million of her own money to bring The O'Connell House to life.

185.    As a result of Fitzpatrick's and Avodah's fraud and negligent misrepresentation, Ms. O'Hara-Rusckowski was forced to incur hundreds of thousands of dollars of otherwise avoidable expenses. She seeks to recover these expenses as damages in this Counterclaim.

### H. Fitzpatrick and Avodah Use This Lawsuit to Threaten, Intimidate, Discredit, and Retaliate against Ms. Rusckowski, and For Other Ulterior Purposes

186.    Upon information and belief, Fitzpatrick and Avodah have a history of using litigation and threats of litigation to silence their critics.

187.    This includes threatening Mark Walsh and Dr. Julia Sadusky, the whistleblowers who reported Avodah to the Denver Archdiocese, with defamation lawsuits.

188.    Avodah has publicly named these private critics and touted its success silencing them on its website:

> The Avodah board of directors and the nonprofit's legal counsel issued a letter to both Dr. Sadusky and Mr. Walsh in the interest of stopping them from spreading lies about Keenan and the broader Avodah community. Mr. Walsh and Dr. Sadusky retained counsel to return a letter to Avodah which stated they had no basis or intent to diagnose Keenan with a personality disorder.

Avodahcollective.org, *March 20 Support Materials* (*available at* https://www.avodahcollective.org/march20support1 (last visited July 31, 2025).

189.    On January 25, 2024, Fitzpatrick and Avodah filed this action against Ms. O'Hara-Rusckowski, Malta, Order of Malta, Western Association, USA, and Order of Malta Worldwide Relief Malteser International Americas, Inc. ECF 1.

190.    Fitzpatrick and Avodah's First Amended Complaint (the "Complaint") against Ms. O'Hara-Rusckowski (ECF 72) is littered with false, uncredible, and inflammatory allegations against Ms. O'Hara-Rusckowski, some of which are already disproven by the exacting allegations in this Counterclaim and all of which will be disproven on the merits.

191.    Tellingly, Fitzpatrick and Avodah have filed various iterations of the complaint in this action, each version telling a very different, inconsistent story of what they imagine occurred.

192.    However, Ms. O'Hara-Rusckowski's abuse of process counterclaim is ***not*** about Fitzpatrick and Avodah filing the lawsuit and the Complaint's absurd content.

193.    Rather, this claim turns on the extra-judicial ways that Fitzpatrick and Avodah have used the lawsuit to threaten, intimidate, discredit, and retaliate against Ms. O'Hara-Rusckowski.

194.    They have also admittedly used the lawsuit as a vehicle to publicly air their grievances with the Denver Archdiocese.

195.    And they have used it in a misguided effort to denigrate Ms. O'Hara-Rusckowski, gain publicity, and try to improve their standing with Ms. O'Hara-Rusckowski's Catholic faith-based and charitable networks.

196.    As noted above, Fitzpatrick and Avodah are under federal criminal investigation.

197.    They are aware that Ms. O'Hara-Rusckowski is an important witness in the federal criminal investigation. Indeed, they plead—incorrectly—in their Complaint that Ms. O'Hara-Rusckowski is responsible for initiating the criminal investigation.

198.    They filed the lawsuit at the same time that the federal government's investigation was becoming active and, based on information and belief, the U.S. Attorney's Office was actively putting witnesses into the grand jury to testify.

199.    Also as noted above, Fitzpatrick and Avodah were investigated by the Denver Archdiocese and disavowed as a Catholic ministry.

200.    They are aware that Ms. O'Hara-Rusckowski was a witness in this ecclesiastical investigation. Indeed, they plead—incorrectly—in their Complaint that Ms. O'Hara-Rusckowski is responsible for the Denver Archdiocese's February 3, 2023 decision not to restore their Catholic status.

201.    Ms. O'Hara-Rusckowski first learned about this lawsuit from the Denver Archdiocese, who contacted her on January 25, 2024, shortly after Ms. Tilton sent Archbishop Aquila an email and letter disclosing the lawsuit.

202.    In this letter, Avodah describes the defamation lawsuit in the first paragraph and then spends the next five paragraphs criticizing the Denver Archdiocese's investigation, including their perceived "lack of due process."

203.    The letter states that:

In persevering with our ministry, we have only felt escalating repercussions from the accusations and the lack of due process of your [Archbishop Aquila's] office.

It is out of a desire for this due process that we have turned to our country's legal system in hopes that they may extend a channel for the truth to be exposed – an opportunity we were never afforded by the Archdiocese of Denver.

204.    Thus, Fitzpatrick and Avodah readily admit that they sued Ms. O'Hara-Rusckowski in order to publicly assert their grievances against the non-party Denver Archdiocese.

205.    Ms. O'Hara-Rusckowski next heard about the lawsuit from the Catholic News Agency, a well-known news organization in the Catholic community. Also on January 25, 2024, a reporter asked for comment on the lawsuit that she had not yet even had an opportunity to read.

206.    Catholic News Agency published an article the next day and it remains publicly available today. Catholic News Agency, *Catholic-founded Colorado charity sues Order of Malta groups, alleging defamation*, January 26, 2024 (available at https://www.catholicworldreport.com/2024/01/26/catholic-founded-colorado-charity-sues-order-of-malta-groups-alleging-defamation/ (last visited on July 31, 2025)).

207.    It is apparent that Fitzpatrick named Malta, Order of Malta, Western Association, USA, and Order of Malta Worldwide Relief Malteser International Americas, Inc. as defendants, and particularly the latter two organizations that they quickly dismissed as defendants, in an effort to make their lawsuit newsworthy.

208.    Fitzpatrick and Avodah also sent letters about the lawsuit to Father Bayhi, and a medical consultant and a technical advisor to the O'Connell Houe.

209.    These people are also witnesses to Fitzpatrick's and Avodah's criminal misconduct.

210.    Upon information and belief, Fitzpatrick and Avodah have widely disseminated communications about and copies of the lawsuit to people involved with the Lowell Home

project—many of whom are also likely witnesses in the federal criminal investigation—and other people in Ms. O'Hara-Rusckowski's Catholic faith-based and charitable networks.

211.    As a result of Fitzpatrick's and Avodah's improper use of this lawsuit, Ms. O'Hara-Rusckowski has suffered significant harm and damages, including, but not limited to: costs and legal fees to defend the lawsuit; loss of her time while participating in the defense of the lawsuit; loss of income, including the inability to obtain employment and positions in the field of helping victims of human trafficking; damage to The O'Connell House, including her ability to fundraise for the safe house; damage to GSO; Malta largely severing ties with Ms. O'Hara-Rusckowski and discontinuing its human trafficking program; the cancellation of her trip to meet the Pope to discuss the need for more human trafficking safe houses; damage to her reputation; and anxiety, humiliation, embarrassment, indignity, and public disgrace.

## CAUSES OF ACTION

### COUNT I – FRAUD

212.    Ms. O'Hara-Rusckowski repeats and re-alleges, as if set forth fully herein, the allegations contained in the preceding paragraphs.

213.    Fitzpatrick and Avodah made material misrepresentations of fact to and omitted material information from Ms. O'Hara-Rusckowski with the intention of causing Ms. O'Hara-Rusckowski to agree to partner with them on the Lowell Home project and to donate $500,000 to Avodah for this project.

214.    Fitzpatrick and Avodah represented to Ms. O'Hara-Rusckowski that they:

a)    Were experts in acquiring and redeveloping church properties, such that they had the experience, expertise, and contacts need to be able to successfully redevelop the Garin House into the Lowell Home (*see* paragraphs 40-47, 57, 66-69, 71, 73-74, and 77);

b)    Were experts in impact investing and fundraising, such that they had the financial wherewithal, including access to investors and donors, needed to

purchase the Garin House and redevelop into the Lowell Home (*see* paragraphs 40-47, 57, 66-69, 71, 74-74, and 77);

c)    Were doing due diligence on the Garin House and developing a plan and budget for redeveloping the property into the Lowell Home, and, in fact, were currently working on the property such that they had sufficient information to do so accurately (*see* paragraphs 57, 73, and 76);

d)    Operated a safe house for human trafficking victims in Colorado and were involved with other safe houses around the United States (*see* paragraphs 37, 44-45, and 77-78);

e)    Were a Catholic organization that worked closely with the Denver Archdiocese (*see* paragraphs 38, 44-45, and 77-78); and

f)    Had the ability and intention to operate a nationwide Sister Care model program, including that they were nearly finished securing contracts with long-term placements for the Avodah Sisters (*see* paragraphs 44-45, 57, and 77).

215.    In reasonable and justifiable reliance on these representations, Ms. O'Hara-Rusckowski invited Fitzpatrick and Avodah to partner with her on the Lowell Home project, including by:

a)    Introducing them to contacts in her Catholic faith-based and charitable networks, such that they could work with Father Bayhi to bring the Avodah Sisters to the United States to work for Avodah, enter the PSA and a lease for the Garin House, and access fundraising through Malta;

b)    Giving them the responsibility to lead the project redeveloping the Garin House into the Lowell Home; and

c)    Enabling them to enter arrangements with the Avodah Sisters and Catholic partner organizations, such that they could earn money and gain recognition for supposedly implementing the Sister Care model across the United States and helping victims of human trafficking.

216.    In reasonable and justifiable reliance on these representations, Ms. O'Hara-Rusckowski donated $500,000 to Avodah in accordance with two strictly earmarked and restricted Malta grants. She donated the money through Malta in order to encourage—successfully—additional fundraising for Avodah, but the $500,000 was her personal financial donation and it was intended only to fund Avodah as specified in the grants.

217.    Fitzpatrick's and Avodah's representations were material, because Ms. O'Hara-Rusckowski would not have invited them to participate in the Lowell Home project and lead the real estate development effort or donated $500,000 to Avodah if they did not represent themselves as worthy business, religious, and charitable partners.

218.    Fitzpatrick's and Avodah's representations were false and/or misleading because they omitted material information needed to make the representations truthful in context.

219.    Over the course of spring and summer 2022, it became clear that Fitzpatrick and Avodah had made misrepresentations and material omissions to Ms. O'Hara-Rusckowski.

220.    Fitzpatrick and Avodah misrepresented their experience, expertise, and financial wherewithal to lead a church property redevelopment project, as evidenced by to their utter failure to do their due diligence, plan for, fund, and competently and professionally manage the Lowell Home project.

221.    As a result of these misrepresentations materializing, Fitzpatrick and Avodah caused significant delays and cost overruns for the Lowell Home project, and thereby caused Ms. O'Hara-Rusckowski to incur significant out of pocket expenses to fix these problems.

222.    Fitzpatrick and Avodah misrepresented their experience, expertise, and intent to open the Lowell Home as a safe house for victims of sex trafficking, as evidenced by their failure to actually open and operate a safe house and Colorado and their apparent labor trafficking of the Avodah sisters.

223.    As a result of their misrepresentations materializing, Fitzpatrick and Avodah caused Ms. O'Hara-Rusckowski to incur significant out of pocket expenses to protect the Lowell Passionist Sisters from Fitzpatrick's and Avodah's apparent labor trafficking and threats of eviction from the Lowell Home and deportation.

224. Fitzpatrick and Avodah acted with scienter and knew that (or were reckless in not knowing that) their representations and omissions were false and misleading when made.

225. Fitzpatrick and Avodah had motive to commit fraud. By misleading Ms. O'Hara-Rusckowski, they could gain legitimacy and prestige with and earn money from Catholic faith-based and charitable organizations, and solicit her $500,000 donation.

226. Fitzpatrick and Avodah had an opportunity to commit fraud. Ms. O'Hara-Rusckowski trusted Fitzpatrick and Avodah, and she had no meaningful ability to vet their representations because she was not a member of Avodah, did not live in Colorado, and had no experience in real estate development.

227. Ms. O'Hara-Rusckowski sustained losses as a direct result of Fitzpatrick's and Avodah's misrepresentations and omissions. Her losses include the portion of her donation that Fitzpatrick and Avodah misused and misappropriated, and the significant out of pocket costs and legal fees she incurred to remedy the delays and cost overruns caused by their mismanagement of the Lowell Home project and to protect the Lowell Passionist Sisters.

228. As a result of Fitzpatrick's and Avodah's misrepresentations and omissions, Ms. O'Hara-Rusckowski has suffered losses in the amount of no less than $1 million to be determined at trial.

229. Ms. O'Hara-Rusckowski is also entitled to punitive damages because Fitzpatrick and Avodah acted in a malicious and wanton manner toward Ms. O'Hara-Rusckowski and the public, especially toward the Avodah Sisters who they mistreated and may have labor trafficked.

## COUNT II – NEGLIGENT MISREPRESENTATION

230. Ms. O'Hara-Rusckowski repeats and re-alleges, as if set forth fully herein, the allegations contained in the preceding paragraphs.

231.    Fitzpatrick and Avodah made negligent misrepresentations of fact to Ms. O'Hara-Rusckowski and thereby caused Ms. O'Hara-Rusckowski to agree to partner with them on the Lowell Home project and to donate $500,000 to Avodah for this project.

232.    Fitzpatrick and Avodah had a duty to Ms. O'Hara-Rusckowski to give correct information as a result of the parties' business relationship working together on the Lowell Home project. Indeed, Fitzpatrick and Avodah allege that they had a "joint venture and/or partnership to develop a survivor safe home and implement the Sister Care model at a survivor safe home in Massachusetts." Amended Complaint, ¶ 21.

233.    Fitzpatrick and Avodah represented to Ms. O'Hara-Rusckowski that they:

a)      Were experts in acquiring and redeveloping church properties, such that they had the experience, expertise, and contacts need to be able to successfully redevelop the Garin House into the Lowell Home (*see* paragraphs 40-47, 57, 66-69, 71, 73-74, and 77);

b)      Were experts in impact investing and fundraising, such that they had the financial wherewithal, including access to investors and donors, needed to purchase the Garin House and redevelop into the Lowell Home (*see* paragraphs 40-47, 57, 66-69, 71, 74-74, and 77);

c)      Were doing due diligence on the Garin House and developing a plan and budget for redeveloping the property into the Lowell Home, and, in fact, were currently working on the property such that they had sufficient information to do so accurately (*see* paragraphs 57, 73, and 76);

d)      Operated a safe house for human trafficking victims in Colorado and were involved with other safe houses around the United States (*see* paragraphs 37, 44-45, and 77-78);

e)      Were a Catholic organization that worked closely with the Denver Archdiocese (*see* paragraphs 38, 44-45, and 77-78); and

f)      Had the ability and intention to operate a nationwide Sister Care model program, including that they were nearly finished securing contracts with long-term placements for the Avodah Sisters (*see* paragraphs 44-45, 57, and 77).

234.    In reasonable and justifiable reliance on these representations, Ms. O'Hara-Rusckowski invited Fitzpatrick and Avodah to partner with her on the Lowell Home project, including by:

a)    Introducing them to contacts in her Catholic faith-based and charitable networks, such that they could work with Father Bayhi to bring the Avodah Sisters to the United States to work for Avodah, enter the PSA and a lease for the Garin House, and access fundraising through Malta;

b)    Giving them the responsibility to lead the project redeveloping the Garin House into the Lowell Home; and

c)    Enabling them to enter agreements with the Avodah Sisters and Catholic partner organizations, such that they could earn money and gain recognition for supposedly implementing the Sister Care model across the United States and helping victims of human trafficking.

235.    In reasonable and justifiable reliance on these representations, Ms. O'Hara-Rusckowski donated $500,000 to Avodah in accordance with two strictly earmarked and restricted Malta grants. She donated the money through Malta in order to encourage—successfully—additional fundraising for Avodah, but the $500,000 was her personal financial donation and it was intended only to fund Avodah as specified in the grants.

236.    Fitzpatrick and Avodah knew that, and intended for, Ms. O'Hara-Rusckowski to rely on their representations.

237.    Fitzpatrick's and Avodah's representations were material, because Ms. O'Hara-Rusckowski would not have invited them to participate in the Lowell Home project and lead the real estate development effort or donated $500,000 to Avodah if they did not represent themselves as worthy business, religious, and charitable partners.

238.    Fitzpatrick's and Avodah's representations were false and made without reasonable care.

239.    Over the course of spring and summer 2022, it became clear that Fitzpatrick and Avodah had made negligent misrepresentations to Ms. O'Hara-Rusckowski.

240.    Fitzpatrick and Avodah misrepresented their experience, expertise, and financial wherewithal to lead a church property redevelopment project, as evidenced by to their utter failure to do their due diligence, plan for, fund, and competently and professionally manage the Lowell Home project.

241.    As a result of these negligent misrepresentations materializing, Fitzpatrick and Avodah caused significant delays and cost overruns for the Lowell Home project, and thereby caused Ms. O'Hara-Rusckowski to incur significant out of pocket expenses to fix these problems.

242.    Fitzpatrick and Avodah misrepresented their experience, expertise, and intent to open the Lowell Home as a safe house for victims of sex trafficking, as evidenced by their failure to actually open and operate a safe house and Colorado and their apparent labor trafficking of the Avodah sisters.

243.    As a result of their negligent misrepresentations materializing, Fitzpatrick and Avodah caused Ms. O'Hara-Rusckowski to incur significant out of pocket expenses to protect the Lowell Passionist Sisters from Fitzpatrick's and Avodah's apparent labor trafficking and threats of eviction from the Lowell Home and deportation.

244.    Ms. O'Hara-Rusckowski sustained losses as a direct result of Fitzpatrick and Avodah's negligent misrepresentations. Her losses include the portion of her donation that Fitzpatrick and Avodah misused and misappropriated, and the significant out of pocket costs and legal fees she incurred to remedy the delays and cost overruns caused by their mismanagement of the Lowell Home project and to protect the Lowell Passionist Sisters.

245.    As a result of Fitzpatrick's and Avodah's negligent misrepresentations, Ms. O'Hara-Ruscowski has suffered losses in the amount of no less than $1 million to be determined at trial.

## COUNT III – ABUSE OF PROCESS

246.    Ms. O'Hara-Ruscowski repeats and re-alleges, as if set forth fully herein, the allegations contained in the preceding paragraphs.

247.    Fitzpatrick and Avodah had at least three ulterior purposes for filing this lawsuit against Ms. O'Hara-Ruscowski:

     a)    To threaten, intimidate, discredit, and retaliate against Ms. O'Hara-Ruscowski for acting as a witness against them in an active federal criminal investigation and in the Denver Archdiocese's now-complete ecclesiastical investigation;

     b)    To publicly air their grievances against the non-party Denver Archdiocese; and

     c)    To publicly denigrate Ms. O'Hara-Ruscowski and gain publicity and improve their standing with the Catholic faith-based and charitable communities to whom they disseminated the lawsuit.

248.    Fitzpatrick and Avodah have engaged in willful acts in the use of this lawsuit that are not proper in the regular conduct of a proceeding.

249.    **First**, Fitzpatrick and Avodah are the targets of an ongoing federal criminal investigation into their treatment and suspected labor trafficking of the Avodah Sisters, their purported work assisting human trafficking survivors, and their involvement in the Lowell Home project, among other topics.

250.    Fitzpatrick and Avodah are aware of the investigations, that Ms. O'Hara-Ruscowski is a key witness, and presumably that she has cooperated with the government. Indeed, they plead—incorrectly—in their Complaint that Ms. O'Hara-Ruscowski is responsible for initiating the criminal investigation.

251.     They filed the lawsuit at the same time that the federal government's investigation was becoming active and, based on information and belief, the U.S. Attorney's Office was actively putting witnesses into the grand jury to testify.

252.     Fitzpatrick and Avodah were also investigated by the Denver Archdiocese and disavowed as a Catholic ministry.

253.     They are aware that Ms. O'Hara-Rusckowski was a witness in this ecclesiastical investigation. Indeed, they plead—incorrectly—in their Complaint that Ms. O'Hara-Rusckowski is responsible for the Denver Archdiocese's February 3, 2023 decision not to restore their Catholic status.

254.     Fitzpatrick and Avodah filed this frivolous and outrageous lawsuit against a key witness during the height of an active criminal investigation.

255.     **Second**, Fitzpatrick and Avodah admit that they filed this lawsuit in order to air their grievances against the non-party Denver Archdiocese. They state that "it is out of a desire for this due process [that Fitzpatrick and Avodah perceive they did not receive from the Denver Archdiocese] that we have turned to our country's legal system in hopes that they may extend a channel for the truth to be exposed – an opportunity we were never afforded by the Archdiocese of Denver."

256.     **Third**, Fitzpatrick and Avodah immediately disseminated the lawsuit to Archbishop Aquila, the Catholic News Agency, and to Ms. O'Hara-Rusckowski's contacts who are also witnesses to their criminal misconduct.

257.     Upon information and belief, Fitzpatrick and Avodah have widely disseminated communications about and copies of the lawsuit to other people involved with the Lowell Home

project—many of whom are also likely witnesses in the federal government investigation—and other people in Ms. O'Hara-Rusckowski's Catholic faith-based and charitable networks.

258.    Ms. O'Hara-Rusckowski has been injured and damaged by Fitzpatrick's and Avodah's abuse of process, including, but not limited to: costs and legal fees to defend the lawsuit; loss of her time while participating in the defense of the lawsuit; loss of income, including the inability to obtain employment and positions in the field of helping victims of human trafficking; damage to The O'Connell House, including her ability to fundraise for the safe house; damage to GSO; Malta largely severing ties with Ms. O'Hara-Rusckowski and discontinuing its human trafficking program; the cancellation of her trip to meet the Pope to discuss the need for more human trafficking safe houses; damage to her reputation; and anxiety, humiliation, embarrassment, indignity, and public disgrace.

259.    Ms. O'Hara-Rusckowski has suffered losses in the amount of no less than $10 million to be determined at trial.

260.    Ms. O'Hara-Rusckowski is also entitled to punitive damages because Fitzpatrick and Avodah acted in a malicious and wanton manner toward Ms. O'Hara-Rusckowski and the public, especially toward the Avodah Sisters who they mistreated and may have labor trafficked.

## PRAYER FOR RELIEF

WHEREFORE, Ms. O'Hara-Rusckowski respectfully requests the entry of an Order by this Court as follows:

A.    Dismissing with prejudice all claims by Fitzpatrick and Avodah against Ms. O'Hara-Rusckowski;

B.    Denying Fitzpatrick's and Avodah's requested relief, including all damages (including economic and non-economic damages, and special damages), attorneys' fees and costs, and pre- and post-judgment interest;

C.    As to the First Counterclaim, a judgment in favor of Ms. O'Hara-Rusckowski against Fitzpatrick and Avodah and an award of damages in an amount to be determined at trial, punitive damages, and special damages.

D.    As to the Second Counterclaim, a judgment in favor of Ms. O'Hara-Rusckowski against Fitzpatrick and Avodah and an award of damages in an amount to be determined at trial;

E.    As to the Third Counterclaim, a judgment in favor of Ms. O'Hara-Rusckowski against Fitzpatrick and Avodah and an award of damages in an amount to be determined at trial, punitive damages, and special damages;

F.    Awarding Ms. O'Hara-Rusckowski her attorneys' fees and costs, including under Colorado's anti-SLAPP statute;

G.    Awarding Ms. O'Hara-Rusckowski pre- and post-judgment interest; and

H.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Ms. O'Hara-Rusckowski demands a jury for the trial of this action on all matters so triable.

Respectfully submitted,

COZEN O'CONNOR


By:    _/s/ Sarah Krissoff_
        Sarah Krissoff
        Matthew L. Elkin
        Cozen O'Connor
        3 WTC, 175 Greenwich St. 55th Floor
        New York, NY 10007
        (212) 509-9400
        skrissoff@cozen.com
        melkin@cozen.com

        Marci LeBranche
        Stimson LaBranche Hubbard LLC
        1652 Downing Street
        Denver, CO 80218
        labranche@slhlegal.com

        *Attorneys for Defendant/Counterclaim-
        Plaintiff Deborah O'Hara-Rusckowski*